# Exhibit 25

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| MEGAN COOK and SHEENA | ) |
| WILLIAMSON, | ) |
| Plaintiffs, | ) |
| vs. | ) No. 18-cv-4583 |
| COOK COUNTY RECORDER OF | ) |
| DEEDS OFFICE, and COOK | ) |
| COUNTY, | ) |
| Defendants. | ) |

The deposition of CAROLYN R. WILHIGHT, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Kari Wiedenhaupt, at 300 West Adams Street, Suite 330, Chicago, Illinois, on November 6, 2019, at the hour of 1:07 o'clock p.m.

Kari Wiedenhaupt
License No: 084-004725

**2**

```
 1   APPEARANCES:
 2       ED FOX & ASSOCIATES, by
 3       JACLYN N. DIAZ
 4       300 WEST ADAMS STREET
 5       SUITE 33
 6       CHICAGO, IL  60606
 7       (312) 345-8877
 8       jdiaz@efoxlaw.com
 9            Representing the Plaintiffs;
10
11   STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS,
12   by
13       COLLEEN HARVEY
14       MONA LAWTON
15       500 RICHARD J. DALEY CENTER
16       CHICAGO, IL  60602
17       (312) 603-6665
18       kathleen.ori@cookcountyil.gov
19       mona.lawtwon@cookcountyil.gov
20            Representing the Defendant.
21
22
23
24
```

**4**

```
 1         E X H I B I T S
 2   NUMBER                MARKED FOR ID
 3   WILHIGHT Deposition Exhibit
 4   No. 1                 26
 5   No. 2                 35
 6   No. 3                 38
 7   No. 4                 42
 8   No. 5                 45
 9   No. 6                 52
10   No. 7                 57
11   No. 8                 61
12   No. 9                 65
13   No. 10                67
14   No. 11                73
15   No. 12                76
16   No. 13                80
17   No. 14                83
18   No. 15                110
19   No. 16                114
20   No. 17                133
21   No. 18                143
22
23
24
```

**3**

```
 1           I N D E X
 2   WITNESS                      EXAMINATION
 3   CAROLYN WILHIGHT
 4     By JACLYN N. DIAZ            5
 5     By COLLEEN HARVEY          140
 6     By JACLYN N. DIAZ          148
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**5**

```
 1            (Whereupon, the witness was duly
 2            sworn.)
 3            CAROLYN R. WILHIGHT,
 4   having been first duly sworn, was examined and
 5   testified as follows:
 6            EXAMINATION
 7   BY MS. DIAZ:
 8       Q.    So good afternoon, Ms. Wilhight.
 9       A.    Okay.
10       Q.    Can you please state and spell your
11   name?
12       A.    Carolyn, C-A-R-O-L-Y-N, Wilhight,
13   W-I-L-H-I-G-H-T.  Do you need middle?
14       Q.    No.  That's fine.  And have you ever
15   given a deposition before?
16       A.    No.
17       Q.    And do you understand that today you
18   are under the same oath as you would be if you
19   were in a courtroom?
20       A.    Yes.
21       Q.    Okay.  And I am going to assume you
22   understand the questions that I ask, unless you
23   tell me that you don't understand them; is that
24   fair?
```

**6**

1    A.    Yes, uh-huh.
2    Q.    Okay.  And is there anything that
3 would prevent you from thinking clearly or
4 testifying truthfully today?
5    A.    Uh-uh.  No.
6    Q.    Okay.  And if at any time you need a
7 break during the deposition, please just let me
8 know.
9    A.    Okay.
10    Q.    So, Ms. Wilhight, did you do
11 anything to prepare for this deposition today?
12    A.    Met with State's Attorney to tell me
13 why I was coming.
14    Q.    I don't want to know about your
15 discussions with your counsel.
16    A.    All right.
17    Q.    But did you review any documents in
18 preparation?
19    A.    Did I review any documents?  I think
20 she had maybe a couple of them, a couple of docs.
21    Q.    Do you recall what the documents
22 were?
23    A.    A letter.  Oh, see, now you are
24 really testing my memory here.  It was a letter

**7**

1 that I had written for Sheena Wil- -- I can't of
2 her last -- Sheena, in order to do -- it
3 was either -- we used the term "cross-training" or
4 "temporary assignment".  We had that.  I believe
5 the job description, and I am going to say those
6 are the only two that stand out.
7    Q.    Okay.  So now I am going to ask you
8 a few questions about your background.
9    A.    Okay.
10    Q.    Where did you grow up?
11    A.    Gary, Indiana.
12    Q.    And did you go to high school in
13 Gary, Indiana?
14    A.    Yes, I did.
15    Q.    And what is your highest level of
16 education?
17    A.    I have a Bachelor's Degree in
18 Accounting.
19    Q.    And where did you obtain that
20 degree?
21    A.    Purdue University, West Lafayette,
22 Indiana.
23    Q.    And how are you currently employed?
24    A.    I am with the Cook County Clerk's

**8**

1 Office.
2    Q.    And how long have you been employed
3 there?
4    A.    Okay.  December 3rd, 2018.
5    Q.    And what's your title at the Clerk's
6 Office?
7    A.    Deputy Clerk, Real Estate and Tax
8 Services.
9    Q.    And what are your job duties?
10    A.    Okay.  So I manage the full
11 operations of the Real Estate and Tax Division.  I
12 also am the Clerk's Chief Finance Officer
13 reporting to her Chief, you know, the Chief of
14 Staff.  And so with that, I am over everything
15 that relates to accounting, reporting to the
16 comptroller, reporting to the County CFO,
17 reporting to anything that may come from our
18 external auditors.  All of that is included, along
19 with preparing the budget.
20          And then also working with our
21 Internal Director that reports to me that she
22 really manages a lot of the operations, but I
23 oversee part of that function.
24    Q.    Okay.

**9**

1    A.    Okay?
2    Q.    And who do you report to at the
3 Clerk's Office?
4    A.    Cedric Giles is my direct
5 supervisor.
6    Q.    Okay.  And who does he report to, if
7 you know?
8    A.    Karen Yarbrough.
9    Q.    And what is Cedric Giles' title at
10 the Clerk's Office, if you know?
11    A.    Chief of Staff.  I just call him
12 Chief.
13    Q.    Okay.
14    A.    It's terrible.  Sometimes you've got
15 to even look.
16    Q.    So now I am going to ask you about
17 your time at the Recorder of Deeds Office.
18    A.    Okay.
19    Q.    What was your title?
20    A.    Deputy Recorder, Finance.
21    Q.    And when did you start at the
22 Recorder of Deeds Office?
23    A.    March 2014.
24    Q.    Can you tell me a little bit about

10

1  your hiring process for the Recorder of Deeds
2  Office?
3      A.    I had completed a project for them
4  prior. So that's how I met them. From there,
5  they called me back, because the Deputy Clerk -- I
6  mean, Deputy Recorder of Finance position was
7  open. So she call me back for an interview.
8      Q.    Can you clarify who you mean by
9  "they"? So you said you did a review of the
10  project?
11      A.    It was -- oh, man. The legal
12  person, Chloe; Chief Giles; they had an HR person;
13  and the Clerk. So one of them, someone called me,
14  and I just remembered those four for the
15  interview.
16      Q.    And you are talking about the
17  current Clerk, right, so Karen Yarbrough?
18      A.    Yes, yes.
19      Q.    Okay. And what was the project you
20  completed for them?
21      A.    It was the financial review, because
22  they had just come into office. She had just come
23  into the Recorder's Office. So I was a part of an
24  outside consulting team.

11

1      Q.    And was that your first time meeting
2  any of those people?
3      A.    Yes. When I did the financial
4  review. Not at the interview.
5      Q.    Yes.
6      A.    Okay. I just want to make sure.
7  Okay.
8      Q.    Sorry.
9      A.    Okay.
10      Q.    And then what were your duties as
11  the Deputy Recorder of Finance?
12      A.    Same thing for the Clerk's Office.
13  Managing all of the accounting operations, the
14  budgeting, working with the comptroller, the CFO,
15  the County CFO, external auditors, all of that for
16  the accounting. I also had -- the purchasing
17  function as well reported to me or procurement.
18  You may call them purchasing or procurement.
19      Q.    And what exactly is the purchasing
20  function?
21      A.    That would -- that group would be
22  responsible for all orders, all supply orders, all
23  maintenance contracts, anything that we need to
24  purchase from internal -- or internal would be our

12

1  marketplace that we use. External would be if we
2  need something from an outside vendor, we would
3  manage that whole process.
4              Anything that we needed for the
5  full operation of the office from postage, paper,
6  you name it, we handled that, and then invoices,
7  accounts payable was under there, too.
8      Q.    Okay. And who did you report to?
9      A.    Chief Giles.
10      Q.    And then did Chief Giles report to
11  Karen Yarbrough?
12      A.    Yes.
13      Q.    Okay. And did anyone report to you?
14      A.    Yes.
15      Q.    Okay.
16      A.    I had the Accounting Department. I
17  also had the Purchasing Department. And I
18  forgot -- or not forgot to state. I had one other
19  division just temporarily. I had another division
20  that was called Database Management, that I had
21  them maybe for 18 months or something, and then
22  that shifted to the Operations Manager, Operations
23  Deputy.
24      Q.    And when you were overseeing the

13

1  database management, was that when you initially
2  started?
3      A.    Yes.
4      Q.    And that was for 18 months, you
5  said?
6      A.    About 18 months or so.
7      Q.    So you briefly discussed that part
8  of the your role was the budget?
9      A.    Okay. Yes.
10      Q.    Can you explain to me what that
11  means, how did you set the budget or --
12      A.    Okay. With the budget, it would be
13  working with Chief Giles, and, of course, Karen
14  Yarbrough, the Recorder. And we are looking at
15  and analyzing where we are for the year and where
16  they are projecting they want to be. And also
17  with that is working with the Budget Office, and
18  then also the system that we use that's called
19  Hyperion.
20      Q.    So when you mentioned the Budget
21  Office, is that part of the Recorder of Deeds or
22  is that --
23      A.    No. That's separate. That's
24  County.

14

```
 1      Q.    Okay.  And then I didn't catch --
 2  what's the program you said you work with?
 3      A.    Oh, it was called Hyperion.
 4      Q.    Hyperion?
 5      A.    Uh-huh.
 6      Q.    And what is that?
 7      A.    That's the system that we use to
 8  input all the data for -- related to the budget
 9  from your line item expenditures to anything that
10  relates to positions, capital planning.  All of
11  that goes into that main system.
12      Q.    Okay.  And do you recall who you
13  worked with at the Budget Office?
14      A.    Let me see.  I had two people.
15  Brenski Coleman, and then -- oh, three people.
16  And then it shifted to a Jimmy Rayan, and then
17  currently a Jeron Blan (phonetic), and you know
18  what?  I am taking you through my Clerk time.  So
19  Brenski and Jimmy would be at the Recorder's
20  Office.
21      Q.    And you still have communication
22  with Budget Office?
23      A.    Oh, yes.
24      Q.    In your duty as the Clerk?
```

15

```
 1      A.    Yes.
 2      Q.    Okay.  And what consulting firm did
 3  you work at prior to joining the Recorder of Deeds
 4  Office?
 5      A.    It was ICL, and I would be -- I
 6  can't even tell you what it means now.  It will --
 7  it will drop.  I can't even think of the acronym
 8  right now.
 9      Q.    That's fine.
10      A.    Okay.
11      Q.    And what was your title for ICL?
12      A.    Oh, just one of his consultants.
13  That's all.
14      Q.    How long did you work there?
15      A.    I didn't -- this was more or less
16  because I was on my own, and he can hire out.  So
17  because I am a CPA, I worked under him as, like,
18  my own private.  So I did probably three projects
19  under him.  It was about three.
20      Q.    And do you recall what you did
21  before you started working for ICL?
22      A.    Ah-huh.  I worked for myself, and
23  then I did outside consulting for taxes, auditing,
24  accounting for some non-for-profits, and then also
```

16

```
 1  I was hired as the CPA for a guy who had about six
 2  Jackson Hewitts.  So I was a CPA for him.
 3      Q.    Okay.
 4      A.    How much prior do you want to know?
 5      Q.    That was fine.
 6      A.    It was just -- okay.
 7      Q.    So I believe you previously
 8  testified to this, but your relationship with
 9  Karen Yarbrough then started -- do you remember
10  what time you or what year you had your consulting
11  project working for her?
12      A.    That was -- would be around, I want
13  to say, at least June.  It was the summer of 2013.
14      Q.    And that would be when your
15  relationship with Karen Yarbrough began?
16      A.    Yes.
17      Q.    Okay.  And do you have any
18  affiliation with the Proviso Township Democratic
19  Organization?
20      A.    I may help out every now and then.
21      Q.    And by help out, what do you mean?
22      A.    Because I am affiliated in my area
23  with some of the elected officials.  So whenever
24  help is needed with, we'll say boots on the
```

17

```
 1  ground, I may come and help out and do that.
 2      Q.    And do you have any affiliation with
 3  the Maywood United Party?
 4      A.    They are, like, kind of right there
 5  together.  So I would --
 6      Q.    Okay.
 7      A.    Yeah.
 8      Q.    And did you become involved through
 9  your work at the Recorder of Deeds and then the
10  Clerk's Office?
11      A.    With the Recorder of Deeds.
12      Q.    Are you familiar with the Cook
13  County Shakman Decree?
14      A.    Yes.
15      Q.    And how did you become familiar with
16  it?
17      A.    When I came in doing the financial
18  review --
19      Q.    Uh-huh.
20      A.    -- I was exposed to it at that time
21  by the person over me, who was Mr. James Hill.
22  It's his company, ICL.  So I got the full
23  background of what we were entering and how we had
24  to work with staff when we needed things.
```

5 (Pages 14 to 17)

18

1    Q.    And did you ever receive training on
2  Shakman compliance?
3    A.    Yes.  After I started working there.
4  When did we -- I can't tell you the date when we
5  did it, but we did.  We all had the manuals and
6  everything.
7    Q.    Would that be shortly after you
8  started working there, at the Recorder of Deeds
9  Office?
10    A.    I can't recall the time period, but
11  I know we all went through it.
12    Q.    Okay.  And was it a group training?
13    A.    We did group, a big group, and then
14  as some of her executives where we were reading
15  through so we could learn, so they could get me up
16  to speed.  I was like the last one in almost.
17    Q.    Okay.  And what does it mean to you
18  to be compliant with Shakman?
19    A.    Oh, that we are following through
20  the full Employment Plan, that we are not
21  deviating in any type of way.  And so we are
22  meeting all the requirements, and we are working
23  with the -- we call them the DOC.  Again, I can't
24  break down that name -- Director of Compliance.

19

1  Okay.  To ensure that any employment actions we
2  have to do, that we are involving that person.
3    Q.    And would that also be at the
4  Recorder -- or at the Clerk's Office?
5    A.    No.  Recorder's Office.
6    Q.    So do you know an Erica Sanchez or
7  formerly Erica Cuevas?
8    A.    Yes.
9    Q.    And how do you know her?
10    A.    Erica -- I met Erica at the Recorder
11  of Deeds Office.
12    Q.    When you were doing your project, or
13  when you started employment?
14    A.    Both.  I met her -- well, first I
15  was introduced to the whole office when we did the
16  project, because we would have to interact with
17  people for information or let them know we were on
18  site, or if I needed to speak to maybe the Chief
19  or to the Recorder, we would usually go through
20  Erica or Robin, who was the Recorder's
21  Administrative Assistant.  So that's how I, you
22  know, got to know them.
23    Q.    Okay.  And is Ms. Sanchez with you
24  at the Clerk's Office?

20

1    A.    Yes.  She is in the Vital Records
2  Department.
3    Q.    Okay.  Have you ever met
4  Ms. Sanchez's husband, Antonio?
5    A.    Yes.
6    Q.    And when did you meet him, if you
7  recall?
8    A.    I can't say when, but I have met
9  him.
10    Q.    On more than one occasion?
11    A.    Maybe on more than one occasion,
12  yes.
13    Q.    And during your time at the Recorder
14  of Deeds Office, did you ever learn that Karen
15  Yarbrough had a personal relationship with Erica
16  Sanchez?
17    A.    Later we went to a dinner, and it
18  was, "Oh, they knew each other."  But I don't
19  know, like, we know each other, like, you know, at
20  the barbecue.  I don't -- I don't know all that,
21  but I just knew they knew each other.
22    Q.    And where was this dinner, if you
23  recall?
24    A.    We had -- not a dinner.  It was an

21

1  outside event, and I am thinking it was our
2  Christmas or holiday time period.  Somewhere in
3  there.  I am just kind of recalling one of those.
4    Q.    And was it at the Recorder of Deeds
5  Office?
6    A.    No.
7    Q.    Or was it at somewhere --
8    A.    No.  Offsite.  We did something
9  downtown.
10    Q.    Do you recall where it was?
11    A.    That may come to me later.
12    Q.    Okay.  And have you ever been to
13  Mariella's Banquets?
14    A.    Yes.
15    Q.    Okay.  And do you know --
16    A.    It's in Maywood.
17    Q.    Do you know when you went to
18  Mariella's Banquets?
19    A.    Can we put that down as a question I
20  can come back to that I have to think about?
21    Q.    If you don't know, that's fine.
22    A.    Yeah.  I can't tell you, like,
23  exactly when, but I have been there.
24    Q.    Do you know why you were there?

6 (Pages 18 to 21)

22

1    A.   I had helped out for the school
2 board. I had some people that were running for
3 the school board at that time, and so the end of
4 the evening, we were meeting there to get the
5 voting numbers and all of that.
6    **Q.   And at any time did you learn that**
7 **Mariella's Banquets was owned or had relations**
8 **with Antonio Sanchez, Erica's husband?**
9    A.   Say that again?
10   **Q.   Sorry. At any time did you learn**
11 **the Sanchez's relationship to Mariella's Banquets?**
12   A.   Oh, yeah. I -- right there, yeah.
13 When I -- she -- they were announced that that
14 was -- I think when she announced, like, some of
15 the staff once, and then I found out that was
16 Erica's husband, yeah.
17   **Q.   Okay. And I know you said you don't**
18 **recall the dates you went to Mariella's Banquets,**
19 **but was it on more than one occasion?**
20   A.   I am going to say at least twice.
21 At least twice.
22   **Q.   And that was during your time at the**
23 **Recorder of Deeds Office, right?**
24   A.   Yes. I was thinking of the school

23

1 board time period elections. That would be 2015,
2 2017? Yeah. That's what I am thinking.
3    **Q.   Okay. And at those events, would**
4 **there be other Recorder of Deeds employees?**
5    A.   Yes.
6    **Q.   And do you recall specifically which**
7 **employees?**
8    A.   Let's see. I remember Erica. I
9 want to say Robin Staggers. Of course the Clerk,
10 and then I am thinking because one of our -- my
11 school board peers out there, and I am saying
12 school board peers, because I used to be on the
13 school board, and so anyone that's associated with
14 the school board, I say school board peers.
15   **Q.   Okay.**
16   A.   Brian Cross.
17   **Q.   And who is Brian Cross?**
18   A.   Brian Cross, he was on the school
19 board for Proviso, and he also worked at the
20 Recorder of Deeds Office.
21   **Q.   And if you know --**
22   A.   So I know that one.
23   **Q.   Do you know what his position was**
24 **with the Recorder of Deeds Office?**

24

1    A.   Veteran's Office. I can't give you
2 his title.
3    **Q.   Okay. So I am going to switch gears**
4 **and go back to a little bit about your job duties.**
5    A.   Okay.
6    **Q.   As the Deputy Recorder of Finance,**
7 **did you have any say in setting the salary of an**
8 **employee?**
9    A.   I would give suggestions based on
10 any research I did and also reaching out to the
11 County HR and also our budget.
12   **Q.   And when you say research, what**
13 **research would you do?**
14   A.   In terms of -- let me think. I was
15 trying to recall a position that we may have been
16 hiring for that you could just Google to say, what
17 is the rate for an IT person in information
18 technology? So I would do some research before,
19 if the suggestion came that, okay, we need to add
20 an additional person in IT.
21       So I would do some research also
22 reaching out to the County to ask, if we are going
23 to get a systems network person, what do you all
24 see as the average salary? And then talking with

25

1 our budget to really see where would that fit in
2 the budget also.
3       So that's why I would say I
4 would, you know, kind of do those things, and then
5 present it to the Chief to say, "Here is what I
6 found out, along with talking with our HR person
7 of what they found out", so we can make sure if we
8 are going to come up with a salary that -- and we
9 are looking for outside, that it's going to meet
10 and attract someone coming in from outside as
11 well.
12   **Q.   And who ultimately would have the**
13 **final say on what the salary would be?**
14   A.   That would be the Chief.
15   **Q.   And that's the Chief -- you mean**
16 **Cedric Giles?**
17   A.   Cedric, yes. Okay.
18   **Q.   But you would give Cedric**
19 **recommendations of what you think a salary should**
20 **be?**
21   A.   Yeah. So I usually would. I
22 usually would.
23   **Q.   Okay.**
24

26

1          (Whereupon, WILHIGHT Deposition
2      Exhibit No. 1 was marked for
3      identification.)
4  BY MS. DIAZ:
5      Q.    So Exhibit 1 is Bates stamped Cook
6  and Williamson 334, and it's Cook County Recorders
7  of Deeds Request to Hire.
8      A.    Uh-huh.
9      Q.    Are you familiar with this type of
10 document?
11     A.    Yes.
12     Q.    Okay.  And what's the purpose of a
13 Request to Hire?
14     A.    The Request to Hire is completed in
15 order for the County Budget the County HR -- at
16 that time, because they have now changed a whole
17 bunch, in order for them to put it into the system
18 to then put you as -- first, for budget to say,
19 yes, you have funds in your budget for this
20 position, and then for them to put it into the
21 payroll system and accept it.  Then, for them to
22 apply a PCID, all of this information, into the
23 system for every individual that comes into the
24 County.

27

1      Q.    So -- and what part of the hiring
2  process would this come in?  Would you have
3  already recommended a salary or --
4      A.    For?
5      Q.    Just in general.
6      A.    Okay.  In general, if we had talked
7  about it, and it was approached to me that
8  something was coming, I would say, "Okay.  Let's
9  take a look at it."  Because I am always looking
10 at that budget, you know.  Not -- we can't pull
11 numbers out of the air.  And say you want to offer
12 someone 90, and our budget guy is saying, "You
13 only have 50,000, you know, room for that."  So it
14 was, you know, talking and collaborating.
15     Q.    Okay.  And so this specific
16 document, that's dated May 8th, 2013.  And it
17 looks like that's for an Administrative Assistant
18 IV.  Do you see that?
19     A.    Uh-huh.
20     Q.    Okay.  And the annual salary is set
21 at 46,476?
22     A.    Yes.  Okay.
23     Q.    So do you have any idea how the
24 salary would -- the salary would be determined?

28

1      A.    For this or in general?
2      Q.    This.
3            MS. HARVEY:  I am going to object,
4  just because --
5  BY THE WITNESS:
6      A.    Because this, I don't --
7            MS. HARVEY:  Yeah.  Ms. Wilhight
8  wasn't even an employee at the Recorder of Deeds
9  Office at the time this one was.  Just --
10           MS. DIAZ:  I am asking with your --
11           MS. HARVEY:  To put that on the
12 record.
13 BY MS. DIAZ:
14     Q.    Sorry.  With your general knowledge
15 as the Deputy Recorder of Finance.
16     A.    Uh-huh.
17     Q.    So when it got to the point of
18 filling out a Request to Hire, how would the
19 annual salary be determined?
20     A.    Okay.  So in general, it would be,
21 what is in your budget book?  That's the guidance,
22 or we'll say that's the Bible for you.  What is
23 available in the budget book?  And also, the way
24 the budget books work or the budget works for the

29

1  entire County really is that any position, let's
2  say someone leaves it, you drop -- that position
3  drops down to what's called Step 1.
4            So whatever is available at that
5  Step 1, that is usually -- if there is no
6  additional room in the budget, that's what the
7  amount will be offered.
8      Q.    Okay.  And so you were briefly
9  talking about steps.
10     A.    Okay.
11     Q.    So I want to ask you, what exactly
12 is a step?
13     A.    Okay.  How do I describe that?  So
14 in the County for every position under a Grade 24,
15 there is -- and I think the range starts at 9,
16 Grade 9, and you have steps up to -- I think it
17 goes up to 9.  And so it's set by if you're -- if
18 you are in the union, that's your -- you are going
19 from, like, a particular grade and steps up to, I
20 think it's 9.  And it's described according to the
21 CBA.
22     Q.    Okay.
23     A.    Then, if you are outside of the
24 union, non-union, they also have a schedule for

30

1 that, and that's set, again, by the County, and
2 it's in the budget books for that. And the steps
3 can be higher, much higher than that.
4 **Q.    Okay.  And do the steps usually**
5 **start at a 1 when someone is initially hired?**
6     A.    Yes.
7 **Q.    Would there be any reason for an**
8 **individual to be hired at a different level?**
9     A.    Right.  It depends on the position
10 itself, and again, it's doing the research with
11 the County.  And they will work with you to say,
12 you know, the average is this, and we bring them
13 in at this.
14             But just budget itself, the
15 budget system, it will -- it is -- it will convert
16 everything to a Step 1, period.  When a position
17 is terminated -- let's say -- I'm not leaving, but
18 if I left, let's say, and if I was in the union,
19 it would take -- it would go from Grade 9, Step 1,
20 because of however it works.  It just works that
21 way.
22 **Q.    Okay.  And how are grades**
23 **determined?**
24     A.    Grades -- so you have the CBA, and

31

1 so that's really a lot that's set in that
2 contract.  And so according to the CBA, the union
3 has already stated certain positions are at a
4 certain grade.
5 **Q.    And what about for non-union**
6 **positions?**
7     A.    For non-union positions, that --
8 some of it is discussed with the County, the
9 County HR, to go through where do we believe this
10 position is?  The County has thousands of
11 positions out there, and they will tell you where
12 certain things start, a grade of this.
13             But it also is linked to this --
14 let's say this dollar amount.  Everything has to
15 link.  So let's say this dollar amount is going to
16 link to a grade and to a step.
17 **Q.    So would you say that grades and**
18 **steps are discretionary?**
19     A.    How do you say that's a loaded
20 question?
21 **Q.    Sorry.**
22     A.    Yeah.
23 **Q.    I can rephrase it, if you'd like.**
24     A.    Because it's so many -- you know,

32

1 you are dealing with so many parameters to set it.
2 So it's like, I just can't say, Oh, we are going
3 to do -- if you mean, I'm just going to do 60,000.
4 Everybody is looking at that 60,000.  You've got
5 to go to your budget.  Do I even have room for
6 that?
7             Then the budget is looking to
8 say, okay, the average for this position is this.
9 So you are kind of a little bit confined, if I can
10 use -- say that, you know, because you have these
11 outside parameters that impact that decision.
12 **Q.    Okay.**
13     A.    Does that help?  Okay.
14 **Q.    From my understanding of what you**
15 **were saying, though --**
16     A.    Okay.
17 **Q.    So I know you weren't around when**
18 **this specific position was decided, but would**
19 **there have been anything in the budget that would**
20 **have made -- that Administrative Assistant IV**
21 **could only come in at a Grade 18, or is that**
22 **discretionary?  Could it have come in at a Grade**
23 **19 or a Grade 20?**
24     A.    See, that's where I would take you

33

1 back to what's in the Shakman, what's listed
2 there, too.  Because in the Employment Plan, there
3 is a list of positions.  I'm not sure of the
4 grades that go with it, but I do recall the list
5 of positions, and I believe for the Executive
6 Admins, they are listed on that page.
7 **Q.    With the corresponding grade?**
8     A.    With the -- I can't recall if there
9 is a corresponding grade, but I know they are on
10 that list.  So I don't know if that, you know,
11 creates a factor and all of that, too.
12 **Q.    And what's the significance of this**
13 **list within the Employment Plan?**
14     A.    Oh, because that determines what --
15 at that time the Recorder could hire.  That's her
16 hiring list for those who would be exempt, and
17 exempt being -- because I always get this --
18 non-exempt -- do not have to go through the
19 normal, let's say, County hiring process.
20 **Q.    And what's the normal hiring**
21 **process?**
22     A.    How do you put it?  I'd have to pull
23 out the Employment Plan.  I would have to go
24 through the whole Employment Plan to --

34

1       Q.   So non-exempt positions.
2       A.   Non-exempt and exempt, and so I
3  don't want to get them mixed up, because it's --
4  how do I put it?  There is -- in the Employment
5  Plan, there is an exempt list.  And that would be,
6  I think -- okay.  This is a good way to explain
7  it.
8            At-will, that those who are
9  at-will -- or let's say -- I will use me as an
10 example.  I work for the Clerk at-will.  She
11 brought me in.  I did not have to go through --
12 let's see.  They didn't have to post the position,
13 if I can explain it that way, post the position
14 and then go through -- let's say in the Recorder
15 of Deeds it was a full detail process for hiring.
16           You post the position.  Then,
17 you get all the applications.  Then, they had to
18 vet the applications.  Then, from vetting the
19 applications, it went through randomization, a
20 bunch of steps, if I can say it that way, if you
21 have read the Employment Plan.  So that's what I
22 mean.  I didn't have to go through that.
23      Q.   Because you are exempt?
24      A.   Because I am exempt.

35

1       Q.   Okay.  And from your
2  understanding --
3       A.   Okay.
4       Q.   -- were Administrative Assistant IV
5  positions exempt?
6       A.   I believe they were exempt.
7       Q.   Which means they wouldn't have to go
8  through the long process of hiring?
9       A.   Yeah, I didn't think so.  Because
10 this was all before me.  I didn't have to hire
11 anyone, but --
12           (Whereupon, WILHIGHT Deposition
13            Exhibit No. 2 was marked for
14            identification.)
15 BY MS. DIAZ:
16      Q.   Okay.  So I am showing you Exhibit
17 2, which is Bates stamped Cook County 353.
18      A.   Okay.
19      Q.   And it's an Offer of Employment for
20 Sheena Williamson on -- and it's dated May 21st,
21 2013?
22           MS. HARVEY:  I'm also just going to
23 object for the record, because Ms. Wilhight was
24 not an employee at this time at the Recorder's

36

1  Office.
2  BY MS. DIAZ:
3       Q.   Okay.  And Ms. Wilhight, do you see
4  where it says that Ms. Williamson was hired as an
5  Executive Assistant to the Deputy Recorder, Grade
6  18?
7       A.   Uh-huh.
8       Q.   Okay.  And do you see where it says
9  her annual salary 46,476?
10      A.   Yes.
11      Q.   Okay.  And I understand that you
12 weren't around when this Offer of Employment was
13 sent out, but based on your knowledge as the
14 Deputy Recorder of Finance, would this offer
15 letter be based on that Request to Hire we just
16 previously discussed?
17      A.   Yes.
18      Q.   Okay.  And so that would be why her
19 annual salary was set at 46,476?
20      A.   Well, that would be -- I don't -- I
21 mean, why her -- no, no, no.  Okay.  How do I put
22 it?  Well, you asked -- repeat your question
23 again, because I want to make sure I interpret it
24 the right way.

37

1       Q.   Okay.  So the annual salary for
2  Sheena Williamson's offer of employment, which is
3  46,476, that was set based off this Request to
4  Hire, which set the salary?
5       A.   Okay.  Yeah.  So this was -- this
6  established the salary, and then this is the
7  confirmation that went to her.
8       Q.   Okay.
9       A.   So that would be a yes.
10      Q.   Okay.  And, in general, would a
11 Request to Hire happen before or after interviews
12 for the position?
13      A.   The Request to Hires, it usually
14 should be before.
15      Q.   Okay.
16      A.   In order to establish what do we
17 have available to even fill this spot.
18      Q.   Okay.
19      A.   So it should be before.  Then, you
20 will have one that will probably follow behind,
21 because then any additional information.  If you
22 have to give to the Budget Office -- you know, you
23 may do a redo or something.  That could happen.
24

10 (Pages 34 to 37)

38

1          (Whereupon, WILHIGHT Deposition
2          Exhibit No. 3 was marked for
3          identification.)
4    BY MS. DIAZ:
5          Q.    So Exhibit 3 is Bates stamped Cook
6    County 1258, and this document is dated
7    February 26th, 2013, and I understand that was
8    before you were employed at the Recorder of Deeds
9    Office.
10          And it appears that this
11    document is an Open Position Posting for
12    Administrative Assistant V, Grade 20.  Do you see
13    that?
14          A.    Uh-huh.
15          Q.    And so you were briefly talking
16    about how exempt employees, typically you didn't
17    have to post a job posting.  Do you remember that?
18          A.    That's what I was thinking from the
19    Employment Plan of everybody that is listed under
20    there for those positions.
21          Q.    Okay.  But this would be one of
22    those job postings that you were discussing
23    earlier?
24          A.    That's what I thought.

39

1          Q.    Okay.  And so if you look to the
2    middle of the document, it says, Executive
3    Assistant to Chief Deputy, Grade 20.  And then it
4    says the salary range is 56,172 through 90,218.
5    Do you see that?
6          A.    Yes.
7          Q.    And is it typical, in your general
8    experience, that job postings would have a salary
9    range?
10          A.    You could put a range.
11          Q.    Okay.  And in what circumstances
12    would you put a salary range?
13          A.    Let's say -- I am going to focus on
14    what I am doing now, where we are not definitely
15    confident on where we want to place that salary,
16    because we are looking at all the experience.
17          So let's say, for example, I am
18    looking -- you know, we are talking about an IT
19    position now.  We have a range in which we can
20    work with.  We know the max is here, but anything
21    below, you know, we could go that way, or we can
22    go to the max at this amount here, and that's it.
23          And so to attract the people so
24    that people just won't apply, you could put in the

40

1    range to see what you are going to get in terms of
2    potential talent.
3          Q.    And you are saying now.  So are you
4    referring to your time at the Clerk's Office?
5          A.    Yeah.  It's just we are working on a
6    couple of positions now that we are thinking
7    about.  So that's why I am going to say from that
8    experience.  What they did here, I can't attest
9    to.
10          Q.    So not this specific job posting.
11          A.    Uh-huh.
12          Q.    Would you ever have any -- would you
13    ever do any work with posting other open job
14    postings?
15          A.    With --
16          Q.    At the Recorder of Deeds Office?
17          A.    With the postings, that wasn't me.
18    That was the Human Resources persons.
19          Q.    And who would be the Human Resources
20    persons at your time at the Recorder of Deeds?
21          A.    It was Felix Babatunde, Erwin -- he
22    would get me if I couldn't remember his last name.
23          Q.    Would it be Erwin Acox?
24          A.    You got it.  Erwin, and then

41

1    Patricia, and that's it.  That's terrible to say.
2    My kids talk about me with the last names, but
3    Patricia.
4          Q.    So they would be responsible for
5    posting the open positions?
6          A.    Yes.
7          Q.    And so it would be within their
8    discretion to include a salary range or not?
9          A.    It would be whatever has been
10    finalized with them and the Chief.
11          Q.    The Chief being?
12          A.    Cedric Giles.
13          Q.    And this specific document looks
14    like it was signed by Karen Yarbrough?
15          A.    Okay.
16          Q.    Is it your understanding that Karen
17    Yarbrough would have to sign off on job postings?
18          A.    I don't recall.
19          Q.    Okay.  And then do you see back
20    through where you were originally looking where it
21    says a salary range, and then right after that it
22    says, "with appointment usually made at the first
23    entry step."  Do you see that?
24          A.    Uh-huh.

11 (Pages 38 to 41)

42

```
 1      Q.   And would that mean a Step 1?
 2      A.   Whatever the first entry step would
 3 be for this, for an Executive Assistant.
 4      Q.   So could it be --
 5      A.   So -- because this is not a union
 6 position, we would have to take a look at the full
 7 budget book to say where it would begin.
 8      Q.   But then --
 9      A.   Because this could be -- this 56 --
10 this 56 could be -- they are different numbers
11 when it comes to non-union.  So it may not be 1.
12 It could be 45, 55.  I don't know.
13      Q.   Okay.
14      A.   But I would say -- I would reflect
15 back on just the budget book, and you would have
16 to go by what is confirmed here in the budget
17 book, because that's where you have to match up.
18      Q.   So the steps directly correspond to
19 the salary?
20      A.   Yes.
21      Q.   Okay.
22      A.   Grade, salary -- I mean, grade,
23 step.
24      Q.   Okay.
```

43

```
 1      A.   Okay.  Could I interject?  Okay.
 2           MS. DIAZ:  Is this Exhibit 4 or 5?
 3           THE COURT REPORTER:  4.
 4           (Whereupon, WILHIGHT Deposition
 5            Exhibit No. 4 was marked for
 6            identification.)
 7 BY MS. DIAZ:
 8      Q.   So Exhibit 4 is Bates stamped Cook
 9 County 1262, and it's a Request to Hire, and the
10 date is February 26th, 2013.
11           So, again, I understand you
12 weren't here at this time.
13      A.   Uh-huh.
14      Q.   And it appears that this Request to
15 Hire is for the Executive Assistant to Chief
16 Deputy Recorder.  Do you see that?
17      A.   Yes.
18      Q.   Okay.  And that would be the same
19 position as the job posting we just looked at,
20 correct?
21      A.   Yeah, uh-huh.
22      Q.   Okay.  And on this Request to Hire,
23 it looks like the annual salary was set as 70,308.
24 Do you see that?
```

44

```
 1      A.   Okay.
 2      Q.   And so is it your understanding that
 3 that annual salary would have been based upon the
 4 salary range we just previously looked at on the
 5 job posting?
 6      A.   Between 56,172 to 90,218, yes.
 7      Q.   And do you have any idea whose --
 8 who would make the final determination of the
 9 annual salary?
10      A.   Between the Chief with the HR
11 person.
12      Q.   So they would both make that
13 decision?
14      A.   Together, along with working with
15 the Budget Group and the County HR.
16      Q.   Okay.  And in general, would the
17 person who hired the position have the discretion
18 to set an annual salary?  So if it wasn't the
19 Chief Deputy Director.
20      A.   If it was -- you mean if the
21 Purchasing Director wanted --
22      Q.   Uh-huh.
23      A.   No.
24      Q.   Okay.
```

45

```
 1      A.   No.  Everything --
 2      Q.   So it's always --
 3      A.   We followed the hierarchy.
 4      Q.   So the Chief Deputy --
 5      A.   With the HR.
 6           (Whereupon, WILHIGHT Deposition
 7            Exhibit No. 5 was marked for
 8            identification.)
 9 BY MS. DIAZ:
10      Q.   -- and the HR.  Okay.
11           So Exhibit 5 is Bates stamped
12 Cook County 1539, and it's dated June 8th, 2015.
13 Do you recognize this document?
14      A.   Yes.
15      Q.   And what is this document?
16      A.   This was a request for Sheena to go
17 on a temporary assignment to fulfill the spot of
18 Erica Sanchez while she was out on maternity
19 leave.  Oh, no, no, no.  Wrong one, this was --
20 oh, okay.  No, no, no.
21           This is where I needed her to
22 assist with some things in Accounting, and we had
23 to formalize any request.  So I had to formalize
24 this request.
```

12 (Pages 42 to 45)

46

1    Q.    Okay.
2    A.    Uh-huh.
3    Q.    And that's your signature at the
4 top?
5    A.    Yes, uh-huh.
6    Q.    Okay.  And do you recall -- do you
7 recall why you needed Sheena Williamson to be
8 assigned to the Accounting Department?
9    A.    Okay.  So Sheena worked for me, and
10 as budget, accounting, you name it, put the
11 spreadsheets together, you know, I needed
12 assistance to handle what we saw.  Refunds were
13 piling up, and then at that time, we were told
14 Nick was going to be leaving.
15          And so we have refunds piling
16 up, and so I wanted her to help try to work on
17 those things in the interim while we went through
18 the hiring process.  I was told I had to create a
19 formal temporary assignment document in order for
20 her to even help out, even though she worked for
21 me, and so that's why I -- I wrote it.
22    Q.    And so a couple questions.  Who told
23 you, you had to fill out a temporary assignment
24 document?

47

1    A.    We worked with Tom, our DOC.
2    Q.    And I think you previously
3 testified, DOC means Director of Compliance?
4    A.    Yes.
5    Q.    So Tom directed you to fill out a
6 temporary assignment?
7    A.    Right, that he -- yeah.  So any
8 employment actions I would go to -- my routine was
9 to go to Tom as our Director of Compliance for
10 direction.
11    Q.    Okay.  And you said that you needed
12 help because a Nick Macabenta was retiring?
13    A.    Yes.
14    Q.    And do you recall what Nick's formal
15 position was?
16    A.    He was in accounting.  I can't tell
17 you -- I can't recall his full title.
18    Q.    Okay.  And Sheena, you said, worked
19 for you, and do you remember what her full title
20 was?
21    A.    Executive Admin Assistant to Deputy
22 Recorder of Finance.
23    Q.    Okay.  And in this letter you have
24 some duties that you needed Gina to help you with?

48

1    A.    Uh-huh.
2    Q.    And so one of them is inputting of
3 daily collections into supporting Excel
4 spreadsheets.  Do you see that?
5    A.    Yes.
6    Q.    And what does that mean?
7    A.    That would be we had a couple of
8 staff that were required to put together, I will
9 say, the balancing for the day, and so that was
10 Nick's responsibility to put it into a main
11 spreadsheet.  Unfortunately, we didn't have a
12 wonderful accounting system that would normally do
13 that, so we did a lot of things manually, and so
14 that was a key piece that we need to make sure
15 that we kept up with on a daily basis so we could
16 balance.
17    Q.    Okay.  And would you have to have
18 knowledge of accounting to be able to do that?
19    A.    No.  This was just take what they
20 wrote here and enter it into the spreadsheet.
21    Q.    Okay.  And do you have any
22 recollection if Nick Macabenta had an accounting
23 degree or a finance background?
24    A.    I can't recall.

49

1    Q.    Okay.  And then what does daily cash
2 counting refer to?
3    A.    This would be in the absence of --
4 Nick was the backup for our two staff people, and
5 so -- because we were trying to always do
6 segregation of duties.  With a small staff, this
7 would be if she went down, and it was just make
8 sure you just gather the cash and gather any
9 checks, rubber band them together, tell us the
10 total, and then we will just send it out to the
11 bank for pickup.  So that was just to do a backup
12 of those staff.
13    Q.    Okay.  And then what about the
14 reconciliation of Imprest?
15    A.    The Imprest bank account, that's
16 just our petty cash.  The couple dollars that come
17 in and out, just balance it.
18    Q.    So these duties that you had listed,
19 was Sheena Williamson qualified to do them?
20    A.    Yes.
21    Q.    And how do you know she was
22 qualified?
23    A.    Based on conversations with Sheena,
24 her past background at the time, I felt that she

13 (Pages 46 to 49)

50

1  could do that, and then when we worked along
2  together on different things where I knew she
3  understand spreadsheets, she put together several
4  spreadsheets for me.  This should be just easy.
5      Q.    Okay.  And in this temporary
6  assignment, would Sheena Williamson still be
7  required to perform her administrative assistant
8  duties?
9      A.    Yes.
10     Q.    So this would be on top of her
11 administrative assistant duties?
12     A.    Yes, because this was backup.  You
13 know, if we needed her to do the backup for that,
14 but the other ones would be as time was available
15 so that we could make sure we kept things going.
16     Q.    So would her priority be her
17 administrative assistant?
18     A.    Duties, uh-huh.
19     Q.    And would Ms. Williamson have a pay
20 increase for this temporary assignment?
21     A.    No.
22     Q.    And why not?
23     A.    No pay increase.  That's all I could
24 say.  No pay increase.

51

1      Q.    But she was getting new duties to
2  perform from this temporary assignment?
3      A.    No pay increase.
4      Q.    Would you consider these different
5  duties than her duties as your Administrative
6  Executive Assistant?
7      A.    Let's see.  Somewhat.
8      Q.    And what do you mean by somewhat?
9      A.    Because her job description says
10 as -- duties as assigned.  So I could have
11 assigned her any duties.  So duties as assigned,
12 and so with this, this is formally writing down
13 duties as assigned.
14     Q.    Okay.  And at the bottom it looks
15 like you cc'd Cedric Giles, Ed Michalowski, Thomas
16 McMahon, Linda Batchelor and the RCA?
17     A.    Yes.
18     Q.    What's the RCA?
19     A.    Recorder's Compliance Administrator.
20     Q.    And why did you cc those
21 individuals?
22     A.    Basically, every employment action
23 document, they should be referenced and copied on.
24     Q.    Okay.  And was it up to Felix

52

1  Babatunde to grant this temporary assignment?
2      A.    For Felix, yes.
3      Q.    Okay.
4      A.    And he would talk, you know, like,
5  "Okay.  Make sure he understood."  And then we
6  would go from there.
7      Q.    Would talk to you or talk to who?
8      A.    You know, if he had questions.
9      Q.    Okay.
10     A.    He would come back and talk to me.
11     Q.    Do you remember in this specific
12 instance if you and Felix had any conversations
13 about this temporary assignment?
14     A.    I don't recall.
15         (Whereupon, WILHIGHT Deposition
16          Exhibit No. 6 was marked for
17          identification.)
18 BY MS. DIAZ:
19     Q.    Okay.  So Exhibit 6 is Bates stamped
20 Cook County 1395, and it appears to be an e-mail
21 from Matt Pryor.  And the e-mail appears to be
22 dated Tuesday, June 23rd, 2015.  Have you seen
23 this e-mail before?
24     A.    I don't recall.

53

1      Q.    Okay.  If you look at the heading of
2  the e-mail, it was sent to you; is that correct?
3      A.    Yes.
4      Q.    Okay.  And it's from a Matthew
5  Pryor?
6      A.    Yes.
7      Q.    Who was Matthew Pryor?
8      A.    He was part of the Compliance
9  Administration Team.
10     Q.    Okay.  And do you know what his role
11 was?
12     A.    All I can say is lead under
13 Cardelle.
14     Q.    Okay?
15     A.    Okay.
16     Q.    And the subject of this e-mail is
17 the Temporary Assignment of Sheena Williamson.
18     A.    Uh-huh.
19     Q.    So if you want to take a second, can
20 you please review the e-mail, and then let me know
21 when you are done?
22     A.    Okay.  Okay.
23     Q.    And so as far as Matthew Pryor goes,
24 did you have many interactions with him during

14 (Pages 50 to 53)

54

1  your daily job duties?
2      A.    I would say some, not many.  We
3  started out in meetings, and if he called to ask a
4  question, but he met with -- mainly HR.
5      Q.    Okay.  And what do you mean, you
6  started out in meetings?
7      A.    When the -- when Cardelle and the --
8  or let's -- it's the RCA Group -- that's what I am
9  used to calling them -- would have the meetings
10  with the executives, we would meet then, and that
11  may have been once a month, but then it started
12  digressing based on whatever was going on.
13      Q.    And you mentioned someone named
14  Cardelle.  Can you clarify who that is?
15      A.    Cardelle Spangler.
16      Q.    And who is Cardelle Spangler?
17      A.    She is over what is the RCA; like,
18  Cardelle, Matt, and then whoever else works with
19  them.  That's the best way I can describe it.
20      Q.    Do you know her title?
21      A.    No.
22      Q.    Okay.  And so back to this e-mail.
23      A.    Uh-huh.
24      Q.    Would it be a correct assumption to

55

1  say that this e-mail was in response to your
2  temporary assignment request of Sheena Williamson?
3      A.    Yes.
4      Q.    Okay.  And it appears that Matt
5  Pryor at the RCA had some questions for you about
6  the temporary assignment; is that correct?
7      A.    Yes.
8      Q.    Okay.  And do you recall why he had
9  questions about the temporary assignment?
10      A.    Based on what he is saying here, he
11  felt that it was outside of the competitive
12  process; such as, Executive Admin Assistants.
13      Q.    And what does that mean to be
14  outside the competitive process?
15      A.    That goes back to when I was trying
16  to describe the Employment Plan and whereas, there
17  is a set list of employees that don't have to go
18  through the -- what I was calling the standard
19  hiring process.  So that's what he's reflecting
20  upon here.
21      Q.    And Executive Assistants didn't have
22  to go through the competitive process; is that
23  correct?
24      A.    That was to my knowledge.

56

1      Q.    Okay.  And it appears that Matt
2  Pryor had some concerns about Sheena's
3  qualifications for the job; is that correct?
4      A.    Uh-huh.
5      Q.    And here it clarifies that the job
6  title would be the Director of Financial Control.
7  Is that the position that Sheena was to be
8  temporarily assigned to?  It's at the bottom of
9  the e-mail.  Sorry.
10      A.    We didn't assign her to the
11  position.  We assigned her to a variety of duties.
12      Q.    But that would be the position that
13  Nick Macabenta would be leaving; is that correct?
14      A.    Yes.
15      Q.    And the position, Director of
16  Financial Control, would that go through the
17  competitive hiring process?
18      A.    Yes.
19      Q.    Okay.
20      A.    Oh, no, no, no, no.  Competitive
21  hiring process?  No, no, no.  Not through the
22  competitive -- employees outside of a -- wait a
23  minute.  See, this is how he is describing it.  He
24  would go through the standard process, because he

57

1  was union, if I could say it that way.
2      Q.    The Director of Financial Control?
3      A.    Yeah.  Would go through the hiring
4  process required under the CBA that they would
5  have to go through.
6          (Whereupon, WILHIGHT Deposition
7           Exhibit No. 7 was marked for
8           identification.)
9  BY MS. DIAZ:
10      Q.    Okay.  So Exhibit 7 is Bates stamped
11  1394, and I want to draw your attention to the
12  first e-mail, which is the one on the bottom.  It
13  appears that -- sorry.  There is two e-mails on
14  this sheet.
15          So the one on the bottom is from
16  Felix Babatunde on June 23rd, 2015, at 4:08.  Do
17  you see what I am referring to?
18      A.    Okay.  Am I missing something?  Oh,
19  from Felix.  Date.  Okay.
20      Q.    So this would be Felix's response to
21  Matt Pryor's concerns with the temporary
22  assignment, correct?
23      A.    Okay.
24      Q.    And then the e-mail on top, if you

58

1 look, it's addressed from you. Do you see that?
2 A. Uh-huh.
3 Q. Do you recall sending this e-mail?
4 A. It says me.
5 Q. But do you have any --
6 A. But I don't -- this is 2015. I
7 don't recall.
8 Q. So you don't have any recollection?
9 A. Yeah.
10 Q. Okay. And do you see that the
11 e-mail -- who was the e-mail sent to?
12 A. Matt. To Matt and to me.
13 Q. So I am referring to the e-mail on
14 the top.
15 A. Oh.
16 Q. Which is from you. Sorry.
17 A. Okay. To Cedric, to the Chief, to
18 Ed and to James Gleffe, uh-huh.
19 Q. And in the e-mail you just
20 said, "FYI." Do you see that?
21 A. Okay, okay.
22 Q. And do you know why you would have
23 sent that specific e-mail to those individuals?
24 A. Why I sent it to those individuals?

59

1 I cannot recall for this e-mail.
2 Q. Okay. And would it be fair to say
3 that you were forwarding the e-mail chain with
4 Matthew Pryor?
5 A. For Cedric Giles and Jim Gleffe
6 overall were our -- what did they call them --
7 like, liaisons to the RCA. So messages, they were
8 supposed to be informed on things. So overall we
9 would send messages to them, but to say I sent
10 this one, I can't recall even the message, but on
11 average, everything should have gone through Chief
12 Giles, Chief Gleffe, because we're getting
13 messages from the RCA.
14 Q. So, generally, if you get a message
15 from the RCA, would you be expected to forward it
16 to Karen Yarbrough?
17 A. All of them. I would forward all of
18 them.
19 Q. Okay. And that would be any
20 instance where you had --
21 A. Unless, I am going to say, rules --
22 how would I put it? The Employment Plan -- we had
23 the Employment Plan. You needed to do this.
24 Then, you had the Employment Plan. You needed to

60

1 do this. Things shifted in between. So -- but I
2 am going to say, my overall position was to inform
3 all until they said, "Okay. We are not the ones.
4 You need to inform this person, or you need to
5 inform this person."
6 Q. Okay.
7 A. Because they were our RCA Liaisons.
8 Q. Cedric Giles and James Gleffe?
9 A. And so they would normally sit in
10 the meetings with the RCA. If I wasn't there, if
11 our peers weren't there, we made sure any issues,
12 any topics they were informed of.
13 Q. What about Edmund Michalowski?
14 A. Ed was our -- 2015, he was still
15 over HR.
16 Q. And would any of these individuals;
17 so Giles, Yarbrough, Michalowski or Gleffe, have
18 any role in the temporary assignment of
19 Ms. Williamson?
20 A. Anything -- I am going to go with
21 anything we would give to them to know what's
22 being discussed with the RCA, from that
23 standpoint.
24 Q. If the RCA was not involved, would

61

1 they have any role in temporarily assigning
2 Ms. Williamson to the position?
3 A. All operation matters we inform the
4 team.
5 (Whereupon, WILHIGHT Deposition
6 Exhibit No. 8 was marked for
7 identification.)
8 BY MS. DIAZ:
9 Q. Okay. So Exhibit 8 is Bates stamped
10 Cook County 1396. So this is another e-mail, and
11 I am referring to the top portion.
12 A. Okay.
13 Q. And it's -- do you recognize this
14 e-mail?
15 A. I am reading it.
16 Q. Do you remember this e-mail?
17 A. Yes.
18 Q. Okay. And is this e-mail your
19 response to Matt Pryor about the temporary
20 assignment of Sheena Williamson?
21 A. Yes, yes.
22 Q. And so were you addressing the
23 questions he had about the temporary assignment?
24 A. Giving my overall statement to him.

62

1    Q.    And what do you mean by overall
2  statement?
3    A.    He was challenging -- how do I want
4  to say it?  He was challenging and going back to
5  the Employment Plan and all of that.  That had
6  been, I would say, the big bottleneck where he
7  would say, "I don't agree with it.  It's not in
8  the Employment Plan."  My focus was, I've got to
9  get the job done.
10        You guys are working on the
11  Employment Plan, revising, updating.  I've still
12  got to get the job done, and so that's where I
13  said, I am going to hand this off to labor
14  counsel, because I didn't want to get -- I didn't
15  feel it was my position to get into the dialogue
16  of the Employment Plan that he is working out with
17  labor counsel and legal counsel.
18    Q.    Did you often challenge the RCA?
19    A.    If I disagreed with some of the
20  positions that they may have been taking on
21  things.  If I disagreed.
22    Q.    And to be compliant with Shakman,
23  were you supposed to follow their recommendations?
24    A.    Not necessarily if we -- if it was

63

1  out of what was operational duties, because they
2  didn't work there every day.  So it was, let's
3  dialogue.  I saw it as let's dialogue about it and
4  come to a mutual agreement.
5    Q.    Okay.  And did you frequently
6  disagree with their recommendations?
7    A.    I really can't answer that, because
8  if it was a question or something, we could talk
9  about it.
10    Q.    Okay.  But as far as this instance
11  goes, you said you --
12    A.    I -- right.
13    Q.    -- totally disagreed?
14    A.    I disagreed, yes.
15    Q.    And why did you disagree?
16    A.    Because we were -- he brought back
17  his feelings related to the Employment Plan and
18  how he didn't think it related to that, and I am
19  like, "I am just trying to get my job done."
20    Q.    So you felt the temporary assignment
21  was necessary for you to get the job done?
22    A.    Yes.
23    Q.    Okay.  And in the e-mail you are --
24  last line, it says, "Your position will impact our

64

1  reporting to the County, which is truly
2  unacceptable."  What did you mean by that?
3    A.    Okay.  We report to the County on a
4  monthly basis, and with revenue reporting you have
5  until the 15th to send your reports up to the
6  County Comptroller, who reports them to the CFO.
7        If you are not on time, your
8  name goes on the list that goes before the Board,
9  and it is announced, and I refuse to have the
10  work, you know, presented that way, that we are
11  not meeting our deadlines.  I respect the work
12  that I do.  I respect the Recorder at that time,
13  and her faith in me to get my job done with my
14  team.
15        So we did not ever want that to
16  happen, and that was also part of our performance
17  metrics, that we meet our deadlines.
18    Q.    Okay.  So because you disagreed with
19  the position that Matt Pryor was taking, did you
20  still temporarily assign Sheena Williamson to the
21  accounting position?
22    A.    No.  Because he said that, it's
23  like, I did things myself.
24    Q.    So she didn't take on the roles

65

1  then?
2    A.    No.
3    Q.    Okay.  And that -- was that because
4  the RCA had questions about --
5    A.    Questions and it's like, I've just
6  got to get the work done myself.
7    Q.    Okay.  And who was labor and legal
8  counsel?
9    A.    Ed Michalowski, and legal counsel
10  was Jim Gleffe.
11    Q.    And why did you feel it was a better
12  matter for them to handle than you?
13    A.    Because I knew that they were
14  working through the Employment Plan, and Jim and
15  the Chief at that time -- and again, the roles
16  were changing as who were the lead liaisons for
17  the RCA.  So I thought this was a matter of they
18  are challenging the book, you know, the Plan.
19        (Whereupon, WILHIGHT Deposition
20        Exhibit No. 9 was marked for
21        identification.)
22  BY MS. DIAZ:
23    Q.    Okay.  So Exhibit 9 is Bates stamped
24  Cook County 1398.  So take a chance to look over

17 (Pages 62 to 65)

66

1  this e-mail, and let me know when you have
2  finished.
3      A.   Uh-huh.
4      Q.   So this e-mail appears to be to
5  Felix Babatunde; is that correct?
6      A.   Yes, yes.
7      Q.   And you, again, reiterate that you
8  feel Matt's response was unacceptable, right?
9      A.   Uh-huh.
10     Q.   Do you recall why you had such
11 strong feelings about the RCA's recommendations?
12     A.   They are not strong.  They are just
13 stating it's unacceptable.
14     Q.   And your belief that it was
15 unacceptable was because you had a deadline; is
16 that correct?
17     A.   Deadlines, yes.
18     Q.   Okay.  And why would you be telling
19 Felix Babatune that you felt it was unacceptable?
20     A.   Felix was over HR.  So the temporary
21 assignment goes to Human Resources, and from my
22 knowledge of how things were set up back in 2015,
23 Felix would have to discuss things with the RCA,
24 and from there, you get your responses.  You --

67

1  they talk to the Director of Compliance.  It could
2  take time.
3      Q.   Okay.  And so you were mentioning
4  that certain positions were the liaison to the
5  RCA.  Were you not a liaison to the RCA?
6      A.   What I would mean by liaison, it was
7  discussed once that, you know, issues that may
8  come, to make sure that, say, Jim and the Chief
9  are aware, because they could also have meetings
10 with Cardelle and Matt, and so we didn't, you
11 know, want them to go in unaware.  So those were,
12 I would say, like the two leads with it.
13     Q.   But did you have a responsibility to
14 respond to the RCA if they asked you?
15     A.   Oh, yeah, if they asked me a
16 question.  They called.  Their staff would maybe
17 call.
18     Q.   Okay.  So as an executive, it was
19 your duty to --
20     A.   Period, anybody.  It was everybody.
21          (Whereupon, WILHIGHT Deposition
22           Exhibit No. 10 was marked for
23           identification.)
24

68

1  BY MS. DIAZ:
2      Q.   Okay.  So Exhibit 10 is Cook County
3  1400.  And so in the middle of the document, it
4  appears that it's an e-mail from Matt Pryor.  Do
5  you see that?
6      A.   Uh-huh.
7      Q.   So take a chance and look it over,
8  and let me know when you are done.
9      A.   Okay.
10     Q.   So this e-mail was addressed to you?
11     A.   Okay.
12     Q.   Correct?
13     A.   Uh-huh.
14     Q.   Okay.  And in the first paragraph
15 Matt says, "How one could find objectionable the
16 RCA's attempt to ensure that Ms. Williamson meets
17 the minimum qualifications for the position into
18 which she would be temporarily assigned is
19 unclear."
20          Was that what you found
21 objectionable, the -- that the RCA was attempting
22 to ensure that Ms. Williamson met the minimum
23 qualifications?
24     A.   I don't know what process he was

69

1  going through, but she worked for me.  So I
2  understood her skill set.  So I don't know how to
3  answer that question.
4      Q.   So your belief was that she was
5  minimally qualified?
6      A.   I did, right.
7      Q.   Even though she didn't go through a
8  competitive hiring process?
9      A.   I don't know how to answer that,
10 because I don't see how one really relates to the
11 other, but she was qualified.  That's all I could
12 say.
13     Q.   And you are basing that off of
14 your --
15     A.   Working with her from March 2014 up
16 until this date.
17     Q.   Okay.  And then -- so after this,
18 all these e-mails about the temporary assignment,
19 do you recall if Sheena Williamson was eventually
20 allowed to be assigned to the Accounting
21 Department?
22     A.   I cannot recall, but I know -- no.
23 Because she would have had to work with Linda and
24 all that.  No.  I don't recall.

70

```
 1     Q.   Okay.  And then did you have any
 2 issues with Matthew Pryor?
 3     A.   What do you mean by issues?
 4     Q.   Or did you have any bad feelings
 5 towards Matthew Pryor?
 6     A.   No.
 7     Q.   Okay.  And did you speak to Matthew
 8 Pryor about this incident after this e-mail chain,
 9 if you recall?
10     A.   I don't recall.
11         MS. DIAZ:  Okay.  Can we take a
12 break, if you guys are fine with that?
13         (Whereupon, a short break was
14            taken.)
15 BY MS. DIAZ:
16     Q.   So, Ms. Wilhight --
17     A.   Yes.
18     Q.   -- I wanted to now ask you about if
19 you remembered Sheena Williamson's request for a
20 salary increase?
21     A.   Yes.
22     Q.   Okay.  And did you have the ability
23 to increase her salary?
24     A.   I'd talked things over with the
```

71

```
 1 Chief and present things, and then I would use
 2 the -- we had so many books; the Employment Plan
 3 and the manual, to see if there is any
 4 justification for it.
 5     Q.   Okay.
 6     A.   And then I would make the decision
 7 from all of that.
 8     Q.   So you would be in charge of the
 9 ultimate decision whether or not to increase her
10 salary?
11     A.   Right.
12     Q.   Okay.  Did you meet with Sheena to
13 discuss a salary increase?
14     A.   Yes.
15     Q.   And do you recall who was at that
16 meeting?
17     A.   The RCA, the DOC, and I remember
18 those two.  I can't recall if we had an HR there.
19     Q.   And would the RCA be Matt Pryor?
20     A.   It could have been anyone on his
21 team.  I couldn't say who.
22     Q.   Okay.  And who else was -- made up
23 his team, if you know?
24     A.   Serah, and then -- I only met her
```

72

```
 1 once, and we would call a number, and she could
 2 either be on the phone.  It's another person that
 3 we -- that was during that time.  I can't remember
 4 her name.
 5     Q.   But you were sure the RCA was
 6 present at that meeting?
 7     A.   When we -- I presented my results to
 8 her, I believe they were.  They should have been.
 9     Q.   So was there more than one meeting?
10     A.   I can't recall.
11     Q.   Okay.  And then by the DOC, do you
12 mean the Director of Compliance?
13     A.   Yes.
14     Q.   Which would be Tom McMahon, correct?
15     A.   Yes.
16     Q.   Okay.  And do you recall if he was
17 at -- at both meetings?  Were there more than one
18 meeting?
19     A.   I remember the meeting where I
20 presented everything I had to write up to justify.
21 I recall that meeting.
22     Q.   Okay.  And that's to justify turning
23 down her salary increase?
24     A.   My decision.
```

73

```
 1     Q.   Okay.  Your ultimate decision was
 2 not to give her a salary increase?
 3     A.   Right.
 4     Q.   Okay.  And do you recall what you
 5 based your decision on?
 6     A.   Using the job description, the
 7 Employment Plan, and the plan -- Employment Plan
 8 and then our policy manual that states, okay,
 9 justifying for any re-classes, blah, blah, blah,
10 blah, blah, you need to make sure you go through
11 these things, along with the job description.  So
12 I used those as going through to make sure I did
13 my due diligence.
14     Q.   Okay.  I am going to show you an
15 e-mail.
16         (Whereupon, WILHIGHT Deposition
17            Exhibit No. 11 was marked for
18            identification.)
19 BY MS. DIAZ:
20     Q.   So Exhibit 11 is an e-mail Bates
21 stamped 1410, and it's -- do you recognize this
22 e-mail?
23     A.   It's been a while.  All I can say,
24 it's from me.  Okay.
```

19 (Pages 70 to 73)

74

1      Q.   So you would have written this
2 e-mail?
3      A.   Yes.
4      Q.   Okay.  And it's dated Monday, July
5 13th, 2015.  Do you see that?
6      A.   Okay.  Yes.
7      Q.   And in the e-mail it says -- or the
8 subject of the e-mail is, Request For Salary and
9 Job Responsibility Discussion Follow-Up?
10     A.   Uh-huh.
11     Q.   And it says that you were going to
12 review the paperwork submitted in the salary and
13 job responsibility discussion.  Do you see that?
14     A.   Yes.
15     Q.   Do you recall what paperwork Sheena
16 Williamson would have submitted to you?
17     A.   I don't recall.
18     Q.   Okay.  And so based on this e-mail,
19 there would have been an e-mail, or there would
20 have been a previous discussion to you issuing
21 your findings?
22     A.   Say that again?
23     Q.   So based on this e-mail, would
24 there -- it says, "the discussion."  Would there

75

1 have been a discussion prior to you issuing your
2 finding?
3          I can rephrase.  Okay.  So this
4 e-mail --
5      A.   Yes.
6      Q.   -- from my understanding, is in
7 response to a discussion you had with Sheena
8 Williamson about her salary and job
9 responsibility?
10     A.   Okay.
11     Q.   Is that what you understand this
12 e-mail to be?
13     A.   Yes.
14     Q.   Okay.  And you said you were going
15 to review the paperwork she submitted?
16     A.   Okay.
17     Q.   So this would have been prior to you
18 getting the decision to her?
19     A.   Yes.  Okay.
20     Q.   So that would mean that there would
21 have been more than one meeting based on her
22 salary and job responsibility?
23     A.   Probably so.  I can -- I don't
24 recall having --

76

1          MS. HARVEY:  I think you are
2 mischaracterizing her testimony there.
3          THE WITNESS:  Yeah, I'm like -- I'm
4 like -- I'm like --
5          MS. HARVEY:  That's --
6 BY MS. DIAZ:
7      Q.   Okay.  Does this e-mail that you
8 addressed to Sheena say that you were going to
9 review paperwork submitted in a discussion?
10     A.   Yes.
11     Q.   Okay.  And you said you hoped to
12 provide feedback or you -- "I hope to have
13 feedback from you by the end of the week or
14 sooner"; is that correct?
15     A.   Yes.
16     Q.   Okay.  And just to -- so this was
17 dated Monday, July 13th, 2015, correct?
18     A.   Uh-huh.
19          (Whereupon, WILHIGHT Deposition
20          Exhibit No. 12 was marked for
21          identification.)
22 BY MS. DIAZ:
23     Q.   So now I want to show you an e-mail.
24 So Exhibit 12 is an e-mail Bates stamped 1411.  So

77

1 this e-mail was from you; is that correct?
2      A.   Uh-huh.
3      Q.   And it was to Sheena Williamson?
4      A.   Okay.
5      Q.   And it was sent on Tuesday,
6 July 14th, 2015; is that correct?
7      A.   Yes.
8      Q.   Okay.  If you could just read
9 through the e-mail really fast and let me know
10 when you are -- or take your time.  Read through
11 the e-mail and let me know when you are done.
12     A.   Okay.
13     Q.   So this e-mail was sent the day
14 after the e-mail Bates stamped 1410 that we just
15 looked at, correct?
16     A.   Yes.
17     Q.   Okay.  And this e-mail -- in this
18 e-mail you are telling Sheena to no longer assist
19 in refund processing; is that correct?
20     A.   Yes.
21     Q.   Okay.  And do you know why you told
22 her to no longer participate in refund processing?
23     A.   Based on the reason here.
24     Q.   Which is?

78

```
 1      A.    "I am revisiting all duties,
 2 projects and responsibilities to ensure they align
 3 properly with your job description, as per your
 4 request."
 5      Q.    Okay.  So this would have been in
 6 response to her request for a salary increase?
 7      A.    I can't say, because I can't think
 8 back to July 15th, like what happened A, B, C and
 9 D.  Unfortunately, I can't.
10      Q.    Okay.  Do you have any recollection
11 of why you would be revisiting her duties,
12 projects and responsibilities to make sure they
13 align properly with her job description?
14      A.    I can't recall.
15      Q.    Was that something you did normally
16 in -- on a day-to-day basis or a week -- on any
17 basis, that you would go and revisit your
18 employees' duties, projects and responsibilities?
19      A.    I don't recall.  I can't say.
20      Q.    Okay.  And so refund processing,
21 would that -- can you explain to me what exactly
22 that is?
23      A.    Let's see.  Customers who overpay,
24 we would at the frontline counter issue to them a
```

79

```
 1 document that stated, "We owe you a refund,
 2 because of blah, blah, blah, blah, blah, blah,
 3 blah."  And in that we would just get stacks of
 4 them from the collections team that went down, and
 5 they would just stack them up.
 6           So from what I would recall, I
 7 would have her -- if she could just at least --
 8 let's say if we had 40 items in this big stack
 9 that's from B to A, let's try to put all of B of
10 A's together.  Let's put all of CitiBank's
11 together.  Let's try to put some organization to
12 it.
13      Q.    Okay.
14      A.    And then we would process the
15 refunds after that; meaning, we would cut checks,
16 blah, blah, blah.
17      Q.    So would refund processing be a job
18 duty that would have been part of her temporary
19 assignment in accounting?
20      A.    Or duties as assigned from me.
21      Q.    So your testimony is that refund
22 processing was part of her job description as an
23 Executive Assistant?
24      A.    Duties as assigned.
```

80

```
 1      Q.    I don't understand what that means.
 2      A.    If you have a copy of the job
 3 description, it says somewhere "duties as
 4 assigned".  So I could assign additional duties to
 5 her --
 6      Q.    Okay.
 7      A.    -- that aligns with what my job is.
 8      Q.    And you believe that refund
 9 processing were duties as assigned?
10      A.    Yes.
11      Q.    Okay.  And do you know how long she
12 was kept off of refund processing, based on this
13 e-mail?
14      A.    No.
15      Q.    Okay.  And I'm sorry.  I don't
16 recall if you testified as to why you -- strike
17 that.
18           (Whereupon, WILHIGHT Deposition
19            Exhibit No. 13 was marked for
20            identification.)
21 BY MS. DIAZ:
22      Q.    So Exhibit 13 is 747 through 748,
23 and have you seen this document before?
24      A.    Yes.
```

81

```
 1      Q.    And what is this document?
 2      A.    This is a document Sheena wrote up
 3 for justification of a job -- I mean, a salary
 4 increase.
 5      Q.    Okay.  And would you have reviewed
 6 this document?
 7      A.    Yes.
 8      Q.    And so if you turn to the first
 9 page.
10      A.    Uh-huh.
11      Q.    So it's -- Sheena listed her current
12 salary as $47,409.44.  Do you see that?
13      A.    Yes.
14      Q.    Okay.  And the first page, it's
15 titled, Job Responsibilities, correct?
16      A.    Uh-huh.
17      Q.    And then if you turn to the second
18 page, it says additional -- or Added
19 Responsibilities?
20      A.    Uh-huh.
21      Q.    So is it your understanding that
22 these were the responsibilities that Sheena felt
23 were outside of her job description?
24      A.    Repeat your question.
```

21 (Pages 78 to 81)

82

1      Q.    Is it your understanding that
2  this -- these added responsibilities were what
3  Sheena believed were outside of her job
4  description?
5      A.    Yes.
6      Q.    Okay.  And did you consider this
7  when you decided -- you made your ultimate
8  decision whether or not to increase her salary?
9      A.    Yes.  There was a write-up that I
10 did.
11     Q.    In response to --
12     A.    Uh-huh, in response.
13     Q.    Okay.  And so Added Responsibility
14 A, it says, "Assisting accounting in processing
15 refunds since September 2014, with exception of
16 the two months I was out on FMLA.  I have been
17 processing refunds for a total of seven months."
18 Do you see that?
19     A.    Yes.
20     Q.    So do you agree with Sheena's belief
21 that she had been processing refunds since
22 September of 2014?
23     A.    I can't recall any dates, particular
24 dates of starting.

83

1      Q.    Was processing refunds something
2  that Sheena did throughout her time working for
3  you?
4      A.    Yes.
5      Q.    Okay.
6      A.    Upon me asking, helping out.
7            (Whereupon, WILHIGHT Deposition
8            Exhibit No. 14 was marked for
9            identification.)
10 BY MS. DIAZ:
11     Q.    Okay.  And then -- well, I will show
12 you.
13           So Exhibit 14 is Bates stamped
14 335 through 338.  Do you recognize this document?
15     A.    Yes.
16     Q.    Okay.  Is this the document you were
17 referring to?  Is this your response to Sheena to
18 her salary increase?
19     A.    Yes.
20     Q.    Okay.  And this was addressed to
21 Sheena Williamson; is that correct?
22     A.    Yes.
23     Q.    And it was dated July 23rd, 2015?
24     A.    Yes.

84

1      Q.    Okay.  So it appears you went
2  through each of the added responsibilities that
3  Sheena mentioned?
4      A.    Yes.
5      Q.    Is that correct?
6      A.    Yes.
7      Q.    Okay.  And then you responded to
8  each of those added responsibilities?
9      A.    Yes.
10     Q.    Okay.  So if we start at Bullet A,
11 Assisting Accounting in Processing of Refunds, can
12 you briefly read that to yourself and let me know
13 when you are done?
14     A.    What?
15     Q.    Sorry.  So A, your Bullet A --
16     A.    Oh, okay.
17     Q.    Where you responded to her added
18 responsibility.
19     A.    Were these -- because I am
20 referencing numbers, and this is, like, A, B, C,
21 D.
22     Q.    I don't understand your question.
23     A.    No.  I just wanted to make sure I am
24 comparing apples to apples, because I am

85

1  referencing numbers here.  So what I do recall,
2  you know, job responsibilities, but I want to make
3  sure -- I am referring to your Duty Item No. 7,
4  Item No. 15.  These are A, B, C, D through
5  whatever, that this hasn't been changed or
6  anything?
7      Q.    So --
8      A.    I just want to make sure I'm doing
9  apples to apples.  So I don't want to say yes, I
10 have seen this, and I am talking numbers over in
11 my document, and this is saying letters.  That's
12 all.  I don't want to --
13     Q.    So I wouldn't know what you based
14 your letter off of.
15     A.    Oh, okay.  Right.
16     Q.    This would have --
17     A.    Okay.
18     Q.    From your testimony, this was the
19 letter from Sheena Williamson, and it was signed
20 by her.  And then you said this was your response?
21     A.    Right.  So I want to make sure --
22     Q.    I didn't alter any documents, if
23 that's what you're saying.
24     A.    No, no, no.  I -- because I know if

86

1 I say I saw this, and I am like, I remember a job
2 description, and she wrote it out. Here it has
3 letters and I am referencing numbers, and I don't
4 want it to be that I'm like, okay. I didn't lie
5 or anything or something like that. That's what I
6 want to make sure.
7    Q.   So I am just referring to your
8 response to Sheena.
9    A.   Okay.
10    Q.   So is it fair to assume that you
11 authored this --
12    A.   Yes, this is me.
13    Q.   This document?
14    A.   Uh-huh.
15    Q.   Okay. So that's what I am asking
16 you about.
17    A.   Okay.
18    Q.   It's a document you authored. Not
19 what Sheena authored.
20    A.   Okay. Yes.
21    Q.   Okay. So can you provide a further
22 explanation as to why you believed that assisting
23 in accounting in processing refunds was part of
24 Sheena Williamson's job description?

87

1    A.   Okay. As an Executive Assistant to
2 the Deputy Recorder of Finance, in which I cover
3 everything related to finance, that is the
4 expectation, as well as in the job description
5 where it says, "additional duties by management as
6 required", that I could give that responsibility.
7    Q.   So since Sheena Williamson was the
8 Executive Assistant to your position, which is the
9 Deputy Recorder of Finance, would any other
10 Executive Assistants have any duties within
11 accounting or finance?
12    A.   They didn't report to me.
13    Q.   So only because --
14    A.   No.
15    Q.   -- Sheena reported to you?
16    A.   Uh-huh.
17    Q.   Okay. And in this paragraph you
18 wrote that you -- towards the bottom it says, "You
19 were required to perform separating, grouping,
20 labeling and inputting of the refunds"?
21    A.   Uh-huh.
22    Q.   And you said it can be equated as
23 administrative duties. Do you see that?
24    A.   Uh-huh.

88

1    Q.   So your belief was that processing
2 refunds fell under the umbrella of administrative
3 duties; is that correct?
4    A.   Define what you mean by
5 administrative duties.
6    Q.   I am asking what you mean by
7 administrative duties.
8    A.   Okay. What I mean? How do I put
9 it? Filing is an administrative function. So
10 then separating, stacking, is more of like an
11 administrative, and then inputting is like an
12 administrative. You are not doing any
13 decisionmaking. You are not doing any analysis.
14    Q.   Okay. So processing refunds --
15    A.   If I can explain -- describe it that
16 way.
17    Q.   So processing refunds didn't involve
18 any independent analysis?
19    A.   No.
20    Q.   Okay. So then if you look to your
21 Heading B, acting as the Chief's Assistant. Do
22 you see what I am referring to?
23    A.   Yes.
24    Q.   Okay. And then No. 1, Bullet 1, or

89

1 (i) says, "On occasions you may be asked to do
2 double duty and assist both the Chief as well as
3 the Deputy Recorder-Finance"?
4    A.   Uh-huh.
5    Q.   So was Sheena required to do both
6 the Chief's administrative duties, as well as your
7 administrative duties?
8    A.   Yes.
9    Q.   And why was that?
10    A.   How would I describe that? Duties
11 as assigned.
12    Q.   But from my understanding, she was
13 assigned to you as the Deputy Recorder of Finance
14 and not the Chief Deputy?
15    A.   However, she worked for the Cook
16 County Recorder of Deeds Office. So it says
17 "duties as assigned". So in terms I could talk --
18 how do I explain it? I don't know how to explain
19 it, to say the Chief and the Clerk can ask any
20 staff person, because you work for the Cook County
21 Recorder of Deeds. You are not just limited to --
22 I mean, I don't know how to explain it. I don't
23 know. I really don't know how to explain that.
24    Q.   So did you use the term "duties as

90

1 assigned" to allow Sheena Williamson to do any job
2 that you delegated to her?
3    A.    That fell within what I believed an
4 Executive Admin Assistant could do.  Not where
5 she'd go run the mail room.  No.  That would not
6 be her role, but along the lines of you are
7 functioning as an admin still.
8    Q.    And you made that determination?
9    A.    No, no, no, no, no, no.  I know what
10 I am thinking about.  It's like all in the
11 Employment Plan book that states if you can do
12 these things, you can still do these things.
13 Wait.  But I don't know how to explain it
14 verbally.
15    Q.    Okay.
16    A.    Okay.
17    Q.    And here it says that she would
18 maybe -- she would have to do double duty and
19 assist both the Chief, as well as yourself?
20    A.    Uh-huh.
21    Q.    And the Chief, that would be Cedric
22 Giles, correct?
23    A.    Correct.
24    Q.    And did Cedric Giles have his own

91

1 Executive Administrative Assistant?
2    A.    Yes, he did.  However, this would
3 have been -- as she referenced, when Erica had
4 been out and she was absent.
5    Q.    So if you turn the page and look at
6 Bullet C?
7    A.    Uh-huh.
8    Q.    It looks like that was addressed
9 later on, where it said, "sat at Erica's desk for
10 three weeks."
11        So from my understanding, Bullet
12 B is a separate incident, or do you understand it
13 to be something different?
14    A.    I can't attest to what she did if
15 Erica was present.
16    Q.    Okay.  So you -- do you have any
17 recollection of a time when Erica was present that
18 Sheena would also have to assist the Chief Deputy?
19    A.    I don't -- I don't recall.
20    Q.    Okay.  But would it be your belief
21 that that would be part of her job duties, to
22 assist the Chief Deputy even if Erica was present?
23    A.    If assistance was needed.
24    Q.    So yes?

92

1    A.    Yes.
2    Q.    Okay.  So then moving on to Bullet
3 C, which you said was when Erica was on maternity
4 leave, correct?
5    A.    Uh-huh.
6    Q.    So when Erica was on maternity
7 leave, Sheena was assigned -- was temporarily
8 assigned; is that correct?
9    A.    Right.
10    Q.    Okay.  And what was her temporary
11 assignment, if you recall?
12    A.    To monitor the phone calls, requests
13 to see the Chief and the Recorder, if Robin who
14 was the Recorder's Admin was offsite.  So where
15 the desk was, it's like you can monitor what's
16 happening and who can -- comes back, and who
17 can -- you know, you can take records of those who
18 want to visit, that type of thing.
19    Q.    And during the time Sheena sat at
20 Erica's desk, was she also still fulfilling her
21 job duties with you?
22    A.    Yes.
23    Q.    And was Sheena allowed -- was Sheena
24 given a pay increase for this?

93

1    A.    No.
2    Q.    Okay.  And how many Administrative
3 Assistants were there serving the Deputies?
4    A.    Five.
5    Q.    And why was Sheena chose to -- or
6 why was Sheena temporarily assigned to Erica's
7 position?
8    A.    I cannot answer that question.
9    Q.    But there was three other Executive
10 Assistants; is that correct?
11    A.    Yes.
12    Q.    Okay.  And so you had no say in
13 Sheena being assigned to Erica's position?
14    A.    No.
15    Q.    So who would have determined that
16 Sheena should fulfill the temporary assignment?
17    A.    The Chief.
18    Q.    Okay.  And did the Chief have to get
19 permission from you to do that?
20    A.    No.  That's the Chief.
21    Q.    Okay.  And so when Sheena was
22 sitting at Erica's desk, would she have been told
23 to prioritize your work or the Chief's work?
24    A.    Chief's work, in terms of whatever

**94**

1 he needs, you get that done, and when you have
2 downtime, work on these things.
3     **Q.**   Okay.
4     A.   Yeah.
5     **Q.**   **And were you aware of what her job**
6 **duties were in her temporary assignment?**
7     A.   No.
8     **Q.**   **Okay. And in your response it says**
9 **that the Office followed the appropriate protocol**
10 **to request a temporary assignment?**
11     A.   Where are you?
12     **Q.**   **Sorry. I am still in -- under**
13 **Bullet C.**
14     A.   Okay.
15     **Q.**   **And can you describe to me what the**
16 **appropriate protocol was?**
17     A.   Making sure, one, in direct -- in
18 talking with the DOC or what is required from the
19 Employment Plan and our manual at the time, to
20 make sure I followed through on those things,
21 which would be requests in writing, any essentials
22 that she needed at that desk, doing those things.
23     **Q.**   **But you weren't involved in her**
24 **temporary assignment, right?**

**95**

1     A.   No. Moving her where I made sure
2 she had any equipment, that type of thing, because
3 I am from the purchasing side. So we wanted to
4 make sure whatever is needed, that she had. Other
5 than that, whatever the Chief gives her to do,
6 that's between her and the Chief, if that's what
7 you are asking.
8     **Q.**   **Okay. So you had no -- you had no**
9 **direct decision in her temporary assignment,**
10 **correct?**
11     A.   No, no direct decision. Just
12 following the process.
13     **Q.**   **Okay. So then if you look to Bullet**
14 **D it says, Acting As Security.**
15     A.   Okay.
16     **Q.**   **Do you know what that is referring**
17 **to?**
18     A.   Because there is -- the way the
19 office was made, we had a desk where usually
20 security -- or we said it's like our information
21 desk. If people come up wanting to see the HR --
22 because you had that HR office up there. You had
23 the Database Management Group. You had the IT.
24 You had the Recorder. You had the Chief. You had

**96**

1 the Operations Deputy up there.
2     So we always tried to make sure
3 someone was at that desk, you know, if security
4 was short, you know, people didn't come in that
5 day or something, that we all really kind of sat
6 at that desk.
7     **Q.**   **When you say "we all", does that**
8 **mean you sat at the security desk?**
9     A.   Yes.
10     **Q.**   **Okay.**
11     A.   Okay.
12     **Q.**   **And would the other**
13 **administrative -- or Executive Assistants have sat**
14 **at the security desk?**
15     A.   Yes.
16     **Q.**   **And why did you believe that was**
17 **part of Sheena's job description?**
18     A.   Other duties as assigned, and it's
19 again, if the phone rings, you are doing the same
20 thing. If you were at your desk over here, you
21 are answering the phone. If you're at the desk
22 over here, you're answering the phone. So there
23 is no discrepancy in terms of how you pick up the
24 phone, where it is.

**97**

1     So, again, Administrative
2 Assistants answer phone calls. They give
3 direction to people coming to the office. So
4 there is no difference, you know. You are just at
5 a different desk in handling this. So when people
6 are coming to the -- that main desk right there,
7 you are directing them of where they need to go or
8 calling that particular deputy, or it was one of
9 the supervisors up there to say, "Okay. Someone
10 is out here to see you."
11     **Q.**   **Okay. So there was no training**
12 **required to sit at the security desk, was there?**
13     A.   No. Outside of -- no, not really.
14     **Q.**   **What do you mean, not really?**
15     A.   We all learned how to answer the
16 phones. "Hello. This is the Cook County
17 Recorder's Office, blah, blah, blah." That's like
18 standard. So everybody knows how to do that.
19     **Q.**   **Okay. So there was nothing outside**
20 **of --**
21     A.   Right. And we are the -- if we --
22 you know, the phone list, outside of that.
23     **Q.**   **Okay. So Bullet E, it says,**
24 **Attending Property Fraud Outreach Events. What**

25 (Pages 94 to 97)

98

1  were property fraud outreach events?
2      A.   The Recorder's -- let's say one of
3  her main objectives and goals was informing the
4  community of what the services were or are for the
5  Recorder's Office.  And one of the key ones was
6  property fraud prevention, and getting that to
7  Cook County residents.
8              And so we all -- and again,
9  that's executives and admins, and we did at one
10  point in time have some supervisors that assisted
11  in going to those outreaches.
12      Q.   And what would Sheena do at these
13  property fraud outreach events?
14      A.   We would set up -- she would set up
15  the table with the material and assist whoever was
16  speaking, and again, if it was attendees, getting
17  information from the attendees if they wanted
18  follow-up phone calls, passing out the literature
19  that we had for the office.
20      Q.   And would Sheena ever speak at those
21  events?
22      A.   No.
23      Q.   And are you aware of other
24  Administrative Assistants attending these property

99

1  fraud outreaches?
2      A.   I can attest for Erica, because we
3  went together on a couple of them, and Cynthia and
4  Robin.  Robin became, like, the main liaison of
5  getting them set up and working with different
6  Commissioners.  So I can attest to those two
7  others.
8      Q.   Okay.  And do you recall how often
9  that Sheena would attend these property fraud
10  outreach events?
11      A.   How often?  Because we had sign-up
12  sheets, and again, everything was based on
13  operational needs, I can't give a number.
14      Q.   Would she need approval from you to
15  attend?
16      A.   Yes.
17      Q.   Okay.  And when -- when would these
18  property fraud outreach events occur?  Would it be
19  during normal job --
20      A.   It would --
21      Q.   Sorry.
22      A.   It would vary.
23      Q.   Okay.
24      A.   So it depended on -- let's say a

100

1  Commissioner up north in Skokie was sponsoring
2  something during the day for their senior
3  citizens.  It could be during the day.  Another
4  group may sponsor something at night, and it could
5  be at night, maybe around 6:30.  It just varied.
6  It just varied, depending on what that community
7  was doing, and we would try to attend.
8      Q.   Would Sheena ever be required to
9  attend, or was this on a -- was she volunteering
10  to attend these?
11      A.   Volunteering.
12      Q.   And if it happened to fall outside
13  of regular business hours, would Sheena be
14  required to attend the full day of work and then
15  afterwards attend the outreach event?
16      A.   We had a process in place that if it
17  started at a certain time, you can start your
18  workday at this time.  Jogging my memory.  I can't
19  recall the specifics, but it was.  We had, like, a
20  little flex schedule, if I can call it that.
21      Q.   Okay.
22      A.   Excuse me.  A flex schedule.
23      Q.   What's the Bud Biliken Parade?
24      A.   I am going to describe it as the big

101

1  back to school parade, and don't ask me, Bud
2  Biliken, what he did and all that stuff.  I can't
3  remember, but it was the big back to school parade
4  that the Recorder's Office would participate it.
5      Q.   And did you assign Sheena to
6  participate in planning it?
7      A.   She did it the year before.  So they
8  asked her.  She was asked if she would help out
9  again.
10      Q.   And was the year before prior to you
11  starting at the Recorder of Deeds?
12      A.   Yes.
13      Q.   Did she have to get your permission
14  to assist?
15      A.   To whatever -- I'm like, if it comes
16  from -- came from the Chief and the Recorder, my
17  permission is not needed.  She is given a
18  directive.  That's the key thing.  She has been
19  given a directive from a superior.
20      Q.   Okay.  So if you turn the page to
21  Bates stamp 337, Bullet G says, Attending to
22  Customers in Veterans Affairs Office.
23              What was the Veterans Affairs
24  Office?

26 (Pages 98 to 101)

102

1      A.      Veterans Affairs Office was a new
2  office established by the Recorder when she
3  started, and it will do -- we had two special
4  things; record their DD214s for free, and then
5  they also established -- what did they call it?
6  It was a Veterans Discount Card that they can use
7  throughout the County.
8              So as Veterans would come in --
9  and we also had a veterans liaison.  So if he was
10  out at an outreach, we all worked to fulfill the
11  office to make sure no veteran was just sitting
12  there and we are telling them, "You've got to come
13  back next week or something."
14      Q.      And did you work in the Veterans
15  Affairs Office?
16      A.      Yes.
17      Q.      And where was the Veterans Affairs
18  Office located?
19      A.      On the first floor, on the first
20  floor in the Recorder of Deeds Office.
21      Q.      And who oversaw the Veterans Affairs
22  Office?
23      A.      That was by -- we had the Deputy of
24  Operations and under him reported -- was Brian

103

1  Cross, who was the liaison.
2      Q.      And when Sheena would attend to
3  customers in the Veterans Affairs Office, would
4  that be because you told her?  How would she get
5  assigned to that?
6      A.      That would have been when we found
7  out -- let's say in our regular operating meetings
8  we talk about what's going on, and if it's stated
9  "Okay.  Brian is going to be out for Wednesday,
10  Thursday.  We need someone to fill in."  Then we
11  would say, "Okay.  Who is available?"  And let's
12  say I am open.  Sheena is open.  Okay.  Sheena
13  could do it today.
14              The -- same thing with
15  Operations and his Exec.  "Okay.  I think it would
16  be good.  Cynthia can do it.  We're not too busy."
17  We would kind of talk about it, and say who would
18  be open.  If it was an occurrence where Brian may
19  have really gotten busy, we would say, "Anybody,
20  run downstairs."  We just didn't want a veteran to
21  be sitting there and not being served.
22      Q.      So would all of the Executive
23  Assistants attend to customers in the Veterans
24  Affairs Office?

104

1      A.      To my knowledge, all Executive
2  Assistants should have.  I can't say if they did
3  it, but that was our request of everybody, all
4  hands on deck.
5      Q.      And so if Sheena was downstairs in
6  the Veterans Office, was she still responsible for
7  fulfilling her job duties with you?
8      A.      When she came back, she just picks
9  up where she left off.
10      Q.      And she wouldn't be required to,
11  like, stay late or anything?
12      A.      Oh, no, no.
13      Q.      So then Bullet H says, Participate
14  in Planning and Set-Up of Special Events?
15      A.      Uh-huh.
16      Q.      Do you know what special events
17  refers to?
18      A.      Okay.  So special events for me
19  would have been where I hosted several breakfast
20  meetings for my staff in the database, or we did a
21  combined with the overall group that I was over,
22  and so it was, okay.  If I am bringing in
23  breakfast, we are going to help -- I am going to
24  tell you where to go.  I will get something.  You

105

1  get something.  You get the napkins.  I get all of
2  this, and we work together to set it up.  That's
3  what we would do.
4      Q.      And why was it your belief that that
5  fell within her job duties?
6      A.      Duties as assigned, and it's a
7  function that the Deputy Recorder of Finance is
8  sponsoring and putting on with my team, and she is
9  a part of the team.  She is the Admin Assistant,
10  and she assists.
11      Q.      Okay.  And then Bullet I says,
12  Schedule, Coordinate and Execute Team Building and
13  Department and Training Sessions.
14              So what were these team building
15  department and training sessions, if you know?
16      A.      So it would be, again, as I came
17  onto the Recorder's Office, it was a gap there
18  with the units.  So I would sit down.  I would
19  say, "Let's talk about what we think we could do
20  to help with morale or things of that nature in
21  our group."
22              So I thought I could work with
23  her.  She is my Executive Admin and we talk about
24  it.  For example, the book, "Who Moved My Cheese?"

106

1 And I -- we -- she searched, found the video clip,
2 and we were like, "Okay. Let's show that." Just
3 coming up with ideas, and we worked together to do
4 that.
5    Q.   And that was for specifically your
6 team?
7    A.   My teams.
8    Q.   Which would be the Finance?
9    A.   The Finance, Purchasing, and at that
10 time I had the Database Management Group.
11    Q.   And were you aware of any other
12 Executive Assistants that had to plan team
13 building and training sessions?
14    A.   I am going to only attest to me and
15 how I led my teams.
16    Q.   Okay.
17    A.   That's all I can say.
18    Q.   So Bullet J says, "Catering for
19 staff luncheons as well as team/department
20 meetings"?
21    A.   Yes.
22    Q.   And can you tell me what that means?
23    A.   So what we would do for our team
24 meetings, our executive meetings, the Recorder did

107

1 not believe in spending any taxpayers' money.
2 Whenever we had team meetings, we would buy
3 lunches.
4        So let's say it's our meeting
5 for this week.  I am buying the lunch, and I may
6 place the order, but I'm in the meeting and I'm
7 like, "Okay.  Could you make sure -- here is my
8 money.  That when Giordano's comes.  If you could
9 give them the money and bring it on into the
10 room."
11        Or I am searching through who I
12 want to order from this month.  "What do you
13 think?  Oh, what did we do last month?"  We are
14 dialoguing.  I'm like, "Oh, okay.  This is the
15 idea that I will do for my session."  And that's
16 what we -- you know, we would do.
17    Q.   Okay.  And so then ultimately you
18 determined that Sheena's -- these added
19 responsibilities -- or these -- strike that.
20        These responsibilities that
21 Sheena felt were outside of her job description
22 were actually within her job description?
23    A.   Yes.
24    Q.   And so you denied her request for a

108

1 salary increase; is that correct?
2    A.   Yes.
3    Q.   Okay.  And did you discuss your
4 decision with anyone?
5    A.   When I sat down at the table.
6    Q.   What do you mean by sat down at the
7 table?
8    A.   We had to have a meeting with the
9 RCA and the group, and then I presented all of
10 this to everybody.
11    Q.   And then did the RCA give you any
12 feedback as to your decision whether or not to
13 increase Sheena's salary?
14    A.   I don't recall.
15    Q.   Okay.  And if you decided -- if you
16 determined to increase her salary, how would you
17 have gone about doing that?
18    A.   If I decided to increase it, No. 1,
19 it would have been -- I would have to give the
20 justification to the Chief and to the Recorder.  I
21 just couldn't open up the budget book and do it,
22 you know.  Then, it would be getting their
23 approval that I am going to do this, because any
24 increase impacts our budget dollars.

109

1        So they have to be aware of
2 that, and so it would be, "I am recommending this.
3 What do you all see?"  I never had to do that, but
4 I am saying if I had to go through the process.
5 The next step also would have been talking with
6 Budget, in terms of is there room within our
7 budget?  Can we do that now, or is that 2000 --
8 let's say we are into the 2020 budget.  Then, it's
9 a recommendation for, say, 2020.
10        We cannot do it now.  If this
11 was back in July or June, whatever date, we could
12 say, "Okay.  We will put this increase in our
13 budget for 2020."
14    Q.   Did you consider any other factors
15 when you decided to deny her -- Sheena's request?
16    A.   No.  It was based solely on the job
17 description and anything stated in the Employment
18 Plan, that we are supposed to do our due diligence
19 in the manual.
20    Q.   Did you have any knowledge about the
21 salary of any other Executive Assistants?
22    A.   I had knowledge of all having the
23 position of Budget.
24    Q.   And did you take that into account

110

1 **when you made your determination to deny her --**
2 **Sheena's request?**
3     A.    I don't recall.  I don't, you know.
4     **Q.    Okay.  And do you think -- did you**
5 **think that Sheena's job description was an**
6 **accurate depiction of her day-to-day duties?**
7     A.    Say that again?
8     **Q.    Do you think the job description for**
9 **Sheena's position was an accurate depiction of her**
10 **day-to-day duties?**
11     A.    You are saying inaccurate?
12     **Q.    Accurate.**
13     A.    Oh, okay.  Oh, it was accurate.  I
14 think it was accurate.  I think the job
15 description was accurate.
16     **Q.    So after this discussion, you didn't**
17 **take any steps to alter her job description or add**
18 **any additional bullets or clarification?**
19     A.    No.  That's a full process by
20 itself.
21         (Whereupon, WILHIGHT Deposition
22         Exhibit No. 15 was marked for
23         identification.)
24

111

1 BY MS. DIAZ:
2     **Q.    Okay.  So Exhibit 15 is Bates**
3 **stamped Cook County 1412.  And if you take a**
4 **chance to look it over, and then let me know when**
5 **you are done.**
6     A.    Okay.
7     **Q.    So in the middle of the document**
8 **there is an e-mail from Thomas McMahon to Matt**
9 **Pryor?**
10     A.    Yes.
11     **Q.    And you are cc'd on it.  Do you see**
12 **that?**
13     A.    Yes.
14     **Q.    Okay.  And do you recall reading**
15 **this e-mail at the time it was sent?**
16     A.    I don't recall.
17     **Q.    Okay.  And do you see the last line**
18 **of the e-mail where it says, "I will create and**
19 **retain a file for this investigation in the Office**
20 **of the DOC"?**
21     A.    Yes.
22     **Q.    Do you know what investigation**
23 **Thomas McMahon is referring to?**
24     A.    I will speak in general.  Any

112

1 employment actions Tom -- I am going to say Tom
2 would consider anything to be like an
3 investigation to him.
4     **Q.    So your denial of Sheena's salary**
5 **request would have been -- would have warranted an**
6 **investigation?**
7     A.    Oh, no.  The whole process, the
8 whole thing.  He -- everything Tom considered an
9 investigation.
10     **Q.    I don't understand what you mean.**
11     A.    How do I put it?  Anything that came
12 to the DOC, he considered this part of my
13 investigation.  So an employment action that -- I
14 can't recall all the e-mails, but let's say Sheena
15 wrote me and copied Tom.  Tom would begin that as
16 part of his investigation.  Okay.  What's next?
17 And so he followed it all the way through until he
18 gave his sign-off.  That's the process that I
19 would -- I recall how Tom would do things.  Okay.
20     **Q.    And did Tom sign off on your denial**
21 **of Sheena's request?**
22     A.    From his e-mail right here.
23     **Q.    So that would be --**
24     A.    That would be like he is --

113

1     **Q.    Complete his investigation?**
2     A.    He is like, "I am done."  Yeah.
3     **Q.    And so you said Tom McMahon, he is a**
4 **Director of Compliance?**
5     A.    Uh-huh.
6     **Q.    Was the Office of Director of**
7 **Compliance within the Recorder of Deeds, or was it**
8 **a separate?**
9     A.    Right.  It's part of the Employment
10 Plan.  Part of the employment action plan is that
11 we had to hire a Director of Compliance.  There
12 is, like, 20 pages related to their role.
13     **Q.    But he ultimately works for the**
14 **Recorder of Deeds?**
15     A.    Yes.
16     **Q.    So this is unlike the Recorder of**
17 **Compliance Administration, which is outside the**
18 **Recorder of Deeds?**
19     A.    Right.
20     **Q.    Okay.  And do you recall any**
21 **conversations with Mr. McMahon about Sheena's**
22 **request?**
23     A.    I can't recall.  I can't recall.
24     **Q.    Okay.  And then at the top of this**

114

1 e-mail it appears you sent an e-mail to Cedric
2 Giles, Edmund Michalowski and James Gleffe. And
3 the only thing you wrote was, "FYI."
4          Do you have any recollection of
5 why you would have sent it to those individuals?
6     A.    Again, as the liaison -- they were,
7 like, the key liaisons for the RCA.  Keeping them
8 abreast on where we are with anything that I am
9 going to say hit my desk as an employment action.
10 So if they met with Cardelle or Matt, they knew,
11 "Okay.  This was where we were with it", on a
12 status on anything.
13     Q.    So this was based --
14     A.    That was --
15     Q.    Sorry.  Go ahead.
16     A.    Oh, I'm sorry.
17     Q.    Sorry.  So that was based solely on
18 the fact that Matt Pryor was addressed in this
19 e-mail?
20     A.    Right.
21     Q.    Okay.
22          (Whereupon, WILHIGHT Deposition
23          Exhibit No. 16 was marked for
24          identification.)

115

1 BY MS. DIAZ:
2     Q.    So Exhibit 16 is an e-mail Bates
3 stamped Cook County 1427, and it looks like it's
4 an e-mail from you to Sheena Williamson.  Do you
5 see that?
6     A.    Yes.
7     Q.    And it's dated Friday, August 14th,
8 2015?
9     A.    Okay.
10    Q.    So take a second to read the body of
11 the e-mail, and let me know when you are done.
12    A.    Okay.
13    Q.    So do you recall why you sent this
14 e-mail?
15    A.    Just going by what was written, we
16 had to have some dialogue going on, but I don't
17 recall, like, everything that was happening, since
18 this dates back to, like, 2015.
19    Q.    Okay.  But your e-mail says that the
20 RCA had concerns with Sheena's participation in
21 the refund process.  Do you see that?
22    A.    Yes.
23    Q.    Okay.  And do you know why the RCA
24 had concerns with her assistance in the refund

116

1 process?
2     A.    Everything that was going on they
3 had concerns with.  That's all I can say.
4 Everything -- any employment action they really
5 had concerns with.
6     Q.    I need you to clarify.  So what do
7 you mean by every employment action they had
8 concerns with?  So what would be the employment
9 action in this situation?
10    A.    With Sheena assisting in the
11 Accounting Department, and so that goes back to
12 they didn't think she met the minimum quals, all
13 of those things.  So it was, again, another issue
14 with that, so --
15    Q.    So we previously discussed when you
16 wanted to temporarily assign Sheena Williamson to
17 accounting and the RCA had issues with that,
18 right?
19    A.    Ah-huh.
20    Q.    And you said you didn't end up
21 temporarily assigning her because of the issues
22 that the RCA had, correct?  You also testified --
23 or we read in the -- your response to Sheena's
24 request that she was processing refunds; is that

117

1 correct?
2     A.    Okay.  Looking at the dates, so
3 within the temp assignment was Nick.  When Nick --
4 the things that Nick did, the specific things that
5 Nick did, as being her temporary assignment.  The
6 refunds, I can't recall if I classified it as kind
7 of outside of that, because she had been it all
8 the time, and now here's Nick's specific things
9 that they had a problem with.  So that's why I
10 said it was a total employment action that they
11 had problems with.
12    Q.    But in the e-mail you do state that,
13 "As a result, once again, effective today, please
14 do not assist with the refund clerical processing
15 function."
16          So that would mean previously
17 you had told her she could not participate in the
18 refund processing?
19    A.    Or she was doing it.  This is
20 probably to solidify.  I can't recall.
21    Q.    Okay.
22    A.    I can't recall, like, all the steps.
23    Q.    Do you recall that the RCA had
24 issues with Sheena participating in the refund

118

1  processing previous -- prior to this e-mail?
2      A.   I can't recall.  I -- it's -- I
3  don't know how to put it.  They had issues -- like
4  I said, issues with all employment actions, so
5  refunds was probably one of them.
6      Q.   So are you saying that the RCA had
7  issues with any action you took with your
8  employees?
9      A.   Overall employment actions for the
10  office, because they are monitoring to make sure
11  we do it right.
12      Q.   And how is Sheena participating in
13  refund processing an overall employment --
14      A.   Employment action?
15      Q.   Uh-huh.
16      A.   That anything that you have your
17  employee do that they do not believe or didn't
18  believe lined up with the job description, they
19  could bring up questions on it.  That's what I
20  meant.
21      Q.   And you believed that processing
22  refunds -- you previously testified that
23  processing refunds fell within her job
24  description?

119

1      A.   Yes.
2      Q.   So this e-mail would be -- you sent
3  this e-mail because, once again, the RCA reached
4  out to you saying that they didn't believe it fell
5  within her job description?
6      A.   And I am saying somewhere in there
7  it had to be some dialogue, and because this dates
8  back to, like, 2015, I can't go -- I can't say A,
9  B, C and D happened, and so this.  But I can state
10  overall, there were employment action issues with
11  things that were being done in the office.
12      Q.   Well, this e-mail states that
13  clearly the RCA had concerns with the refund
14  process directly, not overall operational
15  concerns.  Specifically, the refund process,
16  correct?  Correct?
17      A.   Okay.
18      Q.   Yes or no?
19      A.   Yes.
20      Q.   Okay.  So -- and you also said,
21  "Once again, effective today, please do not assist
22  with the refund clerical processing function"; is
23  that right?
24      A.   Yes.

120

1      Q.   Okay.  Do you know -- do you know
2  how long the -- sorry.  Strike that.
3          Do you know how long Sheena was
4  not allowed to assist you with the refund
5  processing or how long this prohibition lasted?
6      A.   Oh, probably until she left.
7      Q.   And why do you say that?
8      A.   Because it was just too much.  I
9  was -- it was too much trying to, let's say, do a
10  temporary assignment, explain it this way.  So I
11  just took on a lot of actions myself and just did
12  the work.
13      Q.   And at the time that you sent this
14  e-mail, was Sheena temporarily assigned to refund
15  processing?
16      A.   I don't recall, because we never got
17  things really approved through all of this temp
18  assignment stuff.  So I really don't recall.
19      Q.   Okay.  So you didn't have the temp
20  assignment approved, but you still had Sheena
21  doing refund processing; is that correct?
22      A.   The temp assignment was for Nick,
23  Nick Macabenta.
24      Q.   If you can -- sorry.  If I can turn

121

1  your attention back to Exhibit 5.
2      A.   Okay.
3      Q.   So Exhibit 5, if you recall, was
4  your request for Sheena Williamson's temporary
5  assignment?
6      A.   Okay.
7      Q.   And as we discussed in the middle,
8  you listed some duties that her temporary
9  assignment would include.  Do you see that?
10      A.   Okay.
11      Q.   And is refund payable processing the
12  same thing as refund processing?
13      A.   Yes.
14      Q.   So that would be a similar --
15  would be the same duty that the RCA previously had
16  concerns with?
17      A.   True.
18      Q.   Okay.  And as we previously
19  discussed, Sheena said she had been working on
20  processing refunds since September 2014; is that
21  correct?
22      A.   According to her statement, yes.
23      Q.   Okay.  And do you have any reason to
24  believe that her statement is incorrect?

122

1    A.    Timing, I can't attest to timing.
2    Q.    From your recollection, was refund
3 processing something Sheena did throughout her
4 time working for you?
5    A.    Yes.
6    Q.    Okay.  And did you ever discuss with
7 the RCA further what their concerns were about the
8 refund processing?
9    A.    I don't recall.
10    Q.    Okay.  And you said earlier that
11 there would have been some dialogue.  Do you
12 recall that testimony?
13    A.    Yeah.  Because I am looking at
14 dates, July to August, and I am just saying it had
15 to be just dialogue in between, but I can't
16 recall, like, meetings, phone calls.  I can't
17 recall any of that.
18    Q.    And dialogue with who?
19    A.    Because we had monthly meetings with
20 the RCA, it could have been a session at that time
21 where they will bring up, "Here is all of the
22 employment actions.  Here is complaints.  Here is
23 these outstanding things the office has before
24 them."

123

1         So those things would be
2 discussed.  So this item could have been one of
3 those discussed.  With court, they would go to
4 court, and if -- meaning Jim being the legal
5 counsel.  Ed may have gone, Chief Giles.  And if
6 they came back and said, "Okay.  We've got to work
7 through these things with Matt, get these things
8 answered.  He says they are outstanding, you can
9 have that."
10         Then, of course we had the
11 Director of Compliance, if -- because he would
12 have meetings with RCA as well.  So if he came
13 back and said, "I need you to do A, B, C and D",
14 we would act on those things.  So that's why I
15 said looking from June to August, there could have
16 been dialogue in between, because we -- you know,
17 we all did collaborate all the time.
18    Q.    And if the RCA was to have concerns
19 with something, would you respect those concerns?
20    A.    I would respect and discuss what
21 they are and express if I agreed or disagreed.
22    Q.    And if you disagreed, would you
23 listen to his recommendations or --
24    A.    Oh, yeah.  There has been plenty.

124

1    Q.    So even if you disagreed, you would
2 still follow the recommendations of the RCA?
3    A.    I would -- oh, follow through if
4 they said this is it and it's documented in
5 writing that I had to do this, I just had to do
6 it.
7    Q.    So if he had concerns with Sheena
8 doing the refund process, then you would take
9 Sheena off the refund process?
10    A.    Where -- how would I put it, because
11 it's like it sounds like it's being a little
12 twisted around.  So I want to make sure I am
13 clear.
14    Q.    Oh.
15    A.    Okay.  How would I put it?  The RCA
16 can give suggestions, but it's not the final rule,
17 if I could put it that way.
18    Q.    And who gives the final rule?
19    A.    So if -- it's because we are
20 dialoguing, and at the end if it's stated, "This
21 is the final conclusion, then that's how I would
22 act."  Like this is the final conclusion.  "Okay.
23 This is what we are doing."
24         If it's some discussions --

125

1 because I really don't know how to explain it,
2 because it's -- have you ever worked with the RCA
3 or Shakman?  I mean, I know I can't ask you that
4 question, because I am just trying to describe you
5 work together to come to a good conclusion of how
6 things should be done, because --
7    Q.    So what I am trying to understand is
8 that obviously Matt Pryor at the RCA had some
9 concerns about Sheena doing the refunded
10 processing.  That was addressed in June of 2015,
11 which you acknowledged, and then as of August 14,
12 2015, Sheena was still doing -- participating in
13 the refund process.
14    A.    However, I guess I interpreted it as
15 he was concerned with Nick Macabenta's full --
16 that's how I looked at it.  This is his full
17 process, whatever.  Not just this one-off.
18    Q.    And one-off, you mean just the
19 refund process?
20    A.    Refund process.
21    Q.    Okay.  And refund processing was
22 typically within -- done by --
23    A.    The entire --
24    Q.    Director of Finance?

126

1    A.    The entire Accounting Department.
2    Q.    Okay.
3    A.    Entire including me, Deputy Recorder
4  of Finance.
5    Q.    Okay.  And your basis of Sheena
6  being qualified was just on having seen her do
7  work previously?
8    A.    Uh-huh.
9    Q.    Okay.  And did you know if Sheena
10 had any accounting background or finance
11 background?
12   A.    I can't recall all the specifics of
13 her background, but I know she was well-rounded.
14   Q.    So in general, was Sheena qualified
15 for the position of Administrative Assistant to
16 the Deputy of -- Recorder of Finance?
17   A.    Yes.
18   Q.    Did you have any issues with Sheena?
19   A.    No.
20   Q.    Do you recall a request to Sheena
21 that she notify you when she left her desk?
22   A.    Yes.
23   Q.    And why did you request her to do
24 that?

127

1    A.    There was an occasion in which that
2  Sheena had left for, like, about a couple hours,
3  and I was like, "Where is she?"  I needed some
4  work done, following up on some customer calls and
5  the comptroller things.  Then, I found out she was
6  with the Director of Compliance.
7    Q.    And what's the significance of that?
8    A.    You can talk to the Director of
9  Compliance whenever you want to, and it was
10 significant, because, the way I can remember it,
11 is because then Tom said, "Oh --" he told me.  He
12 said, "Oh, no, Carolyn.  That was my fault.  I
13 should have also informed."
14          And then he started a process
15 after that, that if staff -- he didn't -- he was
16 saying, "I don't want staff to use me as their
17 excuse for leaving their work stations.  'I am
18 with Tom, so it's okay.'"
19          So then he acclimated a process
20 to say, sign in, sign out.  I will also inform
21 their direct supervisors that they are visiting
22 me.
23   Q.    But your instruction to Sheena to
24 notify you when she left her desk, that went above

128

1  and beyond just the Director --
2    A.    No.
3    Q.    When she was meeting the Director --
4    A.    So then because of that then the
5  went -- from that standpoint, because my office
6  was here.  Hers was around the corner.  So I am
7  getting up to go, and I'd say, "Just let me know
8  if you are going to, you know, leave or whatever.
9  Then, I'd know."
10          But she took it to the extreme.
11 "I am going to the bathroom."  And I'm like, "All
12 right.  Something is going on here.  I am not even
13 going to worry about it.  I have got too much work
14 to do."
15   Q.    Were you aware of other
16 Administrative Assistants that had to notify their
17 superior when they left their desk?
18   A.    I can only attest for what I require
19 of the staff that I'm the leader over.
20   Q.    And you had Sheena notifying -- did
21 you have Sheena notifying other individuals
22 besides you when she left her desk?
23   A.    No.
24   Q.    So Sheena was not required to notify

129

1  all Administrative Assistants when she left her
2  desk?
3    A.    If she is going to be absent.  We
4  would all do that so that other admins would know
5  who is out and who is in.
6    Q.    What about when Sheena would take
7  her -- would take a break or a lunch break?
8    A.    Just informing me that, "I am gone
9  off the floor" or whatever.
10   Q.    And she wouldn't have to notify
11 other Administrative Assistants of that?
12   A.    Not -- not to my knowledge, no.
13   Q.    Okay.  And do you remember a request
14 by Sheena for flex time?
15   A.    Uh-huh.
16   Q.    And tell me a little -- tell me a
17 little bit about her request.
18   A.    She was in a class, and I think it
19 was called the internship or co-op or something
20 like that, and she needed an extended period of
21 time to fulfill it, and from there, it was going
22 to be -- at least her morning hours a couple of
23 days during the week in which she would have to be
24 away from the office, and she wanted to work it

130

1 out where she could come in later.
2        And then she was -- would stay
3 her full eight.  However, according to our
4 Employment Plan, also the manual, you cannot stay
5 later unless a supervisor is onsite, and so she
6 wanted to really use me as, "Okay.  You are going
7 to be here until 8:00.  You work until 8:00.  So I
8 could do it."
9        And I'm like, "No, you can't.
10 You couldn't base it on me and my work schedule."
11 That was -- I didn't want to have that ownership.
12 I'm like, "No.  We can't do that."
13      Q.    So did you ultimately deny her flex
14 time request?
15      A.    Yes, I did, and I did write that up,
16 because it was an extensive amount of hours.  And
17 then also being an Executive Administrative
18 Assistant, I don't -- I didn't think that -- I was
19 going to say fair me in the role that I play in
20 the office where I am meeting and reporting to
21 comptroller, CFO, of course our own Chief of
22 Staff, our own Recorder of Deeds, and then also at
23 the time you have external auditors who are
24 requesting information, that you are out for that

131

1 length of time.
2        And then so, again, it would be
3 based on we had a policy -- or a short policy in
4 place, and of course they were revising that, but
5 I based it on, okay, operational needs, and my
6 operational needs as her direct report.
7      Q.    And did you discuss her flex time --
8 Sheena's flex time request with anyone else?
9      A.    HR and legal, because I was looking
10 at the manual and what it says.
11      Q.    But ultimately you made the decision
12 to deny the request?
13      A.    Yes.
14      Q.    And that was based on your
15 operational concerns?
16      A.    Yes.
17      Q.    So you mentioned that you have
18 interactions with a number of individuals outside
19 of the Recorder of Deeds Office?  I don't recall
20 the names you just mentioned.
21      A.    Comptroller, the CFO, the County
22 CFO.
23      Q.    Anyone else?
24      A.    The Internal Audit Group, the

132

1 External Audit Group.
2      Q.    The -- what about the Budget Office?
3      A.    And, of course, the Budget Team.
4      Q.    And as your Executive Assistant,
5 would Sheena be in communication with these
6 individuals?
7      A.    If I needed her to contact, reach
8 out, take documents.  Things of that nature.
9      Q.    And do you recall any instances when
10 you did need her to reach out to these
11 individuals?
12      A.    I can't recall specifics, but, what,
13 from 2014 to 2016, I am pretty sure there was some
14 interaction.
15      Q.    Okay.
16      A.    Oh, and Payroll, because we had to
17 drop off payroll reports.
18      Q.    So on a general day, what would be
19 Sheena's job responsibilities from you?
20      A.    It could vary.  Let's say if it was
21 budget season, pulling the expense reports so I
22 can review those.  Tracking.  Also on a daily
23 basis she tracked some of the expenditure items
24 that I would call for that report to see where we

133

1 were at any given time.
2        Let's see.  If I had any
3 paperwork filing, scanning, if I had any documents
4 coming from the bank, in which we needed to
5 collect on items or they are collecting on our
6 behalf.  We are filling out all that paperwork.
7 It could really vary from day to day.
8      Q.    And were you satisfied with Sheena's
9 work as an Executive Assistant?
10      A.    Yes.
11      Q.    Okay.
12        (Whereupon, WILHIGHT Deposition
13         Exhibit No. 17 was marked for
14         identification.)
15 BY MS. DIAZ:
16      Q.    Okay.  So Exhibit 17 is an Offer of
17 Employment to Erica Sanchez Cuevas, and I
18 understand you weren't here at this time, but do
19 you see where it says her annual salary is
20 $70,308?
21      A.    Uh-huh.
22      Q.    And when Sheena Williamson was your
23 Executive Assistant, were you aware of what her
24 salary was?

134

1      A.    Yes.
2      Q.    And what was that?
3      A.    I can't give you the dollar amounts.
4  In the 40s.  No.  Because she received step
5  increases -- so I am going to say I recall from
6  all the reports, but I can't give you the exact
7  number.  So in that time each year you receive a
8  step increase.  Depending on how they did it with
9  the County, you could have received it in June,
10  and you receive another one by December.
11      Q.    And would she have received -- she,
12  as in Sheena, would she have received step
13  increases despite not being in a union?
14      A.    Uh-huh.  That's County-wide.
15      Q.    So every employee would get step
16  increases?
17      A.    Except for maybe if you're a Grade
18  24.
19      Q.    And why --
20      A.    And they approve it.
21      Q.    Why would a Grade 24 not --
22      A.    They approve it.  The Commissioners
23  approve Grade 24s and above.
24      Q.    And do you have any -- or why do you

135

1  believe that Erica Sanchez was paid substantially
2  more than --
3      MS. HARVEY:  I am going to object,
4  because Ms. Wilhight was not employed at the
5  office at that time that Erica Sanchez was hired.
6  BY MS. DIAZ:
7      Q.    So as the Deputy Recorder of
8  Finance, in your job duties you obviously had some
9  oversight of salaries in the budget.  Are you
10  aware why there would be such a discrepancy
11  between Administrative Assistants?
12      A.    I can't answer that question,
13  because, yeah, I can't answer, like, what -- how
14  things were done, or I don't know.
15      Q.    And did you have any knowledge that
16  Erica Sanchez had duties -- had more duties than
17  Sheena Williamson as your Executive Assistant?
18      A.    I don't know or didn't know all of
19  Erica's duties.  So I can't address that question.
20      Q.    Do you know any of the duties she
21  had to do for the Chief Deputy?
22      A.    Outside whatever the Chief wanted --
23  needed her to do.  I don't know, like, all the
24  specifics.

136

1      Q.    Okay.  And just generally --
2      A.    Because --
3      Q.    Sorry.  Just generally with your
4  knowledge of the budget, was it something that --
5  was it ordinary to see that -- a position that's
6  the same title to have such a discrepancy in pay?
7      A.    Yes.
8      Q.    And why?
9      A.    Throughout the budget overall, there
10  will be differences in pay, depending on the
11  tenure of the people overall.  So you could have
12  the frontline cashiers Grade 16, 17, 18s.  Yet,
13  they are all frontline cashiers.
14          So if you are asking, have I
15  seen that?  Yes, I've seen it.  Why?  I don't
16  know, you know, like when people came in, that
17  type of thing.  Other than that, I can't attest
18  to.
19      Q.    Okay.  And you said earlier on, when
20  the salary is set, you said not specifically with
21  the Administrative Assistant, because you weren't
22  around, but when -- you do research on what
23  comparative salaries are.  Do you recall that?
24      A.    Yes.

137

1      Q.    So is that something -- is that part
2  of a policy, or is that just something you do?
3      A.    That would be what I did working
4  with Chief Giles when I came in.
5      Q.    And did Chief Giles instruct you
6  that that was something the office does?
7      A.    He never gave word that they didn't
8  or whatever, that was just my -- if I am in the
9  role as a budget -- you're the budget liaison, I
10  want to present you with everything.  So that was
11  my -- I am going to say me.  I can't attest to,
12  you know, this was office policy or anything.  I
13  can't say that.
14      Q.    Had you ever known Cedric Giles to
15  look at comparable salaries before setting a
16  salary for a position?
17      A.    Whatever I presented and whatever
18  maybe HR gave to him, he would take it.  I
19  can't say what he did after that.
20      Q.    Okay.  But when setting a salary
21  would it be possible for the individual to compare
22  the different positions and what their salary
23  rates are?  So the other Administrative Assistants
24  or the other -- whatever the position is, would

138

1 they have the ability to do a comparison of the
2 different salaries?
3    A.   So --
4    Q.   Sorry.
5    A.   So if you are asking --
6    Q.   I can rephrase.
7    A.   Yes.
8    Q.   So when Cedric Giles was -- so
9 Cedric Giles was the person who set salaries for
10 new positions; is that correct?
11    A.   How would I put it?  I would say he
12 would -- how would I put it?  He would sign off.
13 So I am saying, "Okay.  The Chief is the final
14 one, because he has to sign the RTH."  That's how
15 I am putting it.
16         What dialogue he may have had
17 with the HR person, if I wasn't involved in it, I
18 can't attest to everything that they would
19 discuss.  I could only say, "This is what I
20 presented to the Chief, and he would accept it and
21 say, "Okay.  I am I am going to look at those
22 things and talk to the HR and go from there."
23 That's really all I can say.
24    Q.   But not every supervisor would have

139

1 the ability to put input in a salary?
2    A.   So supervisors did not have that
3 responsibility.  That's not their role.  That's
4 usually falling with your Budget, your Human
5 Resources and your Chief.
6    Q.   So you have -- and you have the
7 ability to provide insight because of your role as
8 Deputy Recorder of Finance?
9    A.   Uh-huh.
10    Q.   Okay.  And, ultimately, Cedric Giles
11 would have to sign off on any --
12    A.   Right.
13    Q.   -- salary?
14    A.   Yes.
15    Q.   And when you were considering
16 Sheena's request for a salary raise, did you pay
17 any consideration to the amount Erica Sanchez was
18 making?
19    A.   I don't recall.  I don't recall.
20         MS. DIAZ:  Okay.  I have nothing
21 further.
22         MS. HARVEY:  Okay.  I think I have a
23 few questions.  Yeah, can we take short break?
24         MS. DIAZ:  Oh, yeah.  Of course.

140

1         (Whereupon, a short break was
2         taken.)
3         EXAMINATION
4 BY MS. HARVEY:
5    Q.   Okay.  Ms. Wilhight, I just have a
6 few questions for you.
7    A.   Okay.
8    Q.   If you could look at Exhibit 2.  I
9 can just show you mine.
10    A.   Oh, okay.  I've got them all out of
11 order here.
12    Q.   So I know recognizing you weren't --
13    A.   Okay.  Okay.
14    Q.   You weren't an employee at that
15 time?
16    A.   Uh-huh.
17    Q.   But based on your knowledge as a
18 Deputy Recorder of Finance, in your experience as
19 a Deputy Recorder of Finance, if you want to just
20 quickly look at -- if you could just explain what
21 you see -- what grade this position is that Sheena
22 was hired into?
23    A.   Yes, 18.
24    Q.   And what was the job title?

141

1    A.   Executive Assistant to Deputy
2 Recorder.
3    Q.   Okay.  And then if you could look at
4 Exhibit 17?
5    A.   Yes.
6    Q.   And, again, I recognize you weren't
7 an -- you weren't an employee at this time, but
8 based on your experience as a Deputy Recorder of
9 Finance for the Recorder of Deeds following this
10 period, what grade was Erica Sanchez hired into?
11    A.   She was a Grade 20.
12    Q.   And what was the job title?
13    A.   Executive Assistant to Chief Deputy.
14    Q.   So would you agree that those were
15 different titles?
16    A.   Definitely.
17    Q.   And are -- based on your experience
18 as a Deputy Recorder of Finance, are grades a
19 factor in setting someone's salary?
20    A.   Yes.
21    Q.   Can you explain how so?
22    A.   Because we are given -- what do I
23 call it?  At the close of the Budget -- and I will
24 use, like, 2000 -- we are closing the 2020 budget

36 (Pages 138 to 141)

142

1 projections.  In it the President's Office would
2 close out the grades and respective steps and
3 coincide the respective salaries that would go
4 with those.  They will close that out for each
5 budget cycle.
6            And then also they have already
7 worked through with their CBA how it coincides
8 with -- let's say it was for two years.  It may
9 have covered 2019 and 2020.  That would be a part
10 of the budget book as well.  So we use that as the
11 basis for, here is the grades.  Here is the
12 grades.  Here is the respective step, and you
13 match all that up for the coinciding salaries.
14      Q.    And so based on your knowledge,
15 would a Grade 18 receive a lower salary than a
16 Grade 20?
17      A.    Yes.
18      Q.    And would the Recorder's Office have
19 any discretion in changing the grade of a job
20 title?
21      A.    It -- let's say after a discussion
22 with HR and also with the RCA and with the DOC,
23 and also if it was -- well, this is in regards to
24 this?  It would probably be those key that are in

143

1 the discussion to change it because of the
2 Employment Plan.  We had to follow the Employment
3 Plan for all employment actions.
4      Q.    So is it accurate to say that every
5 job title has a set grade?
6      A.    Yes.
7      Q.    And there would have to be a process
8 in order to change that grade?
9      A.    Yes.
10            (Whereupon, WILHIGHT Deposition
11            Exhibit No. 18 was marked for
12            identification.)
13 BY MS. DIAZ:
14      Q.    I am showing you what I have marked
15 as Wilhight Exhibit 18.  I can just hand it to
16 you.  If you want to just take a minute just to
17 take a look at the document.  If you can just look
18 up once, you've just looked through it.
19      A.    Okay.
20      Q.    Can you tell me what this document
21 up here is?
22      A.    It's the job description for the
23 Executive Assistant to the Deputy Recorder.
24      Q.    Okay.  And what grade does the job

144

1 description say this position is?
2      A.    Oh, 18.
3      Q.    And is this the position that Sheena
4 Williamson worked in?
5      A.    Yes.
6      Q.    And if you want to look at the
7 Essential Job Duties.
8      A.    Okay.
9      Q.    Does the job description provide
10 that employees may be assigned additional duties
11 by management as required?
12      A.    Yes.
13      Q.    And if you'd just scan to the
14 essential job duties, are these the job duties
15 that Sheena Williamson performed as your Executive
16 Assistant?
17      A.    Yes.
18      Q.    And you had testified earlier to an
19 Exhibit 14, which was a document you had drafted
20 regarding Sheena's request for a salary increase?
21      A.    Yes.
22      Q.    If you want to take a look at that
23 document.
24      A.    Okay.

145

1      Q.    And in this document it looks like
2 you had referred to essential job duty items?
3      A.    Yes.
4      Q.    Would you have been referring to the
5 job description?
6      A.    Yes, the job description.
7      Q.    So if we counted down to, like,
8 in -- under A, you referred to -- under A in
9 Exhibit 14, you referred to Job Duty Item 7 and
10 Item 15.  If you count the bullet points --
11      A.    Okay.  Yes.
12      Q.    -- on the job description --
13      A.    Okay.  Yes.
14      Q.    -- does that --
15      A.    Okay.  No. 7.
16      Q.    And that.  So what is Duty Item
17 No. 7, if you can answer that?
18      A.    Okay.  That would be, "Completes
19 projects assigned by Duty -- Deputy Recorder with
20 minimal supervision to the satisfaction of the
21 Deputy Recorder."
22      Q.    And what would Item 15 be?
23      A.    "Organizes and expedites flow of
24 work through the Deputy Recorder's Office.

146

1 Initiates follow-up action on documents to ensure
2 appropriate information, approval or signature are
3 approved within a specified time period."
4     Q.    So would you agree that your
5 references to job duty item numbers in Exhibit 14
6 reflect the bullet points in Exhibit 18?
7     A.    Yes.
8     Q.    And there was some testimony about
9 Sheena filling in as the Chief Deputy -- as the
10 Chief Deputy Recorder's Assistant. How often do
11 you -- if you recall, how often did that Sheena --
12 did Sheena fill in for that -- in that position?
13     A.    I can't give a number, but if I did,
14 I would say maybe once every two months or
15 something if -- contingent upon if Erica and Robin
16 both were out.
17     Q.    So it was only in the absence --
18     A.    Absence of -- yeah.
19     Q.    Of one of them?
20     A.    Yes.
21     Q.    And if you know, did Sheena
22 previously work directly for Chief Giles?
23     A.    Yes. He held the position before I
24 came on.

147

1     Q.    So prior to you coming on, Sheena
2 reported directly to Giles?
3     A.    Yes.
4     Q.    In the role of Deputy Recorder of
5 Finance?
6     A.    Yes.
7     Q.    So they had previously worked
8 together?
9     A.    Yeah.
10     Q.    If you could look at Exhibit 12.
11     A.    Okay.
12     Q.    And this e-mail, this was in July of
13 2015; is that correct?
14     A.    Uh-huh.
15     Q.    And this was an e-mail where you
16 instructed Sheena to no longer do -- do the refund
17 processing?
18     A.    Right.
19     Q.    And then if you could look at
20 Exhibit 16.
21     A.    Yes.
22     Q.    You, again, instructed Sheena to no
23 longer assist with the refund processing?
24     A.    Right.

148

1     Q.    When you in your e-mail in
2 Exhibit 16 you just said, "As a result, once
3 again", would the once again have referred to the
4 prior e-mail from July of 2015?
5     A.    I can't recall, but I just know, you
6 know, dialogue, and things of that nature, they
7 had taken place.
8         MS. HARVEY:  Okay. I don't have any
9 other questions.
10         FURTHER EXAMINATION
11 BY MS. DIAZ:
12     Q.    I just have a couple of follow-up
13 based on that.
14         Ms. Wilhight, your counsel was
15 previously asking you to look at Exhibits 2 and
16 17. Can you take a look at those again?
17     A.    Okay. Yes.
18     Q.    Okay. So it's been established,
19 obviously, that you were not at the office during
20 the hiring of Sheena Williamson or Erica Cuevas.
21 However, do you notice the dates on both the
22 Offers of Employments?
23         So the Offer of Employments were
24 both sent out in 2013. Do you see that?

149

1     A.    Uh-huh.
2     Q.    So is it your understanding that the
3 Executive Assistant position for both the Deputy
4 Recorder and the Chief Deputy was vacant at that
5 time?
6         MS. HARVEY:  I can't say she would
7 know.
8 BY THE WITNESS:
9     A.    Yeah, right. Because I don't know
10 when people -- when a new administration comes, I
11 don't know.
12 BY MS. DIAZ:
13     Q.    So would you have any knowledge
14 about whether or not there was Executive
15 Assistants in those positions prior to Karen
16 Yarbrough coming into office?
17     A.    I can't -- I can't say that.  I
18 don't know.
19     Q.    And as your role as the Deputy
20 Recorder of Finance, if you were to create a
21 completely new position that there wasn't -- you
22 weren't filling a spot, it was a brand new
23 position, how would the grade be set?
24     A.    I could just walk you through what

150

1  would be a process, and that, again, would be one
2  based on the budget, the current position of where
3  it is, where it was -- the dollars in the budget,
4  and then, of course, doing any necessary research,
5  working with the HR to say what is the average
6  salary for Executive Administrative Assistants for
7  this role, this role, and this role, and where we
8  also look at what it is throughout the County as
9  well.
10           And then also, if it's a
11 position you are going to hire from outside, you
12 are doing your research to say what is that range
13 in there from -- to attract outside talent.  I can
14 just go through the how from that standpoint.
15      **Q.   I am referring to -- so if there was**
16 **a brand new position that had never previously**
17 **been occupied by anyone that your office created,**
18 **has that ever happened -- did that ever happen at**
19 **your time at the Recorder of Deeds Office?**
20      A.    I am thinking, thinking, thinking.
21 I think we had an IT, that IT.  An IT position.
22      **Q.    And so since an IT position was**
23 **newly created, who was responsible for setting the**
24 **grade?**

151

1       A.    At the -- again, it's going through
2  the research with the budget with the County,
3  because if you have anything that equates to it,
4  the County is telling you for any network
5  administrators, all of them are Grade 20, or it
6  may be this.  It may be this.  So, again, it
7  really factors in on what you are getting from the
8  County.
9       **Q.    So comparable positions?**
10      A.    Yes.
11           MS. DIAZ:  I have nothing further.
12           MS. HARVEY:  I don't have anything
13 based on that.
14           THE COURT REPORTER:  Signature?
15           MS. HARVEY:  Reserved.
16      (FURTHER DEPONENT SAITH NAUGHT.)
17
18
19
20
21
22
23
24

152

1  ERRATA SHEET
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24

153

1       IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4  MEGAN COOK and SHEENA      )
5  WILLIAMSON,               )
6         Plaintiffs,    )  No. 18-cv-4583
7    vs.                )
8  COOK COUNTY Recorder of   )
9  Deeds OFFICE, and COOK    )
10 COUNTY,                   )
11        Defendants.    )
12    I, CAROLYN R. WILHIGHT, being first duly
13 sworn, on oath say that I am the deponent in the
14 aforesaid deposition taken on November 6, 2019;
15 that I have read the foregoing transcript of my
16 deposition, and affix my signature to same.
17     _____
18           CAROLYN R. WILHIGHT
19 Subscribed and sworn to
   before me this       day
20 of          , 2020
21
22
   Notary Public
23
24

154

1
2     I, KARI WIEDENHAUPT, do hereby certify that
3  the foregoing was reported by stenographic and
4  mechanical means, which matter was held on the
5  date, and at the time and place set out on the
6  title page hereof and that the foregoing
7  constitutes a true and accurate transcript of
8  same.
9     I further certify that I am not related to
10  any of the parties, nor am I an employee of or
11  related to any of the attorneys representing the
12  parties, and I have no financial interest in the
13  outcome of this matter.
14     I have hereunder subscribed my hand on the
15  ____ day of _____, 2020.
16
17
18
19
20
21  _____
22  KARI WIEDENHAUPT, CSR
23
24

| A | | | | |
|---|---|---|---|---|

**A's** 79:10
**ability** 70:22
  138:1 139:1,7
**able** 48:18
**abreast** 114:8
**absence** 49:3
  146:17,18
**absent** 91:4 129:3
**accept** 26:21
  138:20
**acclimated** 127:19
**account** 49:15
  109:24
**accounting** 7:18
  8:15 11:13,16
  12:16 15:24
  45:22 46:8,10
  47:16 48:12,18
  48:22 64:21
  69:20 79:19
  82:14 84:11
  86:23 87:11
  116:11,17 126:1
  126:10
**accounts** 12:7
**accurate** 110:6,9
  110:12,13,14,15
  143:4 154:7
**acknowledged**
  125:11
**Acox** 40:23
**acronym** 15:7
**act** 123:14 124:22
**acting** 88:21
  95:14
**action** 51:22
  112:13 113:10
  114:9 116:4,7,9
  117:10 118:7,14
  119:10 146:1
**actions** 19:1 47:8
  112:1 118:4,9
  120:11 122:22

  143:3
**Adams** 1:16 2:4
**add** 24:19 110:17
**added** 81:18 82:2
  82:13 84:2,8,17
  107:18
**additional** 24:20
  29:6 37:21 80:4
  81:18 87:5
  110:18 144:10
**address** 135:19
**addressed** 58:1
  68:10 76:8
  83:20 91:8
  114:18 125:10
**addressing** 61:22
**admin** 47:21
  55:12 90:4,7
  92:14 105:9,23
**administration**
  53:9 113:17
  149:10
**administrative**
  19:21 27:17
  32:20 35:4
  38:12 50:7,11,17
  51:5 87:23 88:2
  88:5,7,9,11,12
  89:6,7 91:1 93:2
  96:13 97:1
  98:24 126:15
  128:16 129:1,11
  130:17 135:11
  136:21 137:23
  150:6
**Administrator**
  51:19
**administrators**
  151:5
**admins** 33:6 98:9
  129:4
**Affairs** 101:22,23
  102:1,15,17,21
  103:3,24

**affiliated** 16:22
**affiliation** 16:18
  17:2
**affix** 153:16
**aforesaid** 153:14
**afternoon** 5:8
**agree** 62:7 82:20
  141:14 146:4
**agreed** 123:21
**agreement** 63:4
**Ah-huh** 15:22
  116:19
**ahead** 114:15
**air** 27:11
**align** 78:2,13
**aligns** 80:7
**allow** 90:1
**allowed** 69:20
  92:23 120:4
**alter** 85:22 110:17
**amount** 29:7
  31:14,15 39:22
  130:16 139:17
**amounts** 134:3
**analysis** 88:13,18
**analyzing** 13:15
**announced** 22:13
  22:14 64:9
**annual** 27:20
  28:19 36:9,19
  37:1 43:23 44:3
  44:9,18 133:19
**answer** 63:7 69:3
  69:9 93:8 97:2
  97:15 135:12,13
  145:17
**answered** 123:8
**answering** 96:21
  96:22
**Antonio** 20:4 22:8
**anybody** 67:20
  103:19
**APPEARANCES**
  2:1

**appears** 38:10
  43:14 52:20,21
  55:4 56:1 57:13
  66:4 68:4 84:1
  114:1
**apples** 84:24,24
  85:9,9
**applications**
  34:17,18,19
**apply** 26:22 39:24
**appointment**
  41:22
**approached** 27:7
**appropriate** 94:9
  94:16 146:2
**approval** 99:14
  108:23 146:2
**approve** 134:20
  134:22,23
**approved** 120:17
  120:20 146:3
**area** 16:22
**asked** 36:22 67:14
  67:15 89:1
  101:8,8
**asking** 28:10 83:6
  86:15 88:6 95:7
  136:14 138:5
  148:15
**assign** 56:10
  64:20 80:4
  101:5 116:16
**assigned** 46:8
  51:10,11,11,13
  56:8,11 68:18
  69:20 79:20,24
  80:4,9 89:11,13
  89:17 90:1 92:7
  92:8 93:6,13
  96:18 103:5
  105:6 120:14
  144:10 145:19
**assigning** 61:1
  116:21

**assignment** 7:4
  45:17 46:19,23
  47:6 50:6,20
  51:2 52:1,13
  53:17 55:2,6,9
  57:22 60:18
  61:20,23 63:20
  66:21 69:18
  79:19 92:11
  93:16 94:6,10,24
  95:9 117:3,5
  120:10,18,20,22
  121:5,9
**assist** 45:22 77:18
  89:2 90:19
  91:18,22 98:15
  101:14 117:14
  119:21 120:4
  147:23
**assistance** 46:12
  91:23 115:24
**assistant** 19:21
  27:17 32:20
  35:4 36:5 38:12
  39:3 42:3 43:15
  47:21 50:7,11,17
  51:6 79:23 87:1
  87:8 88:21 90:4
  91:1 105:9
  126:15 130:18
  132:4 133:9,23
  135:17 136:21
  141:1,13 143:23
  144:16 146:10
  149:3
**Assistants** 55:12
  55:21 87:10
  93:3,10 96:13
  97:2 98:24
  103:23 104:2
  106:12 109:21
  128:16 129:1,11
  135:11 137:23
  149:15 150:6

assisted 98:10
assisting 82:14
   84:11 86:22
   116:10
assists 105:10
associated 23:13
ASSOCIATES
   2:2
assume 5:21 86:10
assumption 54:24
at-will 34:8,9,10
attempt 68:16
attempting 68:21
attend 99:9,15
   100:7,9,10,14,15
   103:2,23
attendees 98:16
   98:17
attending 97:24
   98:24 101:21
attention 57:11
   121:1
attest 40:8 91:14
   99:2,6 106:14
   122:1 128:18
   136:17 137:11
   138:18
Attorney 2:11
   6:12
attorneys 154:11
attract 25:10
   39:23 150:13
Audit 131:24
   132:1
auditing 15:23
auditors 8:18
   11:15 130:23
August 115:7
   122:14 123:15
   125:11
authored 86:11
   86:18,19
available 28:23
   29:4 37:17

50:14 103:11
average 24:24
   30:12 32:8
   59:11 150:5
aware 67:9 94:5
   98:23 106:11
   109:1 128:15
   133:23 135:10

**B**

B 4:1 78:8 79:9,9
   84:20 85:4
   88:21 91:12
   119:9 123:13
Babatunde 40:21
   52:1 57:16 66:5
   66:19
Bachelor's 7:17
back 10:5,7 21:20
   24:4 33:1 41:19
   42:15 52:10
   54:22 55:15
   62:4 63:16
   66:22 78:8
   92:16 101:1,3
   102:13 104:8
   109:11 115:18
   116:11 119:8
   121:1 123:6,13
background 7:8
   17:23 48:23
   49:24 126:10,11
   126:13
backup 49:4,11
   50:12,13
bad 70:4
balance 48:16
   49:17
balancing 48:9
band 49:9
bank 49:11,15
   133:4
Banquets 21:13
   21:18 22:7,11,18

barbecue 20:20
base 130:10
based 24:9 36:13
   36:15 37:3 44:3
   49:23 54:12
   55:10 73:5
   74:18,23 75:21
   77:23 80:12
   85:13 99:12
   109:16 114:13
   114:17 131:3,5
   131:14 140:17
   141:8,17 142:14
   148:13 150:2
   151:13
Basically 51:22
basing 69:13
basis 48:15 64:4
   78:16,17 126:5
   132:23 142:11
Batchelor 51:16
Bates 26:5 35:17
   38:5 43:8 45:11
   52:19 57:10
   61:9 65:23
   73:20 76:24
   77:14 83:13
   101:21 111:2
   115:2
bathroom 128:11
began 16:15
behalf 133:6
belief 66:14 69:4
   82:20 88:1
   91:20 105:4
believe 7:4 16:7
   31:9 33:5 35:6
   72:8 80:8 96:16
   107:1 118:17,18
   119:4 121:24
   135:1
believed 82:3
   86:22 90:3
   118:21

best 54:19
better 65:11
beyond 128:1
Bible 28:22
big 18:13 62:6
   79:8 100:24
   101:3
Biliken 100:23
   101:2
bit 9:24 24:4 32:9
   129:17
blah 73:9,9,9,10
   73:10 79:2,2,2,2
   79:2,2,3,16,16
   79:16 97:17,17
   97:17
Blan 14:17
board 22:2,3 23:1
   23:11,12,13,14
   23:14,19 64:8
body 115:10
book 28:21,23
   42:7,15,17 65:18
   90:11 105:24
   108:21 142:10
books 28:24 30:2
   71:2
boots 16:24
bottleneck 62:6
bottom 51:14 56:8
   57:12,15 87:18
brand 149:22
   150:16
break 6:7 18:24
   70:12,13 129:7,7
   139:23 140:1
breakfast 104:19
   104:23
Brenski 14:15,19
Brian 23:16,17,18
   102:24 103:9,18
briefly 13:7 29:8
   38:15 84:12
bring 30:12 107:9

118:19 122:21
bringing 104:22
brought 34:11
   63:16
Bud 100:23 101:1
budget 8:19 13:8
   13:11,12,17,20
   14:8,13,22 24:11
   25:1,2 26:15,18
   26:19 27:10,12
   28:21,23,24,24
   29:6 30:2,14,15
   32:5,7,19 37:22
   42:7,15,16 44:15
   46:10 108:21,24
   109:6,7,8,13,23
   132:2,3,21 135:9
   136:4,9 137:9,9
   139:4 141:23,24
   142:5,10 150:2,3
   151:2
budgeting 11:14
building 105:12
   105:14 106:13
bullet 84:10,15
   88:24 91:6,11
   92:2 94:13
   95:13 97:23
   101:21 104:13
   105:11 106:18
   145:10 146:6
bullets 110:18
bunch 26:17
   34:20
business 100:13
busy 103:16,19
buy 107:2
buying 107:5

**C**

C 78:8 84:20 85:4
   91:6 92:3 94:13
   119:9 123:13
C-A-R-O-L-Y-N

5:12
**call** 9:11 10:7
 11:18 18:23
 59:6 67:17 72:1
 100:20 102:5
 132:24 141:23
**called** 1:13 10:5
 10:13 12:20
 13:18 14:3 29:3
 54:3 67:16
 129:19
**calling** 54:9 55:18
 97:8
**calls** 92:12 97:2
 98:18 122:16
 127:4
**capital** 14:10
**Card** 102:6
**Cardelle** 53:13
 54:7,14,15,16,18
 67:10 114:10
**Carolyn** 1:12 3:3
 5:3,12 127:12
 153:12,17
**cash** 49:1,8,16
**cashiers** 136:12
 136:13
**catch** 14:1
**Catering** 106:18
**CBA** 29:21 30:24
 31:2 57:4 142:7
**cc** 51:20
**cc'd** 51:15 111:11
**Cedric** 9:4,9
 25:16,17,18
 41:12 51:15
 58:17 59:5 60:8
 90:21,24 114:1
 137:14 138:8,9
 139:10
**CENTER** 2:15
**certain** 31:3,4,12
 67:4 100:17
**certify** 154:2,9

**CFO** 8:16 11:14
 11:15 64:6
 130:21 131:21
 131:22
**chain** 59:3 70:8
**challenge** 62:18
**challenging** 62:3,4
 65:18
**chance** 65:24 68:7
 111:4
**change** 143:1,8
**changed** 26:16
 85:5
**changing** 65:16
 142:19
**charge** 71:8
**checks** 49:9 79:15
**Cheese** 105:24
**Chicago** 1:17 2:6
 2:16
**Chief** 8:12,13,13
 9:11,12 10:12
 12:9,10 13:13
 19:18 25:5,14,15
 39:3 41:10,11
 43:15 44:10,19
 45:4 58:17
 59:11,12 65:15
 67:8 71:1 89:2
 89:14,19 90:19
 90:21 91:18,22
 92:13 93:17,18
 93:20 95:5,6,24
 101:16 108:20
 123:5 130:21
 135:21,22 137:4
 137:5 138:13,20
 139:5 141:13
 146:9,10,22
 149:4
**Chief's** 88:21 89:6
 93:23,24
**Chloe** 10:12
**chose** 93:5

**Christmas** 21:2
**circumstances**
 39:11
**CitiBank's** 79:10
**citizens** 100:3
**Civil** 1:14
**clarification**
 110:18
**clarifies** 56:5
**clarify** 10:8 54:14
 116:6
**class** 129:18
**classified** 117:6
**clear** 124:13
**clearly** 6:3 119:13
**clerical** 117:14
 119:22
**Clerk** 8:7 10:5,13
 10:17 14:18,24
 23:9 34:10
 89:19
**Clerk's** 7:24 8:5
 8:12 9:3,10
 11:12 17:10
 19:4,24 40:4
**clip** 106:1
**close** 141:23 142:2
 142:4
**closing** 141:24
**co-op** 129:19
**coincide** 142:3
**coincides** 142:7
**coinciding** 142:13
**Coleman** 14:15
**collaborate**
 123:17
**collaborating**
 27:14
**collect** 133:5
**collecting** 133:5
**collections** 48:3
 79:4
**COLLEEN** 2:13
 3:5

**combined** 104:21
**come** 8:17 10:22
 10:22 17:1
 21:11,20 25:8
 27:2 32:21,22
 49:16 52:10
 63:4 67:8 95:21
 96:4 102:8,12
 125:5 130:1
**comes** 26:23 42:11
 92:16 101:15
 107:8 149:10
**coming** 6:13
 25:10 27:8 97:3
 97:6 106:3
 133:4 147:1
 149:16
**Commissioner**
 100:1
**Commissioners**
 99:6 134:22
**communication**
 14:21 132:5
**community** 98:4
 100:6
**company** 17:22
**comparable**
 137:15 151:9
**comparative**
 136:23
**compare** 137:21
**comparing** 84:24
**comparison** 138:1
**competitive** 55:11
 55:14,22 56:17
 56:20,22 69:8
**complaints**
 122:22
**Complete** 113:1
**completed** 10:3,20
 26:14
**completely** 149:21
**Completes** 145:18
**compliance** 18:2

18:24 47:3,9
 51:19 53:8 67:1
 72:12 113:4,7,11
 113:17 123:11
 127:6,9
**compliant** 18:18
 62:22
**comptroller** 8:16
 11:14 64:6
 127:5 130:21
 131:21
**concerned** 125:15
**concerns** 56:2
 57:21 115:20,24
 116:3,5,8 119:13
 119:15 121:16
 122:7 123:18,19
 124:7 125:9
 131:15
**conclusion** 124:21
 124:22 125:5
**confident** 39:15
**confined** 32:9
**confirmation** 37:7
**confirmed** 42:16
**consider** 51:4 82:6
 109:14 112:2
**consideration**
 139:17
**considered** 112:8
 112:12
**considering**
 139:15
**constitutes** 154:7
**consultants** 15:12
**consulting** 10:24
 15:2,23 16:10
**contact** 132:7
**contingent** 146:15
**contract** 31:2
**contracts** 11:23
**Control** 56:6,16
 57:2
**conversations**

49:23 52:12
113:21
**convert** 30:15
**Cook** 1:4,8,9 2:11
7:24 17:12 26:5
26:6 35:17 38:5
43:8 45:12
52:20 61:10
65:24 68:2
89:15,20 97:16
98:7 111:3
115:3 153:4,8,9
**cookcountyil.gov**
2:19
**Coordinate**
105:12
**copied** 51:23
112:15
**copy** 80:2
**corner** 128:6
**correct** 43:20 53:2
54:24 55:6,23
56:3,13 57:22
66:5,16 68:12
72:14 76:14,17
77:1,6,15,19
81:15 83:21
84:5 88:3 90:22
90:23 92:4,8
93:10 95:10
108:1 116:22
117:1 119:16,16
120:21 121:21
138:10 147:13
**correspond** 42:18
**corresponding**
33:7,9
**counsel** 6:15
62:14,17,17 65:8
65:9 123:5
148:14
**count** 145:10
**counted** 145:7
**counter** 78:24

**counting** 49:2
**County** 1:8,10
2:11 7:24 8:16
11:15 13:24
17:13 24:11,22
26:6,15,15,24
29:1,14 30:1,11
31:8,9,10 33:19
35:17 38:6 43:9
44:15 45:12
52:20 61:10
64:1,3,6 65:24
68:2 89:16,20
97:16 98:7
102:7 111:3
115:3 131:21
134:9 150:8
151:2,4,8 153:8
153:10
**County-wide**
134:14
**couple** 6:20,20
40:6 46:22 48:7
49:16 99:3
127:2 129:22
148:12
**course** 13:13 23:9
123:10 130:21
131:4 132:3
139:24 150:4
**court** 1:1 43:3
123:3,4 151:14
153:1
**courtroom** 5:19
**Courts** 1:15
**cover** 87:2
**covered** 142:9
**CPA** 15:17 16:1,2
**create** 46:18
111:18 149:20
**created** 150:17,23
**creates** 33:11
**Cross** 23:16,17,18
103:1

**cross-training** 7:3
**CSR** 154:22
**Cuevas** 19:7
133:17 148:20
**current** 10:17
81:11 150:2
**currently** 7:23
14:17
**customer** 127:4
**customers** 78:23
101:22 103:3,23
**cut** 79:15
**cycle** 142:5
**Cynthia** 99:3
103:16

**D**

**D** 3:1 78:9 84:21
85:4 95:14
119:9 123:13
**daily** 48:3,15 49:1
54:1 132:22
**DALEY** 2:15
**data** 14:8
**database** 12:20
13:1 95:23
104:20 106:10
**date** 18:4 43:10
57:19 69:16
109:11 154:5
**dated** 27:16 35:20
38:6 45:12
52:22 74:4
76:17 83:23
115:7
**dates** 22:18 82:23
82:24 115:18
117:2 119:7
122:14 148:21
**day** 48:9 63:2
77:13 96:5
100:2,3,14
132:18 133:7,7
153:19 154:15

**day-to-day** 78:16
110:6,10
**days** 129:23
**DD214s** 102:4
**deadline** 66:15
**deadlines** 64:11
64:17 66:17
**dealing** 32:1
**December** 8:4
134:10
**decided** 32:18
82:7 108:15,18
109:15
**decision** 32:11
44:13 71:6,9
72:24 73:1,5
75:18 82:8 95:9
95:11 108:4,12
131:11
**decisionmaking**
88:13
**deck** 104:4
**Decree** 17:13
**Deeds** 1:9 9:17,22
10:1 13:21 15:3
17:9,11 18:8
19:11 20:14
21:4 22:23 23:4
23:20,24 26:7
28:8 34:15 38:8
40:16,20 89:16
89:21 101:11
102:20 113:7,14
113:18 130:22
131:19 141:9
150:19 153:9
**Defendant** 2:20
**Defendants** 1:11
153:11
**Define** 88:4
**definitely** 39:14
141:16
**degree** 7:17,20
48:23

**delegated** 90:2
**Democratic** 16:18
**denial** 112:4,20
**denied** 107:24
**deny** 109:15 110:1
130:13 131:12
**department** 12:16
12:17 20:2 46:8
69:21 105:13,15
116:11 126:1
**depended** 99:24
**depending** 100:6
134:8 136:10
**depends** 30:9
**depiction** 110:6,9
**deponent** 151:16
153:13
**deposition** 1:12
4:3 5:15 6:7,11
26:1 35:12 38:1
43:4 45:6 52:15
57:6 61:5 65:19
67:21 73:16
76:19 80:18
83:7 110:21
114:22 133:12
143:10 153:14
153:16
**depositions** 1:15
**Deputies** 93:3
**deputy** 8:7 9:20
10:5,6 11:11
12:23 24:6
28:15 36:5,14
39:3 43:16
47:21 87:2,9
89:3,13,14 91:18
91:22 96:1 97:8
102:23 105:7
126:3,16 135:7
135:21 139:8
140:18,19 141:1
141:8,13,18

143:23 145:19
145:21,24 146:9
146:10 147:4
149:3,4,19
**describe** 29:13
54:19 55:16
88:15 89:10
94:15 100:24
125:4
**described** 29:20
**describing** 56:23
**description** 7:5
51:9 73:6,11
78:3,13 79:22
80:3 81:23 82:4
86:2,24 87:4
96:17 107:21,22
109:17 110:5,8
110:15,17
118:18,24 119:5
143:22 144:1,9
145:5,6,12
**desk** 91:9 92:15
92:20 93:22
94:22 95:19,21
96:3,6,8,14,20
96:21 97:5,6,12
114:9 126:21
127:24 128:17
128:22 129:2
**despite** 134:13
**detail** 34:15
**determination**
44:8 90:8 110:1
**determined** 27:24
28:19 30:23
93:15 107:18
108:16
**determines** 33:14
**deviating** 18:21
**dialogue** 62:15
63:3,3 115:16
119:7 122:11,15
122:18 123:16

138:16 148:6
**dialoguing** 107:14
124:20
**DIAZ** 2:3 3:4,6
5:7 26:4 28:10
28:13 35:15
36:2 38:4 43:2,7
45:9 52:18 57:9
61:8 65:22 68:1
70:11,15 73:19
76:6,22 80:21
83:10 111:1
115:1 133:15
135:6 139:20,24
143:13 148:11
149:12 151:11
**difference** 97:4
**differences** 136:10
**different** 30:8
42:10 50:2 51:4
91:13 97:5 99:5
137:22 138:2
141:15
**digressing** 54:12
**diligence** 73:13
109:18
**dinner** 20:17,22
20:24
**direct** 9:4 94:17
95:9,11 127:21
131:6
**directed** 47:5
**directing** 97:7
**direction** 47:10
97:3
**directive** 101:18
101:19
**directly** 42:18
119:14 146:22
147:2
**Director** 8:21
18:24 44:21
47:3,9 56:6,15
57:2 67:1 72:12

113:4,6,11
123:11 125:24
127:6,8 128:1,3
**disagree** 63:6,15
**disagreed** 62:19
62:21 63:13,14
64:18 123:21,22
124:1
**Discount** 102:6
**discrepancy** 96:23
135:10 136:6
**discretion** 41:8
44:17 142:19
**discretionary**
31:18 32:22
**discuss** 66:23
71:13 108:3
122:6 123:20
131:7 138:19
**discussed** 13:7
31:8 36:16
60:22 67:7
116:15 121:7,19
123:2,3
**discussing** 38:22
**discussion** 74:9,13
74:20,24 75:1,7
76:9 110:16
142:21 143:1
**discussions** 6:15
124:24
**District** 1:1,2,14
153:1,2
**division** 1:3 8:11
12:19,19 153:3
**DOC** 18:23 47:1,3
71:17 72:11
94:18 111:20
112:12 142:22
**docs** 6:20
**document** 26:10
27:16 38:6,11
39:2 41:13
45:13,15 46:19

46:24 51:23
68:3 79:1 80:23
81:1,2,6 83:14
83:16 85:11
86:13,18 111:7
143:17,20
144:19,23 145:1
**documented**
124:4
**documents** 6:17
6:19,21 85:22
132:8 133:3
146:1
**doing** 17:17 19:12
30:10 39:14
85:8 88:12,13
94:22 96:19
100:7 108:17
117:19 120:21
124:8,23 125:9
125:12 150:4,12
**dollar** 31:14,15
134:3
**dollars** 49:16
108:24 150:3
**double** 89:2 90:18
**downstairs**
103:20 104:5
**downtime** 94:2
**downtown** 21:9
**drafted** 144:19
**draw** 57:11
**drop** 15:7 29:2
132:17
**drops** 29:3
**due** 73:13 109:18
**duly** 5:1,4 153:12
**duties** 8:9 11:10
24:4 47:24 49:6
49:18 50:8,11,18
51:1,5,5,10,11
51:11,13 54:1
56:11 63:1 78:1
78:11,18 79:20

79:24 80:3,4,9
87:5,10,23 88:3
88:5,7 89:6,7,10
89:17,24 91:21
92:21 94:6
96:18 104:7
105:5,6 110:6,10
121:8 135:8,16
135:16,19,20
144:7,10,14,14
**duty** 14:24 67:19
79:18 85:3 89:2
90:18 121:14,15
145:2,9,16,19
146:5

---

**E**

**E** 3:1 4:1 97:23
**e-mail** 52:20,21
52:23 53:2,16,20
54:22 55:1 56:9
57:12,24 58:3,11
58:11,13,19,23
59:1,3 61:10,14
61:16,18 63:23
66:1,4 68:4,10
70:8 73:15,20,22
74:2,7,8,18,19
74:23 75:4,12
76:7,23,24 77:1
77:9,11,13,14,17
77:18 80:13
111:8,15,18
112:22 114:1,1
114:19 115:2,4
115:11,14,19
117:12 118:1
119:2,3,12
120:14 147:12
147:15 148:1,4
**e-mails** 57:13
69:18 112:14
**earlier** 38:23
122:10 136:19

144:18
**EASTERN** 1:3
153:3
**easy** 50:4
**Ed** 2:2 51:15
58:18 60:14
65:9 123:5
**Edmund** 60:13
114:2
**education** 7:16
**effective** 117:13
119:21
**eight** 130:3
**either** 7:3 72:2
**elected** 16:23
**elections** 23:1
**employed** 7:23 8:2
38:8 135:4
**employee** 24:8
28:8 35:24
118:17 134:15
140:14 141:7
154:10
**employees** 23:4,7
38:16 55:17
56:22 118:8
144:10
**employees'** 78:18
**employment**
18:20 19:1,13
33:2,13,23,24
34:4,21 35:19
36:12 37:2
38:19 47:8
51:22 55:16
59:22,23,24 62:5
62:8,11,16 63:17
65:14 71:2 73:7
73:7 90:11
94:19 109:17
112:1,13 113:9
113:10 114:9
116:4,7,8 117:10
118:4,9,13,14

119:10 122:22
130:4 133:17
143:2,2,3
**Employments**
148:22,23
**ensure** 19:1 68:16
68:22 78:2
146:1
**enter** 48:20
**entering** 17:23
**entire** 29:1 125:23
126:1,3
**entry** 41:23 42:2
**equated** 87:22
**equates** 151:3
**equipment** 95:2
**Erica** 19:6,7,10,10
19:20 20:15
23:8 45:18 91:3
91:15,17,22 92:3
92:6 99:2
133:17 135:1,5
135:16 139:17
141:10 146:15
148:20
**Erica's** 22:8,16
91:9 92:20 93:6
93:13,22 135:19
**ERRATA** 152:1
**Erwin** 40:21,23
40:24
**essential** 144:7,14
145:2
**essentials** 94:21
**establish** 37:16
**established** 37:6
102:2,5 148:18
**Estate** 8:7,11
**evening** 22:4
**event** 21:1 100:15
**events** 23:3 97:24
98:1,13,21 99:10
99:18 104:14,16
104:18

**eventually** 69:19
**everybody** 32:4
38:19 67:20
97:18 104:3
108:10
**exact** 134:6
**exactly** 11:19
21:23 29:11
78:21
**examination** 1:13
3:2 5:6 140:3
148:10
**examined** 5:4
**example** 34:10
39:17 105:24
**Excel** 48:3
**exception** 82:15
**excuse** 100:22
127:17
**Exec** 103:15
**Execute** 105:12
**executive** 33:5
36:5 39:2 42:3
43:15 47:21
51:6 55:12,21
67:18 79:23
87:1,8,10 90:4
91:1 93:9 96:13
103:22 104:1
105:23 106:12
106:24 109:21
130:17 132:4
133:9,23 135:17
141:1,13 143:23
144:15 149:3,14
150:6
**executives** 18:14
54:10 98:9
**exempt** 33:16,17
34:2,5,23,24
35:5,6 38:16
**Exhibit** 4:3 26:2,5
35:13,16 38:2,5
43:2,5,8 45:7,11

52:16,19 57:7,10
61:6,9 65:20,23
67:22 68:2
73:17,20 76:20
76:24 80:19,22
83:8,13 110:22
111:2 114:23
115:2 121:1,3
133:13,16 140:8
141:4 143:11,15
144:19 145:9
146:5,6 147:10
147:20 148:2
**Exhibits** 148:15
**expectation** 87:4
**expected** 59:15
**expedites** 145:23
**expenditure**
132:23
**expenditures** 14:9
**expense** 132:21
**experience** 39:8
39:16 40:8
140:18 141:8,17
**explain** 13:10 34:6
34:13 78:21
88:15 89:18,18
89:22,23 90:13
120:10 125:1
140:20 141:21
**explanation** 86:22
**exposed** 17:20
**express** 123:21
**extended** 129:20
**extensive** 130:16
**external** 8:18
11:15 12:1
130:23 132:1
**extreme** 128:10

———————
**F**
———————
**fact** 114:18
**factor** 33:11
141:19

**factors** 109:14
151:7
**fair** 5:24 59:2
86:10 130:19
**faith** 64:13
**fall** 100:12
**falling** 139:4
**familiar** 17:12,15
26:9
**far** 53:23 63:10
**fast** 77:9
**fault** 127:12
**February** 38:7
43:10
**feedback** 76:12,13
108:12
**feel** 62:15 65:11
66:8
**feelings** 63:17
66:11 70:4
**Felix** 40:21 51:24
52:2,12 57:16,19
66:5,19,20,23
**Felix's** 57:20
**fell** 88:2 90:3
105:5 118:23
119:4
**felt** 49:24 55:11
63:20 66:19
81:22 107:21
**file** 111:19
**filing** 88:9 133:3
**fill** 37:17 46:23
47:5 103:10
146:12
**filling** 28:18 133:6
146:9 149:22
**final** 25:13 44:8
124:16,18,21,22
138:13
**finalized** 41:10
**finance** 8:12 9:20
10:6 11:11 24:6
28:15 36:14

47:22 48:23
87:2,3,9,11
89:13 105:7
106:8,9 125:24
126:4,10,16
135:8 139:8
140:18,19 141:9
141:18 147:5
149:20
**financial** 10:21
11:3 17:17 56:6
56:16 57:2
154:12
**find** 68:15
**finding** 75:2
**findings** 74:21
**fine** 5:14 15:9
16:5 21:21
70:12
**finished** 66:2
**firm** 15:2
**first** 5:4 11:1
19:14 26:18
41:22 42:2
57:12 68:14
81:8,14 102:19
102:19 153:12
**fit** 25:1
**Five** 93:4
**flex** 100:20,22
129:14 130:13
131:7,8
**floor** 102:19,20
129:9
**flow** 145:23
**FMLA** 82:16
**focus** 39:13 62:8
**follow** 37:20 62:23
124:2,3 143:2
**follow-up** 74:9
98:18 146:1
148:12
**followed** 45:3 94:9
94:20 112:17

**following** 18:19
95:12 127:4
141:9
**follows** 5:5
**foregoing** 153:15
154:3,6
**forgot** 12:18,18
**formal** 46:19
47:14
**formalize** 45:23
45:23
**formally** 51:12
**formerly** 19:7
**forward** 59:15,17
**forwarding** 59:3
**found** 22:15 25:6
25:7 68:20
103:6 106:1
127:5
**four** 10:14
**FOX** 2:2
**fraud** 97:24 98:1
98:6,13 99:1,9
99:18
**free** 102:4
**frequently** 63:5
**Friday** 115:7
**frontline** 78:24
136:12,13
**fulfill** 45:17 93:16
102:10 129:21
**fulfilling** 92:20
104:7
**full** 8:10 12:5
17:22 18:20
34:15 42:6
47:17,19 100:14
110:19 125:15
125:16 130:3
**function** 8:23
11:17,20 88:9
105:7 117:15
119:22
**functioning** 90:7

**funds** 26:19
**further** 86:21
122:7 139:21
148:10 151:11
151:16 154:9
**FYI** 58:20 114:3

## G

**G** 101:21
**gap** 105:17
**Gary** 7:11,13
**gather** 49:8,8
**gears** 24:3
**general** 27:5,6
28:1,14,20 37:10
39:7 44:16
111:24 126:14
132:18
**generally** 59:14
136:1,3
**getting** 51:1 59:12
75:18 98:6,16
99:5 108:22
128:7 151:7
**Giles** 9:4 10:12
12:9,10 13:13
25:16 41:12
51:15 59:5,12
60:8,17 90:22,24
114:2 123:5
137:4,5,14 138:8
138:9 139:10
146:22 147:2
**Giles'** 9:9
**Gina** 47:24
**Giordano's** 107:8
**give** 24:1,9 25:18
37:22 60:21
73:2 87:6 97:2
99:13 107:9
108:11,19
124:16 134:3,6
146:13
**given** 5:15 92:24

101:17,19 133:1
141:22
**gives** 95:5 124:18
**Giving** 61:24
**Gleffe** 58:18 59:5
59:12 60:8,17
65:10 114:2
**go** 7:12 19:19 24:4
30:19 31:9 32:5
33:4,18,23 34:11
34:14,22 35:7
39:21,22 42:16
45:16 47:8,9
52:6 55:17,22
56:16,24 57:3,5
60:20 67:11
69:7 73:10
78:17 90:5 97:7
104:24 109:4
114:15 119:8
123:3 128:7
138:22 142:3
150:14
**goals** 98:3
**goes** 14:11 29:17
53:23 55:15
63:11 64:8,8
66:21 116:11
**going** 5:21 7:5,7
9:16 22:20 24:3
24:22 25:8,9
28:3 29:18
31:15 32:2,3
35:22 39:13
40:1,7 46:14
50:15 54:12
59:21 60:2,20
62:4,13 69:1
73:12,14 74:11
75:14 76:8
98:11 100:24
103:8,9 104:23
104:23 106:14
108:23 112:1

114:9 115:15,16
116:2 128:8,11
128:12,13 129:3
129:21 130:6,19
134:5 135:3
137:11 138:21
150:11 151:1
**good** 5:8 34:6
103:16 125:5
**Google** 24:16
**gotten** 103:19
**grade** 29:14,16,19
30:19 31:4,12,16
32:21,22,23 33:7
33:9 36:5 38:12
39:3 42:22,22
134:17,21,23
136:12 140:21
141:10,11
142:15,16,19
143:5,8,24
149:23 150:24
151:5
**grades** 30:22,24
31:17 33:4
141:18 142:2,11
142:12
**grant** 52:1
**ground** 17:1
**group** 11:21 18:12
18:13,13 44:15
54:8 95:23
100:4 104:21
105:21 106:10
108:9 131:24
132:1
**grouping** 87:19
**grow** 7:10
**guess** 125:14
**guidance** 28:21
**guy** 16:1 27:12
**guys** 62:10 70:12

## H

**H** 4:1 104:13
**hand** 62:13
  143:15 154:14
**handle** 46:12
  65:12
**handled** 12:6
**handling** 97:5
**hands** 104:4
**happen** 37:11,23
  64:16 150:18
**happened** 78:8
  100:12 119:9
  150:18
**happening** 92:16
  115:17
**HARVEY** 2:13
  3:5 28:3,7,11
  35:22 76:1,5
  135:3 139:22
  140:4 148:8
  149:6 151:12,15
**heading** 53:1
  88:21
**held** 146:23 154:4
**Hello** 97:16
**help** 16:20,21,24
  17:1 32:13
  46:16,20 47:12
  47:24 101:8
  104:23 105:20
**helped** 22:1
**helping** 83:6
**hereof** 154:6
**hereunder** 154:14
**Hewitts** 16:2
**hierarchy** 45:3
**high** 7:12
**higher** 30:3,3
**highest** 7:15
**Hill** 17:21
**hire** 15:16 26:7,13
  26:14 28:18
  33:15 35:10
  36:15 37:4,11

  43:9,15,22
  113:11 150:11
**hired** 16:1 30:5,8
  36:4 44:17
  135:5 140:22
  141:10
**Hires** 37:13
**hiring** 10:1 24:16
  27:1 33:16,19,20
  34:15 35:8
  46:18 55:19
  56:17,21 57:3
  69:8 148:20
**hit** 114:9
**holiday** 21:2
**hope** 76:12
**hoped** 76:11
**hosted** 104:19
**hour** 1:18
**hours** 100:13
  127:2 129:22
  130:16
**HR** 10:12 24:11
  25:6 26:15 31:9
  44:10,15 45:5,10
  54:4 60:15
  66:20 71:18
  95:21,22 131:9
  137:18 138:17
  138:22 142:22
  150:5
**Human** 40:18,19
  66:21 139:4
**husband** 20:4
  22:8,16
**Hyperion** 13:19
  14:3,4

**I**
**ICL** 15:5,11,21
  17:22
**ID** 4:2
**idea** 27:23 44:7
  107:15

**ideas** 106:3
**identification**
  26:3 35:14 38:3
  43:6 45:8 52:17
  57:8 61:7 65:21
  67:23 73:18
  76:21 80:20
  83:9 110:23
  114:24 133:14
  143:12
**IL** 2:6,16
**Illinois** 1:2,17
  2:11 153:2
**impact** 32:11
  63:24
**impacts** 108:24
**Imprest** 49:14,15
**inaccurate** 110:11
**incident** 70:8
  91:12
**include** 41:8
  121:9
**included** 8:18
**including** 126:3
**incorrect** 121:24
**increase** 50:20,23
  50:24 51:3
  70:20,23 71:9,13
  72:23 73:2 78:6
  81:4 82:8 83:18
  92:24 108:1,13
  108:16,18,24
  109:12 134:8
  144:20
**increases** 134:5,13
  134:16
**independent**
  88:18
**Indiana** 7:11,13
  7:22
**individual** 26:23
  30:8 137:21
**individuals** 51:21
  58:23,24 60:16

  114:5 128:21
  131:18 132:6,11
**inform** 60:2,4,5
  61:3 127:20
**information** 19:17
  24:17 26:22
  37:21 95:20
  98:17 130:24
  146:2
**informed** 59:8
  60:12 127:13
**informing** 98:3
  129:8
**initially** 13:1 30:5
**Initiates** 146:1
**input** 14:8 139:1
**inputting** 48:2
  87:20 88:11
**insight** 139:7
**instance** 52:12
  59:20 63:10
**instances** 132:9
**instruct** 137:5
**instructed** 147:16
  147:22
**instruction**
  127:23
**interact** 19:16
**interaction**
  132:14
**interactions** 53:24
  131:18
**interest** 154:12
**interim** 46:17
**interject** 43:1
**internal** 8:21
  11:24,24 131:24
**internship** 129:19
**interpret** 36:23
**interpreted**
  125:14
**interview** 10:7,15
  11:4
**interviews** 37:11

**introduced** 19:15
**investigation**
  111:19,22 112:3
  112:6,9,13,16
  113:1
**invoices** 12:6
**involve** 88:17
**involved** 17:8
  60:24 94:23
  138:17
**involving** 19:2
**issue** 78:24 116:13
**issues** 60:11 67:7
  70:2,3 116:17,21
  117:24 118:3,4,7
  119:10 126:18
**issuing** 74:20 75:1
**item** 14:9 85:3,4
  123:2 145:9,10
  145:16,22 146:5
**items** 79:8 132:23
  133:5 145:2
**IV** 27:18 32:20
  35:4

**J**
**J** 2:15 106:18
**Jackson** 16:2
**JACLYN** 2:3 3:4
  3:6
**James** 17:21
  58:18 60:8
  114:2
**jdiaz@efoxlaw....**
  2:8
**Jeron** 14:17
**Jim** 59:5 65:10,14
  67:8 123:4
**Jimmy** 14:16,19
**job** 7:5 8:9 24:4
  38:17,22 39:8
  40:10,13 41:17
  43:19 44:5 51:9
  54:1 56:3,5 62:9

62:12 63:19,21
64:13 73:6,11
74:9,13 75:8,22
78:3,13 79:17,22
80:2,7 81:3,15
81:23 82:3 85:2
86:1,24 87:4
90:1 91:21
92:21 94:5
96:17 99:19
104:7 105:5
107:21,22
109:16 110:5,8
110:14,17
118:18,23 119:5
132:19 135:8
140:24 141:12
142:19 143:5,22
143:24 144:7,9
144:14,14 145:2
145:5,6,9,12
146:5
**Jogging** 100:18
**joining** 15:3
**July** 74:4 76:17
77:6 78:8 83:23
109:11 122:14
147:12 148:4
**June** 16:13 45:12
52:22 57:16
109:11 123:15
125:10 134:9
**justification** 71:4
81:3 108:20
**justify** 72:20,22
**justifying** 73:9

**K**

**Karen** 9:8 10:17
12:11 13:13
16:9,15 20:14
41:14,16 59:16
149:15
**Kari** 1:16,22

154:2,22
**kathleen.ori@c...**
2:18
**Keeping** 114:7
**kept** 48:15 50:15
80:12
**key** 48:14 98:5
101:18 114:7
142:24
**kids** 41:2
**kind** 17:4 21:3
25:4 32:9 96:5
103:17 117:6
**knew** 20:18,21,21
50:2 65:13
114:10
**know** 6:8,14 8:13
9:7,10 14:17
16:4 18:11 19:6
19:9,17,22,22
20:19,19,19,20
21:15,17,21,24
22:17 23:21,22
23:23 25:4
27:10,13,14
30:12 31:24
32:10,17 33:9,10
33:10 37:22
39:18,20,21
42:12 46:11
49:21 50:13
52:4,8 53:10,20
54:20 58:22
60:21 64:10
65:18 66:1 67:7
67:11 68:8,24
69:2,9,22 71:23
77:9,11,21 80:11
84:12 85:2,13,24
89:18,22,23,23
90:9,13 92:17
95:16 96:3,4
97:4,22 104:16
105:15 107:16

108:22 110:3
111:4,22 115:11
115:23 118:3
120:1,1,3 123:16
125:1,3 126:9,13
128:7,8,9 129:4
135:14,18,18,20
135:23 136:16
136:16 137:12
140:12 146:21
148:5,6 149:7,9
149:11,18
**knowledge** 28:14
36:13 48:18
55:24 66:22
104:1 109:20,22
129:12 135:15
136:4 140:17
142:14 149:13
**known** 137:14
**knows** 97:18

**L**

**labeling** 87:20
**labor** 62:13,17
65:7
**Lafayette** 7:21
**lasted** 120:5
**late** 104:11
**LAWTON** 2:14
**lead** 53:12 65:16
**leader** 128:19
**leads** 67:12
**learn** 18:15 20:14
22:6,10
**learned** 97:15
**leave** 45:19 92:4,7
128:8
**leaves** 29:2
**leaving** 30:17
46:14 56:13
127:17
**led** 106:15
**left** 30:18 104:9

120:6 126:21
127:2,24 128:17
128:22 129:1
**legal** 10:11 62:17
65:7,9 123:4
131:9
**length** 131:1
**let's** 23:8 27:8
29:1 30:17,18
31:14,15 33:19
34:9,12,14 39:13
39:17 51:7 54:8
63:2,3 78:23
79:8,9,10,11
98:2 99:24
103:7,11 105:19
106:2 107:4
109:8 112:14
120:9 132:20
133:2 142:8,21
**letter** 6:23,24
36:15 47:23
85:14,19
**letters** 85:11 86:3
**level** 7:15 30:8
**liaison** 67:4,5,6
99:4 102:9
103:1 114:6
137:9
**liaisons** 59:7 60:7
65:16 114:7
**License** 1:23
**lie** 86:4
**limited** 89:21
**Linda** 51:16 69:23
**line** 14:9 63:24
111:17
**lined** 118:18
**lines** 90:6
**link** 31:15,16
**linked** 31:13
**list** 33:3,4,10,13
33:16 34:5
55:17 64:8

97:22
**listed** 33:1,6 38:19
49:18 81:11
121:8
**listen** 123:23
**literature** 98:18
**little** 9:24 24:4
32:9 100:20
124:11 129:16
129:17
**loaded** 31:19
**located** 10:8
**long** 8:2 15:14
35:8 80:11
120:2,3,5
**longer** 77:18,22
147:16,23
**look** 9:15 27:9
39:1 42:6 53:1
58:1 65:24 68:7
88:20 91:5
95:13 111:4
137:15 138:21
140:8,20 141:3
143:17,17 144:6
144:22 147:10
147:19 148:15
148:16 150:8
**looked** 43:19 44:4
77:15 125:16
143:18
**looking** 13:14
25:9 27:9 32:4,7
39:16,18 41:20
117:2 122:13
123:15 131:9
**looks** 27:17 41:13
43:23 51:14
91:8 115:3
145:1
**lot** 8:22 31:1
48:13 120:11
**lower** 142:15
**lunch** 107:5 129:7

luncheons 106:19
lunches 107:3

**M**
Macabenta 47:12
  48:22 56:13
  120:23
Macabenta's
  125:15
mail 90:5
main 14:11 48:10
  97:6 98:3 99:4
maintenance
  11:23
making 94:17
  139:18
man 10:11
manage 8:10 12:3
management
  12:20 13:1 87:5
  95:23 106:10
  144:11
Manager 12:22
manages 8:22
Managing 11:13
manual 71:3 73:8
  94:19 109:19
  130:4 131:10
manually 48:13
manuals 18:5
March 9:23 69:15
Mariella's 21:13
  21:18 22:7,11,18
marked 4:2 26:2
  35:13 38:2 43:5
  45:7 52:16 57:7
  61:6 65:20
  67:22 73:17
  76:20 80:19
  83:8 110:22
  114:23 133:13
  143:11,14
marketplace 12:1
match 42:17

142:13
material 98:15
maternity 45:18
  92:3,6
Matt 52:21 54:18
  55:4 56:1 57:21
  58:12,12 61:19
  64:19 67:10
  68:4,15 71:19
  111:8 114:10,18
  123:7 125:8
Matt's 66:8
matter 65:12,17
  154:4,13
matters 61:3
Matthew 53:4,7
  53:23 59:4 70:2
  70:5,7
max 39:20,22
Maywood 17:3
  21:16
McMahon 51:16
  72:14 111:8,23
  113:3,21
mean 10:6,8 16:21
  18:17 25:15
  32:3 34:22
  36:21 42:1,22
  44:20 48:6 51:8
  54:5 55:13 62:1
  64:2 67:6 70:3
  72:12 75:20
  81:3 88:4,6,8
  89:22 96:8
  97:14 108:6
  112:10 116:7
  117:16 125:3,18
meaning 79:15
  123:4
means 13:11 15:6
  35:7 47:3 80:1
  106:22 154:4
meant 118:20
mechanical 154:4

meet 20:6 25:9
  54:10 64:17
  71:12
meeting 11:1
  18:22 22:4
  64:11 71:16
  72:6,9,18,19,21
  75:21 107:4,6
  108:8 128:3
  130:20
meetings 54:3,6,9
  60:10 67:9
  72:17 103:7
  104:20 106:20
  106:24,24 107:2
  122:16,19
  123:12
meets 68:16
MEGAN 1:4
  153:4
memory 6:24
  100:18
mentioned 13:20
  54:13 84:3
  131:17,20
mentioning 67:3
message 59:10,14
messages 59:7,9
  59:13
met 6:12 10:4
  19:10,14 20:3,8
  54:4 68:22
  71:24 114:10
  116:12
metrics 64:17
Michalowski
  51:15 60:13,17
  65:9 114:2
middle 5:13 39:2
  68:3 111:7
  121:7
mine 140:9
minimal 145:20
minimally 69:5

minimum 68:17
  68:22 116:12
minute 56:23
  143:16
mischaracterizing
  76:2
missing 57:18
mixed 34:3
MONA 2:14
mona.lawtwon
  2:19
Monday 74:4
  76:17
money 107:1,8,9
monitor 92:12,15
monitoring
  118:10
month 54:11
  107:12,13
monthly 64:4
  122:19
months 12:21
  13:4,6 82:16,17
  146:14
morale 105:20
morning 129:22
Moved 105:24
moving 92:2 95:1
mutual 63:4

**N**
N 2:3 3:1,4,6
name 5:11 12:6
  18:24 40:22
  46:10 64:8 72:4
named 54:13
names 41:2
  131:20
napkins 105:1
nature 105:20
  132:8 148:6
NAUGHT 151:16
necessarily 62:24
necessary 63:21

150:4
need 5:13 6:6
  11:23 12:2
  24:19 48:14
  60:4,4 73:10
  97:7 99:14
  103:10 116:6
  123:13 132:10
needed 12:4 16:24
  17:24 19:18
  45:21 46:7,11
  47:11,24 50:13
  59:23,24 91:23
  94:22 95:4
  101:17 127:3
  129:20 132:7
  133:4 135:23
needs 94:1 99:13
  131:5,6
network 24:23
  151:4
never 109:3
  120:16 137:7
  150:16
new 51:1 102:1
  138:10 149:10
  149:21,22
  150:16
newly 150:23
Nick 46:14 47:12
  48:22 49:4
  56:13 117:3,3,4
  117:5 120:22,23
  125:15
Nick's 47:14
  48:10 117:8
night 100:4,5
non-exempt 33:18
  34:1,2
non-for-profits
  15:24
non-union 29:24
  31:5,7 42:11
normal 33:19,20

99:19
**normally** 48:12
60:9 78:15
**north** 100:1
**NORTHERN** 1:2
153:2
**Notary** 153:22
**notice** 148:21
**notify** 126:21
127:24 128:16
128:24 129:10
**notifying** 128:20
128:21
**November** 1:18
153:14
**number** 4:2 72:1
99:13 131:18
134:7 146:13
**numbers** 22:5
27:11 42:10
84:20 85:1,10
86:3 146:5

---

**O**

**o'clock** 1:18
**oath** 5:18 153:13
**object** 28:3 35:23
135:3
**objectionable**
68:15,21
**objectives** 98:3
**obtain** 7:19
**obviously** 125:8
135:8 148:19
**occasion** 20:10,11
22:19 127:1
**occasions** 89:1
**occupied** 150:17
**occur** 99:18
**occurrence**
103:18
**offer** 27:11 35:19
36:12,14 37:2
133:16 148:23

**offered** 29:7
**Offers** 148:22
**office** 1:9 8:1,6
9:3,10,17,22
10:2,22,23 11:12
12:5 13:17,21
14:13,20,22 15:4
17:10 18:19 19:4
19:5,11,15,24
20:14 21:5
22:23 23:20,24
24:1 28:9 36:1
37:22 38:9 40:4
40:16 89:16
94:9 95:19,22
97:3,17 98:5,19
101:4,22,24
102:1,2,11,15,18
102:20,22 103:3
103:24 104:6
105:17 111:19
113:6 118:10
119:11 122:23
128:5 129:24
130:20 131:19
132:2 135:5
137:6,12 142:1
142:18 145:24
148:19 149:16
150:17,19 153:9
**Officer** 8:12
**officials** 16:23
**offsite** 21:8 92:14
**oh** 6:23 10:11
14:3,15,23 15:12
18:19 20:18
22:12 32:2
33:14 45:19,20
56:20 57:18
58:15 67:15
84:16 85:15
104:12 107:13
107:14 110:13
110:13 112:7

114:16 120:6
123:24 124:3,14
127:11,12
132:16 139:24
140:10 144:2
**okay** 5:9,21 6:2,6
6:9 7:7,9 8:4,10
8:24 9:1,6,13,18
10:19 11:6,7,9
12:8,13,15 13:9
13:12 14:1,12
15:2,10 16:3,6
16:17 17:6
18:12,17 19:1,23
20:3 21:12,15
22:17 23:3,15
24:3,5,19 25:17
25:23 26:12
27:6,8,15,20,22
28:20 29:8,10,13
29:22 30:4,22
32:8,12,13,16
34:6 35:1,3,16
35:18 36:3,8,11
36:18,21 37:1,5
37:8,10,15,18
38:21 39:1,11
41:15,19 42:13
42:21,24 43:1,1
43:18,22 44:1,16
44:24 45:10,20
46:1,6,9 47:11
47:18,23 48:17
48:21 49:1,13
50:5 51:14,24
52:3,5,9,19 53:1
53:4,10,14,15,22
53:22 54:5,22
55:4,8 56:1,19
57:10,18,19,23
58:10,17,19,21
58:21 59:2,19
60:3,6 61:9,12
61:18 63:5,10,23

64:3,18 65:3,7
65:23 66:18
67:3,18 68:2,9
68:11,14 69:17
70:1,7,11,16,22
71:5,12,22 72:11
72:16,22 73:1,4
73:8,14,24 74:4
74:6,18 75:3,10
75:14,16,19 76:7
76:11,16 77:4,8
77:12,17,21 78:5
78:10,20 79:13
80:6,11,15 81:5
81:14 82:6,13
83:5,11,16,20
84:1,7,10,16
85:15,17 86:4,9
86:15,17,20,21
87:1,17 88:8,14
88:20,24 90:15
90:16 91:16,20
92:2,10 93:2,12
93:18,21 94:3,8
94:14 95:8,13,15
96:10,11 97:9,11
97:19,23 99:8,17
99:23 100:21
101:20 103:9,11
103:12,15
104:18,22
105:11 106:2,16
107:7,14,17
108:3,15 109:12
110:4,13 111:2,6
111:14,17
112:16,19
113:20,24
114:11,21 115:9
115:12,19,23
117:2,21 119:17
119:20 120:1,19
121:2,6,10,18,23
122:6,10 123:6

124:15,22
125:21 126:2,5,9
129:13 130:6
131:5 132:15
133:11,16 136:1
136:19 137:20
138:13,21
139:10,20,22
140:5,7,10,13,13
141:3 143:19,24
144:8,24 145:11
145:13,15,18
147:11 148:8,17
148:18
**okay.'** 127:18
**once** 22:15 54:11
67:7 72:1
117:13 119:3,21
143:18 146:14
148:2,3
**one-off** 125:17,18
**ones** 50:14 60:3
98:5
**onsite** 130:5
**open** 10:7 38:11
40:13 41:5
103:12,12,18
108:21
**operating** 103:7
**operation** 12:5
61:3
**operational** 63:1
99:13 119:14
131:5,6,15
**operations** 8:11
8:22 11:13
12:22,22 96:1
102:24 103:15
**order** 7:2 26:15
26:17 37:16
46:19 107:6,12
140:11 143:8
**orders** 11:22,22
**ordinary** 136:5

organization
16:19 79:11
**Organizes** 145:23
**originally** 41:20
**outcome** 154:13
**outreach** 97:24
98:1,13 99:10,18
100:15 102:10
**outreaches** 98:11
99:1
**outside** 10:24 12:2
15:23 21:1 25:9
25:10 29:23
32:11 55:11,14
56:22 81:23
82:3 97:13,19,22
100:12 107:21
113:17 117:7
131:18 135:22
150:11,13
**outstanding**
122:23 123:8
**overall** 59:6,8
60:2 61:24 62:1
104:21 118:9,13
119:10,14 136:9
136:11
**overpay** 78:23
**oversaw** 102:21
**oversee** 8:23
**overseeing** 12:24
**oversight** 135:9
**owe** 79:1
**owned** 22:7
**ownership** 130:11

___ P ___

**p.m** 1:18
**page** 33:6 81:9,14
81:18 91:5
101:20 154:6
**pages** 113:12
**paid** 135:1
**paper** 12:5

**paperwork** 74:12
74:15 75:15
76:9 133:3,6
**parade** 100:23
101:1,3
**paragraph** 68:14
87:17
**parameters** 32:1
32:11
**part** 8:23 10:23
13:7,21 27:1
53:8 64:16
79:18,22 86:23
91:21 96:17
105:9 112:12,16
113:9,10 137:1
142:9
**participate** 77:22
101:4,6 104:13
117:17
**participating**
117:24 118:12
125:12
**participation**
115:20
**particular** 29:19
82:23 97:8
**parties** 154:10,12
**Party** 17:3
**passing** 98:18
**Patricia** 41:1,3
**pay** 50:19,23,24
51:3 92:24
136:6,10 139:16
**payable** 12:7
121:11
**payroll** 26:21
132:16,17
**PCID** 26:22
**peers** 23:11,12,14
60:11
**people** 11:2 14:14
14:15 19:17
22:2 39:23,24

49:4 95:21 96:4
97:3,5 136:11,16
149:10
**perform** 50:7 51:2
87:19
**performance**
64:16
**performed** 144:15
**period** 18:10 21:2
23:1 30:16
67:20 129:20
141:10 146:3
**permission** 93:19
101:13,17
**person** 10:12,12
17:21 19:2
24:17,20,23 25:6
44:11,17 60:4,5
72:2 89:20
138:9,17
**personal** 20:15
**persons** 40:18,20
**pertaining** 1:15
**petty** 49:16
**phone** 72:2 92:12
96:19,21,22,24
97:2,22 98:18
122:16
**phones** 97:16
**phonetic** 14:17
**pick** 96:23
**picks** 104:8
**pickup** 49:11
**piece** 48:14
**piling** 46:13,15
**place** 39:15
100:16 107:6
131:4 148:7
154:5
**Plaintiffs** 1:6 2:9
153:6
**plan** 18:20 33:2
33:13,23,24 34:5
34:21 38:19

55:16 59:22,23
59:24 62:5,8,11
62:16 63:17
65:14,18 71:2
73:7,7,7 90:11
94:19 106:12
109:18 113:10
113:10 130:4
143:2,3
**planning** 14:10
101:6 104:14
**play** 130:19
**please** 5:10 6:7
53:20 117:13
119:21
**plenty** 123:24
**point** 28:17 98:10
**points** 145:10
146:6
**policy** 73:8 131:3
131:3 137:2,12
**portion** 61:11
**position** 10:6
23:23 24:15
26:20 29:1,2,14
30:9,16 31:10
32:8,18 34:12,13
34:16 37:12
38:11 39:19
42:6 43:19
44:17 47:15
56:7,11,12,15
60:2 61:2 62:15
63:24 64:19,21
68:17 87:8 93:7
93:13 109:23
110:9 126:15
136:5 137:16,24
140:21 144:1,3
146:12,23 149:3
149:21,23 150:2
150:11,16,21,22
**positions** 14:10
31:3,6,7,11 33:3

33:5 34:1 35:5
38:20 40:6 41:5
62:20 67:4
137:22 138:10
149:15 151:9
**possible** 137:21
**post** 34:12,13,16
38:17
**postage** 12:5
**posting** 38:11,17
40:10,13 41:5
43:19 44:5
**postings** 38:22
39:8 40:14,17
41:17
**potential** 40:2
**preparation** 6:18
**prepare** 6:11
**preparing** 8:19
**present** 25:5 71:1
72:6 91:15,17,22
137:10
**presented** 64:10
72:7,20 108:9
137:17 138:20
**President's** 142:1
**pretty** 132:13
**prevent** 6:3
**prevention** 98:6
**previous** 74:20
118:1
**previously** 16:7
36:16 44:4 47:2
116:15 117:16
118:22 121:15
121:18 126:7
146:22 147:7
148:15 150:16
**prior** 10:4 15:3
16:4 75:1,17
101:10 118:1
147:1 148:4
149:15
**prioritize** 93:23

priority 50:16
private 15:18
probably 15:18
37:20 75:23
117:20 118:5
120:6 142:24
problem 117:9
problems 117:11
Procedure 1:14
process 10:1 12:3
27:2 33:19,21
34:15 35:8
46:18 55:12,14
55:19,22 56:17
56:21,24 57:4
68:24 69:8
79:14 95:12
100:16 109:4
110:19 112:7,18
115:21 116:1
119:14,15 124:8
124:9 125:13,17
125:19,20
127:14,19 143:7
150:1
processing 77:19
77:22 78:20
79:17,22 80:9,12
82:14,17,21 83:1
84:11 86:23
88:1,14,17
116:24 117:14
117:18 118:1,13
118:21,23
119:22 120:5,15
120:21 121:11
121:12,20 122:3
122:8 125:10,21
147:17,23
procurement
11:17,18
program 14:2
prohibition 120:5
project 10:3,10,19

16:11 19:12,16
projecting 13:16
projections 142:1
projects 15:18
78:2,12,18
145:19
properly 78:3,13
property 97:24
98:1,6,13,24
99:9,18
protocol 94:9,16
provide 76:12
86:21 139:7
144:9
Proviso 16:18
23:19
Pryor 52:21 53:5
53:7,23 55:5
56:2 59:4 61:19
64:19 68:4 70:2
70:5,8 71:19
111:9 114:18
125:8
Pryor's 57:21
Public 153:22
pull 27:10 33:22
pulling 132:21
purchase 11:24
purchasing 11:16
11:18,19 12:17
44:21 95:3
106:9
Purdue 7:21
purpose 26:12
pursuant 1:13
put 21:19 26:17
26:18,20 28:11
33:22 34:4
36:21 39:10,12
39:24 46:10
48:8,10 50:3
59:22 79:9,10,11
88:8 109:12
112:11 118:3

124:10,15,17
138:11,12 139:1
putting 105:8
138:15

_____
Q
_____

qualifications
56:3 68:17,23
qualified 49:19,22
69:5,11 126:6,14
quals 116:12
question 21:19
31:20 36:22
54:4 63:8 67:16
69:3 81:24
84:22 93:8
125:4 135:12,19
questions 5:22 7:8
46:22 52:8 55:5
55:9 61:23 65:4
65:5 118:19
139:23 140:6
148:9
quickly 140:20

_____
R
_____

R 1:12 5:3 153:12
153:17
raise 139:16
randomization
34:19
range 29:15 39:4
39:9,10,12,19
40:1 41:8,21
44:4 150:12
rate 24:17
rates 137:23
Rayan 14:16
RCA 51:16,18
54:8,17 55:5
59:7,13,15 60:7
60:10,22,24
62:18 65:4,17
66:23 67:5,5,14
68:21 71:17,19

72:5 108:9,11
114:7 115:20,23
116:17,22
117:23 118:6
119:3,13 121:15
122:7,20 123:12
123:18 124:2,15
125:2,8 142:22
RCA's 66:11
68:16
re-classes 73:9
reach 132:7,10
reached 119:3
reaching 24:10,22
read 34:21 77:8
77:10 84:12
115:10 116:23
153:15
reading 18:14
61:15 111:14
Real 8:7,11
really 6:24 8:22
25:1 29:1 31:1
63:7 69:10 77:9
89:23 96:5
97:13,14 103:19
116:4 120:17,18
125:1 130:6
133:7 138:23
151:7
reason 30:7 77:23
121:23
recall 6:21 14:12
15:20 18:10
20:7,23 21:10
22:18 23:6
24:15 33:4,8
41:18 46:6,7
47:14,17 48:24
52:14,24 55:8
58:3,7 59:1,10
66:10 69:19,22
69:24 70:9,10
71:15,18 72:10

72:16,21 73:4
74:15,17 75:24
78:14,19 79:6
80:16 82:23
85:1 91:19
92:11 99:8
100:19 108:14
110:3 111:14,16
112:14,19
113:20,23,23
115:13,17 117:6
117:20,22,23
118:2 120:16,18
121:3 122:9,12
122:16,17
126:12,20
131:19 132:9,12
134:5 136:23
139:19,19
146:11 148:5
recalling 21:3
receive 18:1 134:7
134:10 142:15
received 134:4,9
134:11,12
recognize 45:13
61:13 73:21
83:14 141:6
recognizing
140:12
recollection 48:22
58:8 78:10
91:17 114:4
122:2
recommendation
109:9
recommendations
25:19 62:23
63:6 66:11
123:23 124:2
recommended
27:3
recommending
109:2

reconciliation
49:14
record 28:12
35:23 102:4
Recorder 1:8 9:17
9:20,22 10:1,6
11:11 13:14,21
15:3 17:9,11
18:8 19:4,10,19
20:13 21:4
22:23 23:4,20,24
24:6 28:8,15
33:15 34:14
36:5,14 38:8
40:16,20 43:16
44:19 47:22
64:12 87:2,9
89:13,16,21
92:13 95:24
101:11,16 102:2
102:20 105:7
106:24 108:20
113:7,14,16,18
126:3,16 130:22
131:19 135:7
139:8 140:18,19
141:2,8,9,18
143:23 145:19
145:21 147:4
149:4,20 150:19
153:8
Recorder's 10:23
14:19 19:5,20
35:24 51:19
92:14 97:17
98:2,5 101:4
105:17 142:18
145:24 146:10
Recorder-Finan...
89:3
Recorders 26:6
records 20:1
92:17
redo 37:23

refer 49:2
referenced 51:23
91:3
references 146:5
referencing 84:20
85:1 86:3
referred 145:2,8,9
148:3
referring 40:4
57:17 58:13
61:11 83:17
85:3 86:7 88:22
95:16 111:23
145:4 150:15
refers 104:17
reflect 42:14
146:6
reflecting 55:19
refund 77:19,22
78:20 79:1,17,21
80:8,12 115:21
115:24 117:14
117:18,24
118:13 119:13
119:15,22 120:4
120:14,21
121:11,12 122:2
122:8 124:8,9
125:13,19,20,21
147:16,23
refunded 125:9
refunds 46:12,15
79:15 82:15,17
82:21 83:1
84:11 86:23
87:20 88:2,14,17
116:24 117:6
118:5,22,23
121:20
refuse 64:9
regarding 144:20
regards 142:23
regular 100:13
103:7

reiterate 66:7
related 14:8 63:17
63:18 87:3
113:12 154:9,11
relates 8:15 14:10
69:10
relations 22:7
relationship 16:8
16:15 20:15
22:11
remember 16:9
23:8 38:17
40:22 47:19
52:11 61:16
71:17 72:3,19
86:1 101:3
127:10 129:13
remembered
10:14 70:19
repeat 36:22
81:24
rephrase 31:23
75:3 138:6
report 9:2,6 12:8
12:10,13 64:3
87:12 131:6
132:24
reported 11:17
87:15 102:24
147:2 154:3
REPORTER 43:3
151:14
reporting 8:13,15
8:16,17 64:1,4
130:20
reports 8:21 64:5
64:6 132:17,21
134:6
representing 2:9
2:20 154:11
request 26:7,13
26:14 28:18
36:15 37:3,11,13
43:9,14,22 45:16

45:23,24 55:2
70:19 74:8 78:4
78:6 94:10
104:3 107:24
109:15 110:2
112:5,21 113:22
116:24 121:4
126:20,23
129:13,17
130:14 131:8,12
139:16 144:20
requesting 130:24
requests 92:12
94:21
require 128:18
required 48:8
50:7 57:4 87:6
87:19 89:5
94:18 97:12
100:8,14 104:10
128:24 144:11
requirements
18:22
research 24:10,12
24:13,18,21
30:10 136:22
150:4,12 151:2
Reserved 151:15
residents 98:7
Resources 40:18
40:19 66:21
139:5
respect 64:11,12
123:19,20
respective 142:2,3
142:12
respond 67:14
responded 84:7
84:17
response 55:1
57:20 61:19
66:8 75:7 78:6
82:11,12 83:17
85:20 86:8 94:8

116:23
responses 66:24
responsibilities
78:2,12,18 81:15
81:19,22 82:2
84:2,8 85:2
107:19,20
132:19
responsibility
48:10 67:13
74:9,13 75:9,22
82:13 84:18
87:6 139:3
responsible 11:22
41:4 104:6
150:23
result 117:13
148:2
results 72:7
retain 111:19
retiring 47:12
revenue 64:4
review 6:17,19
10:9,21 11:4
17:18 53:20
74:12 75:15
76:9 132:22
reviewed 81:5
revising 62:11
131:4
revisit 78:17
revisiting 78:1,11
RICHARD 2:15
right 6:16 10:17
15:8 17:4 22:12
22:23 30:9
36:24 41:21
47:7 63:12 66:8
69:6 71:11 73:3
85:15,21 92:9
94:24 97:6,21
112:22 113:9,19
114:20 116:18
118:11 119:23

128:12 139:12
147:18,24 149:9
**rings** 96:19
**Robin** 19:20 23:9
92:13 99:4,4
146:15
**role** 13:8 53:10
60:18 61:1 90:6
113:12 130:19
137:9 139:3,7
147:4 149:19
150:7,7,7
**roles** 64:24 65:15
**room** 27:13 29:6
32:5 90:5
107:10 109:6
**routine** 47:8
**RTH** 138:14
**rubber** 49:9
**rule** 124:16,18
**rules** 1:13 59:21
**run** 90:5 103:20
**running** 22:2

_____
**S**
_____

**S** 4:1
**SAITH** 151:16
**salaries** 135:9
136:23 137:15
138:2,9 142:3,13
**salary** 24:7,24
25:8,13,19 27:3
27:20,24,24
28:19 36:9,19
37:1,4,6 39:4,8
39:12,15 41:8,21
42:19,22 43:23
44:3,4,9,18
70:20,23 71:10
71:13 72:23
73:2 74:8,12
75:8,22 78:6
81:3,12 82:8
83:18 108:1,13

108:16 109:21
112:4 133:19,24
136:20 137:16
137:20,22 139:1
139:13,16
141:19 142:15
144:20 150:6
**Sanchez** 19:6,23
20:16 22:8
45:18 133:17
135:1,5,16
139:17 141:10
**Sanchez's** 20:4
22:11
**sat** 91:9 92:19
96:5,8,13 108:5
108:6
**satisfaction**
145:20
**satisfied** 133:8
**saw** 46:12 63:3
86:1
**saying** 23:11
27:12 32:15
40:3 55:10
85:11,23 109:4
110:11 118:6
119:4,6 122:14
127:16 138:13
**says** 36:4,8 39:2,4
41:21,22 51:9
58:4 63:24
68:15 74:7,11,24
80:3 81:18
82:14 87:5,18
89:1,16 90:17
94:8 95:14
97:23 101:21
104:13 105:11
106:18 111:18
115:19 123:8
131:10 133:19
**scan** 144:13
**scanning** 133:3

**schedule** 29:24
100:20,22
105:12 130:10
**school** 7:12 22:1,3
22:24 23:11,12
23:13,14,14,18
101:1,3
**searched** 106:1
**searching** 107:11
**season** 132:21
**second** 53:19
81:17 115:10
**security** 95:14,20
96:3,8,14 97:12
**see** 6:23 14:14
23:8 24:24 25:1
27:18 32:24
34:12 36:3,8
38:12 39:5 40:1
41:19,23 43:16
43:24 48:4 51:7
56:23 57:17
58:1,10,20 68:5
69:10 71:3 74:5
74:13 78:23
81:12 82:18
87:23 88:22
92:13 95:21
97:10 109:3
111:11,17 115:5
115:21 121:9
132:24 133:2,19
136:5 140:21
148:24
**seen** 52:22 80:23
85:10 126:6
136:15,15
**segregation** 49:6
**send** 49:10 59:9
64:5
**sending** 58:3
**senior** 100:2
**sent** 36:13 53:2
58:11,23,24 59:9

77:5,13 111:15
114:1,5 115:13
119:2 120:13
148:24
**separate** 13:23
91:12 113:8
**separating** 87:19
88:10
**September** 82:15
82:22 121:20
**Serah** 71:24
**served** 103:21
**services** 8:8 98:4
**serving** 93:3
**session** 107:15
122:20
**sessions** 105:13,15
106:13
**set** 13:11 27:20
29:17 30:1 31:1
32:1 36:19 37:3
37:4 43:23
44:18 55:17
66:22 69:2
98:14,14 99:5
105:2 136:20
138:9 143:5
149:23 154:5
**Set-Up** 104:14
**setting** 24:7
137:15,20
141:19 150:23
**seven** 82:17
**Shakman** 17:13
18:2,18 33:1
62:22 125:3
**she'd** 90:5
**Sheena** 1:4 7:1,2
35:20 37:2
45:16 46:7,9
47:18 49:19,23
50:6 53:17 55:2
56:7 61:20
64:20 69:19

70:19 71:12
74:15 75:7 76:8
77:3,18 81:2,11
81:22 82:3 83:2
83:17,21 84:3
85:19 86:8,19,24
87:7,15 89:5
90:1 91:18 92:7
92:19,23,23 93:5
93:6,13,16,21
98:12,20 99:9
100:8,13 101:5
103:2,12,12
104:5 107:21
112:14 115:4
116:10,16
117:24 118:12
120:3,14,20
121:4,19 122:3
124:7,9 125:9,12
126:5,9,14,18,20
127:2,23 128:20
128:21,24 129:6
129:14 132:5
133:22 134:12
135:17 140:21
144:3,15 146:9
146:11,12,21
147:1,16,22
148:20 153:4
**Sheena's** 56:2
82:20 96:17
107:18 108:13
109:15 110:2,5,9
112:4,21 113:21
115:20 116:23
131:8 132:19
133:8 139:16
144:20
**sheet** 57:14 152:1
**sheets** 99:12
**shifted** 12:22
14:16 60:1
**short** 70:13 96:4

131:3 139:23
140:1
**shortly** 18:7
**show** 73:14 76:23
83:11 106:2
140:9
**showing** 35:16
143:14
**side** 95:3
**sign** 41:17 112:20
127:20,20
138:12,14
139:11
**sign-off** 112:18
**sign-up** 99:11
**signature** 46:3
146:2 151:14
153:16
**signed** 41:14
85:19
**significance** 33:12
127:7
**significant** 127:10
**similar** 121:14
**sit** 60:9 97:12
105:18
**site** 19:18
**sitting** 93:22
102:11 103:21
**situation** 116:9
**six** 16:1
**skill** 69:2
**Skokie** 100:1
**small** 49:6
**solely** 109:16
114:17
**solidify** 117:20
**someone's** 141:19
**somewhat** 51:7,8
**sooner** 76:14
**sorry** 11:8 22:10
28:14 31:21
56:9 57:13
58:16 80:15

84:15 94:12
99:21 114:15,16
114:17 120:2,24
136:3 138:4
**sounds** 124:11
**Spangler** 54:15,16
**speak** 19:18 70:7
98:20 111:24
**speaking** 98:16
**special** 102:3
104:14,16,18
**specific** 27:15
32:18 40:10
41:13 52:11
58:23 117:4,8
**specifically** 23:6
106:5 119:15
136:20
**specifics** 100:19
126:12 132:12
135:24
**specified** 146:3
**speed** 18:16
**spell** 5:10
**spending** 107:1
**sponsor** 100:4
**sponsoring** 100:1
105:8
**spot** 37:17 45:17
149:22
**spreadsheet** 48:11
48:20
**spreadsheets**
46:11 48:4 50:3
50:4
**stack** 79:5,8
**stacking** 88:10
**stacks** 79:3
**staff** 8:14 9:11
17:24 22:15
48:8 49:4,6,12
67:16 89:20
104:20 106:19
127:15,16

128:19 130:22
**Staggers** 23:9
**stamp** 101:21
**stamped** 26:5
35:17 38:5 43:8
45:11 52:19
57:10 61:9
65:23 73:21
76:24 77:14
83:13 111:3
115:3
**stand** 7:6
**standard** 55:18
56:24 97:18
**standpoint** 60:23
128:5 150:14
**start** 9:21 30:5
31:12 84:10
100:17
**started** 13:2 15:21
16:9 18:3,8
19:13 54:3,6,11
100:17 102:3
**starting** 82:24
101:11
**starts** 29:15
**state** 5:10 12:18
117:12 119:9
**State's** 2:11 6:12
**stated** 31:3 79:1
103:8 109:17
124:20
**statement** 61:24
62:2 121:22,24
**states** 1:1,14 73:8
90:11 119:12
153:1
**stating** 66:13
**stations** 127:17
**status** 114:12
**stay** 104:11 130:2
130:4
**stenographic**

154:3
**step** 29:3,5,12
30:16,19 31:16
41:23 42:1,2,23
109:5 134:4,8,12
134:15 142:12
**steps** 29:9,16,19
30:2,4 31:18
34:20 42:18
110:17 117:22
142:2
**Street** 1:17 2:4
**strike** 80:16
107:19 120:2
**strong** 66:11,12
**stuff** 101:2 120:18
**subject** 53:16 74:8
**submitted** 74:12
74:16 75:15
76:9
**subscribed** 153:19
154:14
**substantially**
135:1
**suggestion** 24:19
**suggestions** 24:9
124:16
**Suite** 1:17 2:5
**summer** 16:13
**superior** 101:19
128:17
**supervision**
145:20
**supervisor** 9:5
130:5 138:24
**supervisors** 97:9
98:10 127:21
139:2
**supply** 11:22
**supporting** 48:3
**supposed** 59:8
62:23 109:18
**sure** 11:6 25:7
33:3 36:23

48:14 49:8
50:15 52:5
60:11 67:8 72:5
73:10,12 78:12
84:23 85:3,8,21
86:6 94:17,20
95:1,4 96:2
102:11 107:7
118:10 124:12
132:13
**switch** 24:3
**sworn** 5:2,4
153:13,19
**system** 13:18 14:7
14:11 26:17,21
26:23 30:15
48:12
**systems** 24:23

**T**

**T** 4:1
**table** 98:15 108:5
108:7
**take** 27:9 30:19
32:24 42:6
48:19 53:19
64:24 65:24
67:2 68:7 70:11
77:10 92:17
109:24 110:17
111:3 115:10
124:8 129:6,7
132:8 137:18
139:23 143:16
143:17 144:22
148:16
**taken** 1:16 70:14
140:2 148:7
153:14
**talent** 40:2 150:13
**talk** 41:2 52:4,7,7
52:10 63:8 67:1
89:17 103:8,17
105:19,23 127:8

138:22
**talked** 27:6 70:24
**talking** 10:16
  24:24 25:6
  27:14 29:9
  38:15 39:18
  85:10 94:18
  109:5
**Tax** 8:7,11
**taxes** 15:23
**taxpayers'** 107:1
**team** 10:24 53:9
  61:4 64:14
  71:21,23 79:4
  105:8,9,12,14
  106:6,12,23
  107:2 132:3
**team/department**
  106:19
**teams** 106:7,15
**technology** 24:18
**tell** 5:23 6:12 9:24
  15:6 18:4 21:22
  31:11 47:16
  49:9 104:24
  106:22 129:16
  129:16 143:20
**telling** 66:18
  77:18 102:12
  151:4
**temp** 117:3
  120:17,19,22
**temporarily** 12:19
  56:8 61:1 64:20
  68:18 92:7 93:6
  116:16,21
  120:14
**temporary** 7:4
  45:17 46:19,23
  47:6 50:5,20
  51:2 52:1,13
  53:17 55:2,6,9
  57:21 60:18
  61:19,23 63:20

66:20 69:18
  79:18 92:10
  93:16 94:6,10,24
  95:9 117:5
  120:10 121:4,8
**tenure** 136:11
**term** 7:3 89:24
**terminated** 30:17
**terms** 24:14 40:1
  89:17 93:24
  96:23 109:6
**terrible** 9:14 41:1
**testified** 5:5 16:8
  47:3 80:16
  116:22 118:22
  144:18
**testifying** 6:4
**testimony** 76:2
  79:21 85:18
  122:12 146:8
**testing** 6:24
**thing** 11:12 92:18
  95:2 96:20
  101:18 103:14
  112:8 114:3
  121:12 136:17
**things** 17:24 25:4
  31:12 45:22
  46:17 48:13
  50:2,15 59:8
  60:1 62:21
  64:23 66:22,23
  70:24 71:1
  73:11 90:12,12
  94:2,20,22 102:4
  105:20 112:19
  116:13 117:4,4,8
  119:11 120:17
  122:23 123:1,7,7
  123:14 125:6
  127:5 132:8
  135:14 138:22
  148:6
**think** 6:19 15:7

21:20 22:14
  24:14 25:19
  29:15,16,20 34:6
  35:9 47:2 63:18
  76:1 78:7
  103:15 105:19
  107:13 110:4,5,8
  110:14,14
  116:12 129:18
  130:18 139:22
  150:21
**thinking** 6:3 21:1
  22:24 23:2,10
  38:18 40:6
  90:10 150:20,20
  150:20
**Thomas** 51:15
  111:8,23
**thought** 38:24
  65:17 105:22
**thousands** 31:10
**three** 14:15 15:18
  15:19 91:10
  93:9
**Thursday** 103:10
**time** 6:6 9:17 11:1
  14:18 16:10
  17:20 18:10
  20:13 21:2 22:3
  22:6,10,22 23:1
  26:16 28:9
  33:15 35:24
  40:4,20 43:12
  46:13 49:24
  50:14 64:7,12
  65:15 67:2 72:3
  77:10 83:2
  91:17 92:19
  94:19 98:10
  100:17,18
  106:10 111:15
  117:8 120:13
  122:4,20 123:17
  129:14,21

130:14,23 131:1
  131:7,8 133:1,18
  134:7 135:5
  140:15 141:7
  146:3 149:5
  150:19 154:5
**timing** 122:1,1
**title** 8:5 9:9,19
  15:11 24:2
  47:17,19 54:20
  56:6 136:6
  140:24 141:12
  142:20 143:5
  154:6
**titled** 81:15
**titles** 141:15
**today** 5:17 6:4,11
  103:13 117:13
  119:21
**told** 46:13,18,22
  77:21 93:22
  103:4 117:17
  127:11
**Tom** 47:1,5,9
  72:14 112:1,1,8
  112:15,15,19,20
  113:3 127:11,18
**top** 46:4 50:10
  57:24 58:14
  61:11 113:24
**topics** 60:12
**total** 49:10 82:17
  117:10
**totally** 63:13
**Township** 16:18
**tracked** 132:23
**Tracking** 132:22
**training** 18:1,12
  97:11 105:13,15
  106:13
**transcript** 153:15
  154:7
**tried** 96:2
**true** 121:17 154:7

**truly** 64:1
**truthfully** 6:4
**try** 46:16 79:9,11
  100:7
**trying** 24:15 49:5
  55:15 63:19
  120:9 125:4,7
**Tuesday** 52:22
  77:5
**turn** 81:8,17 91:5
  101:20 120:24
**turning** 72:22
**twice** 22:20,21
**twisted** 124:12
**two** 7:6 14:14
  49:4 57:13
  67:12 71:18
  82:16 99:6
  102:3 142:8
  146:14
**type** 18:21 26:9
  92:18 95:2
  136:17
**typical** 39:7
**typically** 38:16
  125:22

---

**U**

**uh-huh** 6:1 14:5
  17:19 26:8
  27:19 28:16
  36:7 38:14
  40:11 41:24
  43:13,21 44:22
  46:2,5 48:1
  50:18 53:18
  54:23 56:4 58:2
  58:18 66:3,9
  68:6,13 74:10
  76:18 77:2
  81:10,16,20
  82:12 86:14
  87:16,21,24 89:4
  90:20 91:7 92:5

104:15 113:5
118:15 126:8
129:15 133:21
134:14 139:9
140:16 147:14
149:1
**Uh-uh** 6:5
**ultimate** 71:9 73:1
82:7
**ultimately** 25:12
107:17 113:13
130:13 131:11
139:10
**umbrella** 88:2
**unacceptable** 64:2
66:8,13,15,19
**unaware** 67:11
**unclear** 68:19
**understand** 5:17
5:22,23 36:11
38:7 43:11 50:3
75:11 80:1
84:22 91:12
112:10 125:7
133:18
**understanding**
32:14 35:2
41:16 44:2 75:6
81:21 82:1
89:12 91:11
149:2
**understood** 52:5
69:2
**Unfortunately**
48:11 78:9
**union** 29:18,24
30:18 31:2 42:5
57:1 134:13
**United** 1:1,14
17:3 153:1
**units** 105:18
**University** 7:21
**updating** 62:11
**use** 12:1 13:18

14:7 32:10 34:9
71:1 89:24
102:6 127:16
130:6 141:24
142:10
**usually** 19:19
25:21,22 29:5
30:4 37:13
41:22 95:19
139:4

_____
**V**
**V** 38:12
**vacant** 149:4
**varied** 100:5,6
**variety** 56:11
**vary** 99:22 132:20
133:7
**vendor** 12:2
**verbally** 90:14
**vet** 34:18
**veteran** 102:11
103:20
**Veteran's** 24:1
**veterans** 101:22
101:23 102:1,6,8
102:9,14,17,21
103:3,23 104:6
**vetting** 34:18
**video** 106:1
**visit** 92:18
**visiting** 127:21
**Vital** 20:1
**volunteering**
100:9,11
**voting** 22:5
**vs** 1:7 153:7

_____
**W**
**W-I-L-H-I-G-H...**
5:13
**wait** 56:22 90:13
**walk** 149:24
**want** 6:14 11:6
13:16 16:4,12

23:9 27:11
29:11 34:3
36:23 39:15
53:19 57:11
62:3,14 64:15
67:11 76:23
85:2,8,9,12,21
86:4,6 92:18
103:20 107:12
124:12 127:9,16
130:11 137:10
140:19 143:16
144:6,22
**wanted** 44:21
46:16 70:18
84:23 95:3
98:17 116:16
129:24 130:6
135:22
**wanting** 95:21
**warranted** 112:5
**wasn't** 28:8 40:17
44:18 60:10
138:17 149:21
**way** 18:21 28:23
30:21 34:6,13,20
36:24 39:21
54:19 57:1
64:10 88:16
95:18 112:17
120:10 124:17
127:10
**we'll** 16:24 28:22
**we're** 59:12
103:16
**We've** 123:6
**Wednesday** 103:9
**week** 76:13 78:16
102:13 107:5
129:23
**weeks** 91:10
**well-rounded**
126:13
**went** 18:11 20:17

21:17 22:18
34:19 37:7
46:17 49:7 79:4
84:1 99:3
127:24 128:5
**weren't** 32:17
36:12 43:12
60:11 94:23
133:18 136:21
140:12,14 141:6
141:7 149:22
**West** 1:16 2:4
7:21
**Wiedenhaupt**
1:16,22 154:2,22
**Wil-** 7:1
**Wilhight** 1:12 3:3
4:3 5:3,8,12
6:10 26:1 28:7
35:12,23 36:3
38:1 43:4 45:6
52:15 57:6 61:5
65:19 67:21
70:16 73:16
76:19 80:18
83:7 110:21
114:22 133:12
135:4 140:5
143:10,15
148:14 153:12
153:17
**Williamson** 1:5
26:6 35:20 36:4
46:7 49:19 50:6
50:19 53:17
55:2 60:19 61:2
61:20 64:20
68:16,22 69:19
74:16 75:8 77:3
83:21 85:19
87:7 90:1 115:4
116:16 133:22
135:17 144:4,15
148:20 153:5

**Williamson's** 37:2
70:19 86:24
121:4
**witness** 3:2 5:1
28:5 76:3 149:8
**wonderful** 48:12
**word** 137:7
**work** 14:2 15:3,14
17:9,24 28:24
30:11 34:10
39:20 40:13
46:16 63:2
64:10,11 65:6
69:23 89:20
93:23,23,24 94:2
100:14 102:14
105:2,22 120:12
123:6 125:5
126:7 127:4,17
128:13 129:24
130:7,10 133:9
145:24 146:22
**workday** 100:18
**worked** 14:13
15:17,22 23:19
46:9,20 47:1,18
50:1 69:1 89:15
102:10 106:3
125:2 142:7
144:4 147:7
**working** 8:20
11:14 13:13,17
15:21 16:11
18:3,8,22 40:5
44:14 62:10,16
65:14 69:15
83:2 99:5
121:19 122:4
137:3 150:5
**works** 28:24 30:20
30:20 54:18
113:13
**worry** 128:13
**wouldn't** 35:7

85:13 104:10
129:10
**write** 72:20
130:15
**write-up** 82:9
**writing** 51:12
94:21 124:5
**written** 7:1 74:1
115:15
**Wrong** 45:19
**wrote** 46:21 48:20
81:2 86:2 87:18
112:15 114:3

---

**X**

**X** 3:1 4:1

---

**Y**

**Yarbrough** 9:8
10:17 12:11
13:14 16:9,15
20:15 41:14,17
59:16 60:17
149:16
**yeah** 17:7 21:22
22:12,12,16 23:2
25:21 28:7
31:22 35:9 37:5
40:5 43:21 47:7
57:3 58:9 67:15
76:3 94:4 113:2
122:13 123:24
135:13 139:23
139:24 146:18
147:9 149:9
**year** 13:15 16:10
101:7,10 134:7
**years** 142:8

---

**Z**

---

**0**

**084-004725** 1:23

---

**1**

**1** 4:4 26:2,5 29:3,5
30:5,16,19 42:1
42:11 88:24,24
108:18
**1:07** 1:18
**10** 4:13 67:22 68:2
**11** 4:14 73:17,20
**110** 4:18
**114** 4:19
**12** 4:15 76:20,24
147:10
**1258** 38:6
**1262** 43:9
**13** 4:16 80:19,22
**133** 4:20
**1394** 57:11
**1395** 52:20
**1396** 61:10
**1398** 65:24
**13th** 74:5 76:17
**14** 4:17 83:8,13
125:11 144:19
145:9 146:5
**140** 3:5
**1400** 68:3
**1410** 73:21 77:14
**1411** 76:24
**1412** 111:3
**1427** 115:3
**143** 4:21
**148** 3:6
**14th** 77:6 115:7
**15** 4:18 85:4
110:22 111:2
145:10,22
**1539** 45:12
**15th** 64:5 78:8
**16** 4:19 114:23
115:2 136:12
147:20 148:2
**17** 4:20 133:13,16
136:12 141:4
148:16
**18** 4:21 12:21 13:4

---

13:6 32:21 36:6
140:23 142:15
143:11,15 144:2
146:6
**18-cv-4583** 1:7
153:6
**18s** 136:12
**19** 32:23

---

**2**

**2** 4:5 35:13,17
140:8 148:15
**20** 32:23 38:12
39:3 113:12
141:11 142:16
151:5
**2000** 109:7 141:24
**2013** 16:13 27:16
35:21 38:7
43:10 148:24
**2014** 9:23 69:15
82:15,22 121:20
132:13
**2015** 23:1 45:12
52:22 57:16
58:6 60:14
66:22 74:5
76:17 77:6
83:23 115:8,18
119:8 125:10,12
147:13 148:4
**2016** 132:13
**2017** 23:2
**2018** 8:4
**2019** 1:18 142:9
153:14
**2020** 109:8,9,13
141:24 142:9
153:20 154:15
**21st** 35:20
**23rd** 52:22 57:16
83:23
**24** 29:14 134:18
134:21

---

**24s** 134:23
**26** 4:4
**26th** 38:7 43:10

---

**3**

**3** 4:6 38:2,5
**300** 1:16 2:4
**312** 2:7,17
**33** 2:5
**330** 1:17
**334** 26:6
**335** 83:14
**337** 101:21
**338** 83:14
**345-8877** 2:7
**35** 4:5
**353** 35:17
**38** 4:6
**3rd** 8:4

---

**4**

**4** 4:7 43:2,3,5,8
**4:08** 57:16
**40** 79:8
**40s** 134:4
**42** 4:7
**45** 4:8 42:12
**46,476** 27:21 36:9
36:19 37:3
**47,409.44** 81:12

---

**5**

**5** 3:4 4:8 43:2 45:7
45:11 121:1,3
**50,000** 27:13
**500** 2:15
**52** 4:9
**55** 42:12
**56** 42:9,10
**56,172** 39:4 44:6
**57** 4:10

---

**6**

**6** 1:18 4:9 52:16
52:19 153:14

---

**6:30** 100:5
**60,000** 32:3,4
**603-6665** 2:17
**60602** 2:16
**60606** 2:6
**61** 4:11
**65** 4:12
**67** 4:13

---

**7**

**7** 4:10 57:7,10
85:3 145:9,15,17
**70,308** 43:23
133:20
**73** 4:14
**747** 80:22
**748** 80:22
**76** 4:15

---

**8**

**8** 4:11 61:6,9
**8:00** 130:7,7
**80** 4:16
**83** 4:17
**8th** 27:16 45:12

---

**9**

**9** 4:12 29:15,16,17
29:20 30:19
65:20,23
**90** 27:12
**90,218** 39:4 44:6